CONFORM

1  Bruce Isaacs, Esq. (SB# 100926), bisaacs@wymanisaacs.com
   Robert Wyman, Esq., (SB# 116975) bwyman@wymanisaacs.com
2  WYMAN & ISAACS LLP
3  5757 Wilshire Blvd., Suite 475
   Los Angeles, CA  90036
4  Tel:  (323) 648-4141
5  Fax: (323) 648-4133

6  Attorneys for Defendant
   INCENTIVE CAPITAL, LLC
7

FILED
CLERK U.S. DISTRICT COURT

MAR 1 8 2011

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10 CAMELOT ENTERTAINMENT, INC. a      )   Case No.:
   Delaware Corporation, CAMELOT FILM )   CV11-02323 GAF(JEMX)
11 GROUP, INC., a Delaware Corporation, )
12 CAMELOT DISTRIBUTION GROUP, INC., a )   NOTICE OF REMOVAL OF ACTION
   Nevada Corporation, ROBERT P. ATWELL, an )   UNDER 28 U.S.C. §1441(b) (DIVERSITY)
13 individual,                       )
                                     )
14                                   )   (Filed Concurrently with Notice of Certificate
              Plaintiffs,            )   of Interested Parties Pursuant to U.S.D.C.
15       vs.                         )   Local Rule 83.1-5)
                                     )
16 INCENTIVE CAPITAL, LLC, a Utah limited )
17 Liability Company and DOES 1 – 50, )
                                     )
18            Defendant.             )
19 _____  )

20

21

22

23

24

25

26

27

28

**TO THE CLERK OF THE ABOVE ENTITLED COURT**

     **PLEASE TAKE NOTICE** that Defendant Incentive Capital, LLC, a Utah limited liability company ("Incentive Capital") hereby gives notice of the removal of this action to the United States District Court for the Central District of California as follows:

     1.    On February 15, 2011, the four Plaintiffs described below commenced an action in the Superior Court of the State of California in and for the County of Los Angeles entitled <u>Camelot Entertainment, Inc., et al v. Incentive Capital, LLC</u>, Case No. BC 455114.  Attached hereto as Ex. "A" is a true and correct copy of the Summons and the Complaint, together with its exhibits.

     2.    Incentive Capital received notice of the Complaint on February 17, 2011.

     3.    This case is a civil action over which this Court has original jurisdiction under 28 U.S.C. §1332.  This action may be removed to this Court by Defendant Incentive Capital pursuant to the provisions of 28 U.S.C. §1441(b) because it is a civil action between citizens of different states, complete diversity exits and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  As paragraphs 15 through 19 of the Complaint demonstrate, according to the four Plaintiffs, the amount in controversy is $666,886.

     4.    As the caption page demonstrates, complete diversity of citizenship exists in that Plaintiffs allege as follows:  Plaintiff Camelot Entertainment, Inc. (Camelot Entertainment") is a Delaware corporation, Plaintiff Camelot Film Group, Inc. ("Camelot Film Group") is a Nevada corporation, Plaintiff Camelot Distribution Group, Inc. ("Camelot Distribution") is a Nevada corporation and Robert P. Atwell ("Atwell") is a resident of the state of California.  Incentive Capital alleges that Camelot Entertainment is domiciled in Delaware, that Camelot Film Group and Camelot Distribution are domiciled in Nevada and that Atwell is domiciled in California.

     5.    Defendant Incentive Capital is a Utah limited liability company domiciled in Utah.

6.      There is complete diversity and the amount in controversy, exclusive of interests and costs, exceeds $75,000.

Dated:  March 16, 2011                              WYMAN & ISAACS LLP

                                                   By:_____

                                                      Bruce Isaacs, Esq.
                                                      Robert A. Wyman, Esq.
                                                      Attorneys for Defendant INCENTIVE CAPITAL, LLC

**EXHIBIT  A**

| | SUM-100 |
|---|---|
| **SUMMONS**<br>**(CITACION JUDICIAL)** | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |

**NOTICE TO DEFENDANT:** Incentive Capital, LLC, an Utah
**(AVISO AL DEMANDADO):** Limited Liability Company and
DOES 1-50   Server _____
Title Process Server
Date 2-17-11  Time 3:30 PM
P/S _____

CONFORMED COPY
OF ORIGINAL FILED
Superior Court of California
County of Los Angeles

FEB 15 2011

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
RUBENA LOPEZ

**YOU ARE BEING SUED BY PLAINTIFF:** Camelot Entertainment
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):** Inc a Delaware
Corporation, Camelot Film Group, Inc., a Delaware
Corporation; Camelot Distribution Group, Inc., a
Nevada Corporation; Robert P. Atwell, an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
(El nombre y dirección de la corte es):

CASE NUMBER:
(Número del Caso) BC455114

Los Angeles Superior Court
111 North Hill Street

Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Jonathan M. Levitan                                      310-979-9240
12400 Wilshire Boulevard, Suite 1300
Los Angeles, CA 90025

DATE:                              Clerk, by _____, Deputy
(Fecha)                            (Secretario)       RUBENA LOPEZ   (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other (specify):

4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

1  LAW OFFICES OF JONATHAN MARK LEVITAN
   Jonathan Mark Levitan, Esq.
2  State Bar No. 106798
   12400 Wilshire Blvd., Ste. 1300
3  Los Angeles, California 90025
   (310) 979-9240
4
   Attorney for Plaintiffs Camelot Entertainment Inc Camelot Film Group, Inc., Camelot Distribution
5  Group, Inc. and  Robert P. Atwell.

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF LOS ANGELES

10                         GENERAL CIVIL

11

12                                        CASE NO.  BC455114
   Camelot Entertainment Inc a Delaware
13 Corporation, Camelot Film Group, Inc., a    COMPLAINT FOR:
   Delaware Corporation; Camelot Distribution
14 Group, Inc., a Nevada Corporation; Robert P.  1. Breach of Contract
   Atwell, an individual.                      2. Declaratory Relief
15                                              3. Unlawful Business Practices
          Plaintiffs,                          4. Constructive Fraud
16                                              5.  Interference with Prospective
                                               Economic Advantage
17 vs.                                          6. Unjust Enrichment

18 Incentive Capital, LLC, an Utah Limited
   Liability Company and DOES 1-50
19          Defendants.

20

21

22

23

24

25

26

27                        1
28 _____Complaint_____

1 | Plaintiffs Camelot Entertainment Group Inc., Camelot Film Group, Inc., Camelot Distribution
2 | Group, Inc. and Robert P. Atwell, ("plaintiffs").
3 |
4 |
5 | **FIRST CAUSE OF ACTION**
6 | **(Breach of Contract)**
7 | **(Against all defendants)**
8 |          1.       Plaintiff Camelot Entertainment Group, Inc is a corporation organized and existing
9 | under the laws of the State of Delaware and is engaged in business in the State of California. It is
10 | a publicly traded company.[Camelot Entertainment Group will sometimes be referred to as CEG].
11 |          2.       Plaintiff Camelot Film Group, Inc is a corporation organized and existing under the
12 | laws of the State of Nevada and is engaged in business in the State of California. Camelot Film
13 | Group Inc is a wholly owned subsidiary of Camelot Entertainment Group, Inc. [Camelot Film Group
14 | will sometimes be referred to as CFG]
15 |          3.       Plaintiff Camelot Distribution Group, Inc is a corporation organized and existing under
16 | the laws of the State of Nevada and is engaged in business in the State of California. Camelot
17 | Distribution Group Inc is a wholly owned subsidiary of Camelot Entertainment Group, Inc.
18 | [Camelot Distribution Group will sometimes be referred to as CDG]
19 |          4.       Plaintiff Robert P. Atwell resides in the State of California
20 |          5.       Defendant Incentive Capital, LLC, is a Utah Limited Liability Company existing
21 | under the laws of the State of Utah and, on information and belief, engaged in business in the State
22 | of California.
23 |
24 |
25 |
26 |
27 |                                                 2
28 |                                          Complaint

7.   The true names and capacities, whether individual, corporate, associate or otherwise, of defendants named herein as Does 1 through 50, inclusive, are unknown to plaintiffs who therefore sues said defendants by such fictitious names and will seek leave of court to amend this complaint to insert their true names and capacities when such has been ascertained.

8.   Plaintiffs are informed and believe and thereon alleges that each of the fictitiously named defendants is responsible, negligently, or in some other actionable manner or legal theory, for the events and happenings alleged herein which proximately caused injury to plaintiffs as alleged herein.

9.   At all times relevant herein, the defendants, and each of them, were the agents, representatives, servants, employees, assistants and the like of their co-defendants, and were, as such, acting within the course and scope of such agency, representation and/or employment and with the permission, authority, knowledge and consent of the other defendants; that each and every defendant was negligent in the selection, hiring, monitoring, supervising and/or continued employment of each and every other defendant as an agent, representative, servant, employee and/or assistant.

10.  Plaintiffs are informed and believe and thereon allege that each of the defendants named herein or designated as a Doe was negligently, wantonly, recklessly, maliciously and otherwise tortuously responsible in some manner for the events and happenings herein referred to and negligently, wantonly, recklessly, maliciously and otherwise tortuously proximately caused the injuries and damages to plaintiffs as alleged herein.

11.  Plaintiff produce, distribute, license, and sell motion picture and television series/episodes.  Its main operations are in Universal City, California an area where many entertainment companies are located.  Through variety of means plaintiffs have accumulated a large film and television library  of motion picture titles and the rights thereat.  Plaintiffs either own some titles outright or is a licensee and is holder of the rights to other titles.  Plaintiffs' business includes, but is not limited to, selling, licencing and distributing these titles to third parties.

3
Complaint

12. On information and belief, defendant Incentive Capital is what is known as a hard money lender. It provides loans at high interest rates and secures those loan with a promise to repay, guarantees and collateral.

13. On or about April 27, 2011 Camelot Film Group, Inc executed a promissory note pursuant to which defendant promised to pay Camelot Film Group the sum of $650,000 ("The Loan"). The Loan was to be repaid under the terms and conditions of the Note (hereinafter "Note"), a copy of which is attached as Exhibit 1.

The obligations of Camelot Film Group, Inc under the Note were secured, by the following:

(i). A Security Agreement executed by Camelot Film Group Inc pursuant to which Camelot Film Group purported to grant a Security Interest to Incentive in certain motion pictures (Exhibit 2) hereto.

(ii) A Security and Participation Agreement (Exhibit 3) executed by Camelot Film Group and Incentive Capital pursuant to which Camelot Film Group granted a security interest in assets to Incentive Capital which were then owned or to be acquired by Camelot Film Group. This includes the so called Liberation Assets which is a large library of motion pictures and television series. The vast majority of the Material Elements of the Liberation Assets (master copies, film and marketing materials) are located in California.

(iii). A Commercial Guaranty Agreement executed by Camelot Distribution Group pursuant to which Camelot Distribution Group Inc guaranteed the obligations of Camelot Film Group under the Note (Exhibit 4).

(iv). A Commercial Guaranty Agreement executed by Camelot Entertainment Group, Inc Film Group Inc pursuant to which Camelot Entertainment Group, Inc guaranteed the obligations of Camelot Film Group under the Note (Exhibit 5).

(v). A Commercial Guaranty Agreement executed by Robert P. Atwell pursuant to which Robert Atwell guaranteed the obligations of Camelot Film Group under the Note (Exhibit 6) hereto

4

Complaint

14.   The Liberation Assets

At the same time as the loan transaction referred to herein, Camelot Film Group Inc. purchased the Liberation Assets. The initial purchase price was $3.9 million with a ceiling of $4.43 million dependent on the value achieved through the sale of certain titles. The purchase of the Liberation Assets were effected through an agreement between a third party called CMBG Advisors, acting as the assignee for the benefit of creditors of Liberation Entertainment Inc. (The Agreement between CMBG and Camelot Film Group is attached hereto as Exhibit 7)

Since April 28, 2010 the plaintiffs have all right, title and interest to the Liberation Assets. That interest includes but not limited to plaintiffs' rights as licensees as those rights relate to certain specific titles.

15.   The Escrow Agreement

In addition to requiring certain loan documents be executed as a condition to its funding of the loan, Incentive required that Camelot Film Group execute an escrow agreement a copy of which is attached as Exhibit 8.

The Escrow Agreement required the delivery, into Escrow, of a certificate authorizing the issuance of issuance of Six Hundred Fifty Thousand dollars ($650,000) worth of Capital Entertainment Group Class F Convertible Preferred Shares (the "Pledged Shares")

In order to obtain the loan and in reliance on the representations of Incentive Capital Entertainment delivered the Pledged Shares into Escrow.

16.   Under the Escrow Agreement plaintiffs have the right to unconditionally tender additional shares as payment in full of the Note

Section 1 (c) of the Escrow agreement provides, in part: "If the total consideration received by the Lender from loan payments, distribution revenues generated by Camelot Distribution Group, Inc and/or CFG and all other sources as more fully discussed and agreed to in the Loan Documents, is less than Six Hundred and Fifty Thousand ($650,000.00) plus applicable interest, in the aggregate, by the time all of said Common Stock has been delivered and is eligible for sale, then CEG shall

5

Complaint

1   issue additional shares of CEG Common Stock to the Lender until the Lender has received Common

2   Stock that has a fair market value in an amount not less than Six Hundred Fifty Thousand Dollars

3   ($650,000.00) plus applicable interest."

4   17.     Plaintiffs have performed all the obligations to be performed by them in connection with the

5   Agreements referred to herein other than those obligations excused or waived by the defendants.

6

7   18.     <u>Incentive claims a default under the Note and proceeds against the Collateral</u>

8           Under the terms of the Note the principal became due and payable on January 31, 2011. As

9   of January 31, 2011 the plaintiffs had paid a total of $104,750 towards the note., This represents

10  payment of principal and interest. Section 1 page 3, of the Note defines Event of Default to include:

11  "If (a) the interest hereunder or other fee due under the Loan Documents shall not be paid in full

12  punctually when due and payable, or within five (5) business days thereafter, or (b) the principal

13  hereof shall not be paid in full punctually when due and payable".

14  19.     Prior to any Notice of Default being given by Incentive, or indeed their being a actual Event

15  of default, on February 2, 2011 plaintiffs invoked Section 1 (c) of the Escrow Agreement and

16  tendered shares with the aggregate value of all shares tendered equal to $666, 888 to Incentive as

17  provided for in the Escrow Agreement. The tender was unconditional and was in the form of a

18  letter to Incentive at its address in Utah. The letter in which plaintiffs invoked their rights under the

19  Escrow Agreement was written and sent to Incentive Capital by Michael O' Brien, plaintiffs' Utah

20  lawyer, is attached as Exhibit 9.

21          The letter states in relevant part:

22  "Reference is made to that certain Escrow Agreement...[P] ursuant to the Loan Documents and the

23  Agreement, and as of February 1, 2011, CEG, on behalf of CFG has issued 1,912,086 shares of CEG

24  Class F Convertible Preferred Stock ("Class F Shares") to Lender which shares, when combined

25  with the existing Class F shares issued to Lender, are convertible into 2,012,086,097 shares of CEG

26  Common Stock at a conversion price of $.0003 for an aggregate value of of $666,886 in full

27                                          6

28                                      Complaint

satisfaction of the obligation of CEG and CFG under the Loan Documents"

21.    Exhibit 9 was delivered by certified mail to Incentive and complies with the requirements of Notice as outlined in the Note. Incentive has never denied receiving the February 2, 2011 Notice. Rather, Incentive has chosen to ignore its obligations under the Escrow Agreement and proceeded as though the Escrow Agreement and plaintiffs' rights thereunder do not exist. On February 9, 2011 the defendant took steps to sell the collateral by way of public sale (Exhibit 10 are the Notices of Disposition of Collateral by Public Sale issued by Nathan Dorinis, a lawyer with the law firm which, on information and belief, represents Incentive Capital). On information and belief defendants have caused the publication of said Notices.

Plaintiffs have performed all the obligations to be performed by them other than those obligations excused or waived by the defendants

22.    The defendants have breached the Note, Escrow Agreement and related documents in a manner which includes but is not limited to:

a.    Noticing the auction at a time when plaintiffs' obligation has been paid in full.

b.    Refusing the unconditional tender of the shares.

c.    Attempting to sell the Liberation Assets and convert those Assets.

23.    As a proximate result of defendants' breaches, plaintiffs have been damaged in an amount according to proof.

## SECOND CAUSE OF ACTION

### (Declaratory Relief)

### (Against all defendants)

24.     Plaintiffs incorporate paragraphs 1-23 of this Complaint as though the same are stated herein in full.

25.     A dispute has arisen between plaintiffs and defendants as to the following:

a.   Whether the Note has been paid off in full.

b.   Whether Incentive has any right to the Collateral, including the Liberation Assets.

c.   Whether Incentive is required to accept the unconditional tender as contained in Michael O'Brien's letter of February 2, 2011.

d.   Whether the obligations of Camelot Entertainment, Inc., Camelot Film Group, Inc., Camelot Distribution Group, Inc. and Robert P. Atwell under the Security Agreements have been extinguished.

## THIRD CAUSE OF ACTION

### (Unlawful Business Practices)

### (Against all defendants)

26.   Plaintiffs incorporates herein paragraphs 1-25 of this complaint.

27.   Defendants' Unfair Business Practices included utilizing and converting the Liberation Assets

28.   The actions and representations of the defendants as described herein were Unlawful Business Practices within the meaning of Business and Professions Code Section 17200 et seq.

29.   As a result of said defendants' actions, plaintiffs has suffered damage in an amount not as yet ascertained but within the jurisdiction of this court.   Plaintiffs will seek leave to amend this complaint when said amount is ascertained.     Through this action plaintiffs also seek the disgorgement of all monies received by the defendant where said monies arise out of or are related

8

Complaint

to the Liberation Assets

## FOURTH CAUSE OF ACTION

### (Constructive Fraud)

### (Against all defendants)

30.   Plaintiffs incorporate herein paragraphs 1-34 of this complaint.

31.   The actions of the defendants constitute constructive fraud.

32.   Effectively defendant have refused payment of the obligations allegedly owned to them by refusing to accept payment in full.

33. On information and belief defendants have so acted for an unlawful purpose, namely to obtain control of the Liberation Assets and any other collateral which defendant seeks to acquire.

As a direct and proximate result of the foregoing, plaintiffs have suffered damages which are not yet ascertained but within the jurisdiction of this court.  Plaintiffs will seek leave of this court to amend this complaint when said amount has been ascertained.

34.   In doing the acts herein alleged, defendants acted wilfully, maliciously and with the intent to injure and oppress plaintiff and are guilty of a total disregard of plaintiffs' rights and by reason thereof, plaintiffs are entitled to exemplary and punitive damages according to proof.

## FIFTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage;

### (Against all Defendants)

35.   Plaintiffs incorporate Paragraphs 1 through 34 of this complaint as though same were set forth in full herein.

36.   Defendants, in doing the acts herein alleged, knowingly and intentionally interfered with plaintiffs' business and prospective economic advantage.

Complaint

1   37      As a direct and proximate result of the foregoing, plaintiffs have suffered damages which are

2   not yet ascertained but within the jurisdiction of this court.  Plaintiffs will seek leave of this court

3   to amend this complaint when said amount has been ascertained.

4   38.      In doing the acts herein alleged, defendants acted wilfully, maliciously and with the intent

5   to injure and oppress plaintiffs and are guilty of a total disregard of plaintiffs' rights and by reason

6   thereof, plaintiffs are entitled to exemplary and punitive damages according to proof.

7

8                              SIXTH CAUSE OF ACTION

9                                  (Unjust Enrichment)

10                                (Against all defendants)

11  39.      Plaintiffs incorporate herein paragraphs 1-39 of this complaint.

12  40.      Any benefit which defendant obtain as a result of their usurpation of the Liberation Assets

13  would be a benefit to which they are not entitled, i.e., monies  paid to defendant by third parties

14  in connection with those assets.  If defendant would have fulfilled their obligations under the

15  Escrow Agreement then plaintiffs would have received those monies which were paid by third

16  parties in connection with the Liberation Assets.

17  41.      Consequently, defendants should be required to disgorge all unjustly retained benefits, the

18  full value of which are presently unknown, but are believed to exceed $1,000,000, according to

19  proof at trial.

20

21  WHEREFORE PLAINTIFFS PRAYS:

22  ON THE FIRST CAUSE OF ACTION

23  1. For compensatory and general damages according to proof.

24  2. For consequential damages according to proof.

25

26

27                                    10

28                                 Complaint

1   ON THE SECOND CAUSE OF ACTION

2   For an order of court that

3   a.   The Note has been paid off in full.

4   b.   Incentive has no right to the Collateral, including the Liberation Assets, or any rights therein.

5   c.   Incentive is required to accept the unconditional tender as contained in Michael O' Brien's letter

6   of February 2, 2011.

7   c.   The obligations of Camelot Entertainment, Inc.,  Camelot Film Group, Inc.,  Camelot

8   Distribution Group, Inc. and  Robert P. Atwell under the Security Agreements have been

9   extinguished.

10

11   ON THE THIRD CAUSE OF ACTION

12   1. For disgorgement of all monies received by the defendants as a result of the commercial

13   exploitation of the Liberation Assets.

14

15   ON THE FOURTH CAUSE OF ACTION

16   1. For compensatory and general damages according to proof.

17   2. For consequential damages according to proof.

18   3. For punitive damages according to proof

19   ON THE FIFTH CAUSE OF ACTION

20   1. For compensatory and general damages according to proof.

21   2. For consequential damages according to proof.

22   3. For punitive damages according to proof

23   ON THE SIXTH CAUSE OF ACTION

24   1. For compensatory and general damages according to proof.

25   2. For consequential damages according to proof.

26

27                                  11

28                               Complaint

1  ON ALL CAUSES OF ACTION

2  1.    For the issuance of a temporary restraining order, preliminary injunction and permanent

3  injunction, all requiring defendants, and their agents, partners, servants, and employees, and all

4  persons acting under or in concert with or through them from:

5       a. Contacting any buyers or prospective licensees  of any film title or television series which

6  form part of the Liberation Assets.

7       b. Selling, pledging, acquiring, encumbering, hypothecating, licensing or distributing any

8  film title or television series which forms part of the Liberation Assets.

9       c. Obtaining any monetary benefit from any film title or television series which forms part

10  of the Liberation Assets.

11       d. Commercially exploiting the Liberation Assets

12       e. From auctioning, selling, or any way disposing of the Liberation Assets.

13  2. For costs of suit.

14  3. For attorney's fees.

15  4. For such other relief as may be just and proper.

16  DATED: February 15, 2011  LAW OFFICES OF JONATHAN MARK LEVITAN

17                           BY:_____

18                              JONATHAN MARK LEVITAN, ESQ.
                                Attorneys for Plaintiff  Camelot Entertainment, Inc.,
19  Camelot Film Group, Inc.,  Camelot Distribution Group, Inc. and Robert P. Atwell.

20

21  -

22

23

24

25

26

27                              12

28                           Complaint

Legal Tabs Co. 1-800-322-3022

Recycled ♺ Stock #EX-5-B

**EXHIBIT 1**

Exhibit 1

**Promissory Note**
**Term Loan**

$650,000.00                                                                                              April 27, 2010

FOR VALUE RECEIVED, CAMELOT FILM GROUP, INC., a Nevada corporation qualified to do business in California with a place of business at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608 ("*Borrower*"), shall pay to the order of INCENTIVE CAPITAL, LLC, a Utah limited liability company with a place of business at 2755 E. Cottonwood Parkway, Suite 100, Salt Lake City, UT 84121, and its successors and assigns ("*Lender*"), the principal amount of Six Hundred Fifty Thousand and No/100 Dollars ($650,000.00) plus interest from this date until paid. The principal amount together with accrued interest thereon shall be due and payable on January 31, 2011 ("*Maturity*"). Lender has advanced the initial principal amount of $500,000 to Borrower. Within fourteen (14) days from the date that Borrower makes at least one "Distribution Payment" (defined below and in the Security Agreement, incorporated herein by this reference, to Lender as set forth herein and in the Security Agreement, Lender shall advance $60,000 to Borrower ("*Additional Principal Amount*"); the remaining $90,000 (the $150,000 constituting the "*Operational Advance*") shall be disbursed to Borrower as follows: $45,000 to Borrower on or before May 27, 2010, which shall be conditioned upon (a) Borrower's and Guarantors' performance of all other obligations under this Note and the related loan documents executed concurrently herewith (the "*Loan Documents*"); and (b) all representations and warranties by Borrower and the Guarantors in the Loan Documents being true and accurate; and $45,000 to Borrower on or before June 27, 2010, which shall be conditioned upon (c) Lender's reasonable satisfaction with Borrower's efforts to exploit the Liberation Assets being purchased with the initial principal advance hereunder upon confirming that all of the representations and warranties of Borrower are accurate and upon receiving at least one other (a second) distribution payment on the 10% of gross (defined as the "Distribution Payments") set forth in the Security Agreement (incorporated herein by this reference).    Any and all Distribution Payments to Lender must be accompanied by verifiable documentation supporting the calculation of the distribution amount.  In other words, the Distribution Payment must actually be derived from 10% of the gross revenue generated from the exploitation of the Library as further set forth in this and the other contemporaneous documents executed herewith.

Interest. Borrower shall pay interest on all principal amounts advanced hereunder at the rate of one and one-half percent (1.50%) per month.  All computations of interest shall be made on the basis of a 360-day year and paid for the actual number of days elapsed.  Whether or not this Note is prepaid, Borrower shall pay Lender no less than six (6) months of interest — or nine percent (9%) — on the principal amount advanced hereunder.

Payments.  Commencing May 27, 2010, and continuing on the 27th day of each consecutive month until Maturity, Borrower shall pay interest then accrued and unpaid on the outstanding balance of this Note.  At Maturity or the earlier acceleration of this Note, Borrower shall pay the entire principal amount, plus all accrued and unpaid interest and fees due as set forth in the Loan Documents hereinafter defined, Borrower shall make all payments on this Note to Lender at its address stated above, or at such other place as the Lender or any other holder of this Note may designate.  Borrower may make prepayments of principal at any time.  For any payment due under this Note not made within ten (10) Business Days after its due date, Borrower shall pay a late fee equal to the greater of five percent (5%) of the amount of the payment not made or $50.00.  Lender shall apply all payments received on this Note to any unpaid late charges and prepayment premiums (if any), accrued and unpaid interest then due and owing, and the reduction of principal of this Note, in such order and in such amounts as Lender may

determine from time to time. The sum or sums shown on Lender's records shall be rebuttably presumptive of the correct unpaid balance of principal and interest on this Note. If any payment comes due on a day that is not a Business Day, Borrower may make the payment on the first Business Day following the payment date and pay the additional interest accrued to the date of payment. "Business Day" means a day of the year on which banks are not required or authorized by law to close in Salt Lake City, Utah.

Fees. As additional consideration for the extension of credit by Lender evidenced by this Note, Borrower shall pay Lender (a) a closing fee, and (b) an origination fee, each in the amount of Sixteen Thousand Two Hundred Fifty Dollars ($16,250.00), for a total of Thirty Two Thousand Five Hundred Dollars ($32,500.00), on or before the date of Maturity. The said closing fee and origination fee shall be included in the principal amount of this Note and shall be deemed a principal advance under the terms of this Note, and said fees shall bear interest under this Note as set forth herein above. As further consideration, $20,000 in legal fees shall be withheld by Lender as follows: $10,000 from the Additional Principal Amount; $5,000 from the May 27, 2010 Operational Advance; and $5,000 from the June 27, 2010 Operational Advance.

Default Rate. At Lender's election, without notice or demand, Borrower shall pay interest at the rate of three and one-half percent (3.50%) per month (*"Default Rate"*) on the outstanding balance of this Note during the period that any Event of Default exists (as defined below), on past due interest on this Note, on all other amounts payable to Lender by Borrower in connection with this Note, and on any unsatisfied judgment on this Note. In no event, however, shall the interest rate on this Note exceed the highest rate permitted by law.

Warranties. The Borrower and each Guarantor hereunder represents and warrants to the Lender (which representations and warranties will survive the delivery of the Note) that:

1. Borrower and Guarantors are each corporations duly organized, validly existing and in good standing under the laws of the State of incorporation of each as set forth herein and has all requisite power and authority to own its property and to carry on its business as now being conducted, to execute and deliver this Note and all other instruments, agreements, and documents entered into from time to time, evidencing or securing this loan or any obligation of payment thereof or performance of Borrower's or Guarantors' obligations in connection with the transactions contemplated hereunder, each as amended (collectively referred to as *"Loan Documents"*), and to carry out the provisions and conditions of the Note and Loan Documents. Borrower is duly qualified to do business and is in good standing in every jurisdiction where the failure to so qualify would have a material adverse effect.

2. Borrower and Guarantors have full power, authority and legal right to incur the obligations provided for in, and to execute and deliver and to perform and observe the terms and provisions of this Note and the Loan Documents; each of them has been duly executed and delivered by Borrower and Guarantors and have been authorized by all required action; Borrower and Guarantors have obtained all requisite consents to the transactions contemplated thereby; and this Note and the Loan Documents constitute the legal, valid and binding obligations of Borrower and Guarantors enforceable against Borrower and Guarantors in accordance with their respective terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency or other similar laws affecting creditors' rights generally.

3. Neither the execution and delivery of this Note and the Loan Documents, nor the compliance by Borrower and Guarantors with the terms and conditions of this Note and the Loan Documents, nor the

2

consummation of the transactions contemplated thereby, will conflict with or result in a breach of the Articles of Incorporation or Code of Regulations, as applicable, or other governing documents of Borrower or Guarantors, or any of the terms, conditions or provisions of any agreement or instrument or any charter or other corporate restriction or law, regulation, rule or order of any governmental body or agency to which Borrower or Guarantors are now a party or is subject, or imposition of a lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Borrower or Guarantors pursuant to the terms of any such agreement or instrument.

4.   No consent, approval, authorization or order of any court or governmental agency or body is required for the consummation by Borrower or Guarantors of the transactions contemplated by this Note and the Loan Documents.

5.   Neither the Borrower nor either of the Guarantors is (i) in material default under any indenture or contract or agreement to which it is a party or by which it is bound; (ii) in violation of its articles of incorporation or Code of Regulations, as applicable, or any other governing document; (iii) in default with respect to any order, writ, injunction or decree of any court; or (iv) in default under any order or license of any federal or state governmental department. There exists no condition, event or act which constitutes, or after notice or lapse of time or both would constitute, an Event of Default.

6.   The Borrower has furnished to the Lender financial assumptions which, in the opinion of Borrower, fairly and accurately reflect the financial assumptions for the operations of Borrower, and there has been no material adverse change in the Borrower's financial prospects since that date which would require revision of the same.

7.   The Borrower represents and warrants that the international sales projections previously provided by Borrower in connection with the parties' initial term sheet shall not vary by more than 25% less than that represented therein on the estimated low value and short term sales potential 10% columns. A copy of the international sales projections is attached hereto as Exhibit A.

Collateral/Guaranties.   Borrower has secured this Note with one or more security agreements of even date herewith.  This Note is guaranteed by each of (a) Camelot Distribution Group, Inc., a Nevada corporation qualified to do business in California with places of business at 318 North Carson Street, Suite 208, Carson City, Nevada 89701 and at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608; (b) Camelot Entertainment Group, Inc., a Delaware corporation qualified to do business in California with a place of business at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608; and (c) Robert P. Atwell, with an address of 28852 Rockport Drive, Laguna Niguel, CA 92677 (individually and collectively, "*Guarantors*") under guaranty agreements of even date herewith.  As used in this Note, the term "Obligor" means (i) a person whose credit or any of whose property is pledged to payment of this Note and includes, without limitation, any Guarantor; and (ii) any signatory to a Loan Document.

Events of Default.   The occurrence of any one or more of the following events shall constitute an Event of Default under this Note:

1.   If (a) the interest hereunder or any commitment or other fee due under the Loan Documents shall not be paid in full punctually when due and payable or within five (5) Business Days thereafter, or (b) the principal hereof shall not be paid in full punctually when due and payable.

3

2. If Borrower or any Obligor fails to perform or observe any covenant or agreement (other than as referred to in (1) above) contained in this Note or in any other of the Loan Documents, and such failure remains unremedied for thirty (30) days after the Lender gives notice thereof to Borrower or such Obligor.

3. If any representation, warranty or statement made in or pursuant to this Note or any Loan Document or any other material information furnished by Borrower or any Obligor to Lender or any other holder of this Note, shall be materially false or erroneous.

4. If (a) any material provision, in the sole but reasonable opinion of Lender, of this Note or any Loan Document shall at any time for any reason cease to be valid, binding and enforceable against Borrower or any Obligor; (b) the validity, binding effect or enforceability of this Note or any Loan Document against Borrower or any Obligor shall be contested by Borrower or any Obligor without legal justification; (c) Borrower or any Obligor shall deny that it has any or further liability or obligation thereunder without legal justification; or (d) any Loan Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to Lender the benefits purported to be created thereby without legal justification.

5. If any event of default or default shall occur under any other Loan Document, or if under any Loan Document any payment is required to be made by Borrower or any Obligor on demand of Lender, such demand is made but such payment is not made.

6. If Borrower shall default in the payment of principal or interest due and owing upon any other material obligation for borrowed money, beyond any period of grace provided with respect thereto or in the performance or observance of any other agreement, term or condition contained in any agreement under which such obligation is created, if the effect of such default is to allow the acceleration of the maturity of such indebtedness or to permit the holder thereof to cause such indebtedness to become due prior to its stated maturity and such default is not cured by Borrower.

7. A final judgment or order for the payment of a material amount of money shall be rendered against Borrower or any Obligor by a court of competent jurisdiction, that remains unpaid or unstayed and undischarged for a period (during which execution shall not be effectively stayed) of thirty (30) days after the date on which the right to appeal has expired.

8. There shall have occurred any condition or event that Lender reasonably determines has or is reasonably likely to have a material adverse effect on (a) the business, operations, property or condition (financial or otherwise) or prospects of Borrower; (b) the business, operations, property or condition (financial or otherwise) of Borrower and its subsidiaries, if any, taken as a whole; or (c) the validity or enforceability of this Note or any of the other Loan Documents or the rights and remedies of Lender hereunder or thereunder.

9. If Borrower or any Obligor shall (a) discontinue business, (b) generally not pay its debts as such debts become due, (c) make a general assignment for the benefit of creditors, (d) apply for or consent to the appointment of a receiver, a custodian, a trustee, an interim trustee or liquidator of all or a substantial part of its assets, (e) be adjudicated a debtor or have entered against it an order for relief under Title 11 of the United States Code, as the same may be amended from time to time, (f) file a voluntary petition in bankruptcy or file a petition or an answer seeking reorganization or an arrangement with creditors or seeking to take advantage of any other law (whether federal or state) relating to relief of debtors, or admit (by answer, by default or otherwise) the material allegations of a petition filed against it

4

in any bankruptcy, reorganization, insolvency or other proceeding (whether federal or state) relating to relief of debtors, (g) suffer or permit to continue unstayed and in effect for thirty (30) consecutive days any judgment, decree or order entered by a court of competent jurisdiction, that approves a petition seeking its reorganization or appoints a receiver, custodian, trustee, interim trustee or liquidator of all or a substantial part of its assets, or (h) take any action in order thereby to effect any of the foregoing, or omit to take, any action in order to prevent any of the foregoing.

**Remedies upon Default.** If any Event of Default shall occur, Lender may, at its election, and without demand or notice of any kind, do any one or more of the following:

1. Declare all of the Borrower's obligations to Lender under this Note immediately due and payable, whereupon all unpaid principal, interest and fees in respect of this Note and the Loan Documents, together with all of Lender's costs, expenses and attorneys' fees related thereto, under the terms of this Note or otherwise, shall be immediately due and payable;

2. Exercise any and all rights and remedies available to Lender under any applicable law;

3. Exercise any and all rights and remedies granted to Lender under the terms of this Note and any of the other Loan Documents; and/or

4. Set off the unpaid balance hereunder against any debt owing to Borrower by the Lender.

**Governing Law.** This Note shall be construed and enforced under the laws of the State of Utah and any applicable federal laws. Time is of the essence in the payment of this Note. All grace periods in this Note and all other Loan Documents shall run concurrently.

**Notices.** All notices, requests, demands and other communications provided for hereunder shall be in writing and, if to Borrower, mailed or delivered to it, addressed to it at the address specified on the signature pages of this Note, or if to Lender, mailed or delivered to it, addressed to the address of Lender specified on the front page of this Note. All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered or forty-eight (48) hours after being deposited in the mails with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation or receipt, except that notices from Borrower to Lender pursuant to any of the provisions hereof shall not be effective until received by Lender.

**Binding Effect.** This Note shall be binding upon the Borrower and upon Borrower's respective heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Lender and its successors, endorsees and assigns.

**Amendments.** Any amendment hereof must be in writing and signed by the party against whom enforcement is sought. Unenforceability of any provision hereof shall not affect the enforceability of any other provision. A photographic or other reproduction of this Note may be made by the Lender, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

**Indemnification.** In consideration of this loan, Borrower hereby releases and discharges Lender and its shareholders, directors, officers, employees, agents and attorneys (collectively, *"Related Parties"*) from any and all claims, demands, liability and causes of action whatsoever, now known or unknown,

5

arising out of or any way related to any of the Borrower's obligations hereunder or under the Loan Documents provided the Lender complies with its obligations to Borrower under this Note and the Loan Documents. Borrower shall indemnify, defend and hold harmless the Lender and the Related Parties against any claim brought or threatened against the Lender by the Borrower, any Guarantor or endorser hereof, or any other person on account of Lender's relationship with the Borrower or any Guarantor or endorser hereof provided the Lender complies with its obligations to Borrower under this Note and the Loan Documents.

No Waiver. None of the following will be a course of dealing, estoppel, waiver, or implied amendment on which any party to this Note or any Loan Document may rely: (1) Lender's acceptance of one or more late or partial payments; (2) Lender's forbearance from exercising any right or remedy under this Note, or any document providing security for or guaranty of repayment of this Note; or (3) Lender's forbearance from exercising any right or remedy under this Note or any Loan Document on any one or more occasions. Lender's exercise of any rights or remedies or a part of a right or remedy on one or more occasions shall not preclude Lender from exercising the right or remedy at any other time. Lender's rights and remedies under this Note, the Loan Documents, and the law and in equity are cumulative to, but independent of, each other.

Costs, Expenses, Fees and Taxes. Borrower agrees to pay on demand all costs and expenses of Lender, including but not limited to (a) administration, travel and out-of-pocket expenses, including but not limited to reasonable attorneys' fees and expenses, of Lender in connection with the preparation, negotiation and closing of the Loan Documents and the administration of the Loan Documents, the collection and disbursement of all funds hereunder and the other instruments and documents to be delivered hereunder, (b) extraordinary expenses of Lender in connection with the administration of this Note and the other Loan Documents, (c) the reasonable fees and out-of-pocket expenses of special counsel for Lender, if any, with respect to the foregoing, and of local counsel, if any, who may be retained by said special counsel with respect thereto, (d) all fees due in any of the Loan Documents, and (e) all costs and expenses, including reasonable attorneys' fees, in connection with the determination of Lender's lien priority in any collateral securing this Note, or the restructuring or enforcement of this Note or any Loan Document. In addition, Borrower shall pay any and all stamp and other taxes and fees payable or determined to be payable in connection with the execution and delivery of any Loan Document, and the other instruments and documents to be delivered hereunder, and agrees to hold Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes or fees. Notwithstanding anything to the contrary contained hereinabove, Lender expressly agrees that Borrower shall pay Lender a cumulative total of no more than $10,000 for all fees and expenses referenced in sections (a), (b) and (c) above upon Lender's providing Borrower with bills or invoices for all such fees and expenses.

Borrower Waivers. Borrower waives presentment, demand, notice, protest, and all other demands and notices in connection with delivery, acceptance, performance, default, or enforcement of this Note.

Jurisdiction. Borrower hereby irrevocably submits to the non-exclusive jurisdiction of any Utah state or federal court sitting in Salt Lake City, Utah, over any action or proceeding arising out of or relating to this Note, and Borrower hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Utah state or federal court. Borrower hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

5

Jury Trial Waiver.  BORROWER WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN LENDER AND BORROWER ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

Borrower:

Camelot Film Group, Inc.

By: _____

Robert P. Atwell, President

Guarantors:

Camelot Distribution Group, Inc.

By: _____

Robert P. Atwell, President

Camelot Entertainment Group, Inc.

By: _____

Robert P. Atwell, President

_____

Robert P. Atwell, Individually

**Exhibit A**
Avails by Key Territory Summary

| Territory | # Avail PTV | Low License fee per title | Estimated Total Value (low) | Short Term Sales Potential (10%) | Med License fee per title | Estimated Total Value (med) | Short Term Sales Potential (10%) |
|---|---|---|---|---|---|---|---|
| CIS (fmr USSR) | 261 | $2,500 | $652,500 | $65,250 | $5,000 | $1,305,000 | $130,500 |
| Benelux | 290 | $2,000 | $580,000 | $58,000 | $4,000 | $1,160,000 | $116,000 |
| Bulgaria | 289 | $1,000 | $289,000 | $28,900 | $2,000 | $578,000 | $57,800 |
| Czech | 366 | $2,000 | $732,000 | $73,200 | $3,000 | $1,098,000 | $109,800 |
| Fmr Yugo | 291 | $1,000 | $291,000 | $29,100 | $1,500 | $436,500 | $43,650 |
| France | 287 | $5,000 | $1,435,000 | $143,500 | $8,000 | $2,296,000 | $229,600 |
| Germany | 310 | $5,000 | $1,550,000 | $155,000 | $10,000 | $3,100,000 | $310,000 |
| Greece | 287 | $2,000 | $574,000 | $57,400 | $4,000 | $1,148,000 | $114,800 |
| Hungary | 293 | $2,000 | $586,000 | $58,600 | $4,000 | $1,172,000 | $117,200 |
| Italy | 273 | $5,000 | $1,365,000 | $136,500 | $8,000 | $2,184,000 | $218,400 |
| Poland | 287 | $3,000 | $861,000 | $86,100 | $5,000 | $1,435,000 | $143,500 |
| Portugal | 289 | $1,500 | $433,500 | $43,350 | $3,000 | $867,000 | $86,700 |
| Romania | 332 | $1,500 | $498,000 | $49,800 | $3,000 | $996,000 | $99,600 |
| Scandinavia | 291 | $3,000 | $873,000 | $87,300 | $6,000 | $1,746,000 | $174,600 |
| Spain | 261 | $4,000 | $1,044,000 | $104,400 | $8,000 | $2,088,000 | $208,800 |
| United Kingdom | 187 | $5,000 | $935,000 | $93,500 | $10,000 | $1,870,000 | $187,000 |
| S. Africa | 286 | $1,500 | $429,000 | $42,900 | $3,000 | $858,000 | $85,800 |
| Thailand | 292 | $1,000 | $292,000 | $29,200 | $2,000 | $584,000 | $58,400 |
| Middle East | 290 | $2,000 | $580,000 | $58,000 | $5,000 | $1,450,000 | $145,000 |
| Turkey | 265 | $2,000 | $530,000 | $53,000 | $4,000 | $1,060,000 | $106,000 |
| Japan | 278 | $5,000 | $1,390,000 | $139,000 | $9,000 | $2,502,000 | $250,200 |
| Australia/NZ | 269 | $3,000 | $807,000 | $80,700 | $6,000 | $1,614,000 | $161,400 |
| Latin America | 258 | $8,000 | $2,064,000 | $206,400 | $14,000 | $3,612,000 | $361,200 |
| USA | 287 | $10,000 | $2,870,000 | $287,000 | $15,000 | $4,305,000 | $430,500 |
| Canada | 296 | $4,000 | $1,184,000 | $118,400 | $7,000 | $2,072,000 | $207,200 |
| **Total** | | | $22,845,000 | $2,284,500 | | $41,536,500 | $4,153,650 |

**EXHIBIT  2**

**Exhibit 2**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT ("Security Agreement"), dated as of April 27, 2010 by and between Camelot Distribution Group, Inc., a Nevada corporation ("Debtor") and Incentive Capital, LLC, a Utah limited liability company ("Secured Party"), is made with reference to the following facts:

A.    Camelot Film Group, Inc. ("Borrower") has executed or shall execute and deliver to Secured Party simultaneously herewith that certain Promissory Note - Term Loan (the "Note") in the original principal amount of $650,000 in connection with a secured term loan (the "Loan") from Secured Party to Borrower.

B.    Debtor has agreed to grant the Secured Party a security interest in the property hereinafter described as security for the prompt and complete payment of the payment and other obligations of the Borrower to the Secured Party under the Note.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and other agreements hereinafter contained, Debtor hereby agrees with Secured Party for the benefit of Secured Party as follows:

1.    <u>Grant of Security Interest</u>.

Debtor hereby grants to the Secured Party a continuing first priority security interest in all Debtor rights to the property as set forth on Schedule 1 attached hereto ("Distribution Assets") and by this reference incorporated herein, and all products and proceeds thereof, including (a) the Distribution Assets; (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Distribution Assets in all media, from all sources, worldwide during the term hereof; and (c) other assets of the Debtor as set forth on said Schedule 1 (collectively, the "Collateral"). Terms used in this Security Agreement are used as defined in (i) the Utah Uniform Commercial Code in effect from time to time; or (ii) the Asset Purchase Agreement executed by Borrower concurrently herewith (the "Purchase Agreement").

2.    [Reserved.]

3.    <u>Security for Obligations</u>. This Security Agreement secures, and the Collateral is collateral security for, the prompt payment or performance in full when due, whether at stated maturity, by acceleration or otherwise (including the payment of amounts which would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. Section 362(a)), to Secured Party of Debtor's Indebtedness and other obligations now existing or hereafter arising to Secured Party with respect to the Note, whether for principal or interest (including, without limitation, interest which, but for the filing of a petition in bankruptcy, would accrue on such obligations) or payments of fees, expenses or otherwise pursuant to the Note and/or any other documents or instrument executed pursuant thereto or hereto (all such obligations being the "Note").

- 1 -

4.    Actions to Perfect.  Debtor hereby authorizes Secured Party at any time and from time to time to file one or more financing or continuation statements describing the Collateral.  Debtor further agrees that at any time and from time to time, at the expense of the Debtor, Debtor will promptly execute and deliver all further instruments and documents, and take all further action that may be reasonably necessary or desirable, or that Secured Party may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Such actions may include, without limitation, the delivery to Secured Party of Collateral for which delivery is required to perfect, the signature by bailees or depository banks on control agreements in favor of the Secured Party with respect to Collateral in the possession of bailees, or complying with the provisions of any applicable statutes governing perfection or protection of the security interest granted hereby in the Collateral.

5.    Representations and Warranties.  Debtor represents and warrants as follows:

(a)    Status of Debtor; Authorization.  Debtor (i) is a corporation duly organized, validly existing and in good standing under the laws of the state of Nevada, and (ii) is duly qualified or licensed to conduct business in each jurisdiction in which the nature of its business or assets requires such qualification or licensing under applicable law except where the failure to be so qualified would not have a material adverse effect on the business, operations or financial condition of Debtor.  Debtor has the requisite power and authority to own its assets and to transact the business in which it is presently engaged and in which it proposes to engage and to grant to Secured Party the security interests in the Collateral as herein provided.  Debtor has taken all action necessary to authorize the execution and delivery of this Security Agreement, and the consummation of the transactions contemplated hereby.

(b)    Binding Security Agreement.  This Security Agreement constitutes the legal, valid and binding agreement and obligation of Debtor, enforceable against Debtor in accordance with its terms, except as enforceability may be limited by the bankruptcy, insolvency, fraudulent conveyance, and similar laws and equitable principles affecting the enforcement of creditors' rights generally.

(c)    Title to Collateral.  Debtor has good and marketable title to its interest in the Collateral, free and clear of any mortgage, pledge, lien, security interest, encumbrance, conditional sale contract or other title retention agreement, or any other adverse claim of any nature whatsoever (collectively, "Lien") except for (X) the first priority security interest granted to the Secured Party hereby.  No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office.

(d)    No Default or Required Consent.  The execution, delivery and performance of this Security Agreement by Debtor, and the effectuation by the Secured Party of any of its rights and remedies thereunder or hereunder, whether upon default or

-2-

otherwise, (x) will not result in a breach of or constitute a default under (i) the certificate of incorporation or bylaws or other charter provision of Debtor, or (ii) any other agreement or instrument to which Debtor is a party or by which any of the Collateral is bound except, in the case of clause (ii), where such breach or default would not have a material adverse effect on the Collateral or on the business, operations or financial condition of Debtor, (y) will not violate any law or any rule or regulation of any administrative agency or any order, writ, injunction or decree of any court or administrative agency, and (z) does not require the consent of any person, entity or governmental agency or any notice or filing with any governmental or regulatory body, except as shall have been previously obtained, given or made or where the failure to obtain such consent would not have a material adverse effect on the Collateral or on the business, operations or financial condition of Debtor.

(e)    Perfection.  Debtor's exact legal name, type of organization and jurisdiction of organization is set forth in the introduction of this Security Agreement. Debtor's organizational identification number is NV20051246701. Debtor's principal place of business is located at the address set forth on the date hereof in Section 14 of this Security Agreement.  Upon (i) the execution and delivery of this Security Agreement by Debtor; and (ii) the proper and timely filing of a financing statement with the Secretary of State of Nevada, the Secured Party will have a first perfected first priority security interest in and to the Collateral.

(f)    Employment of Jamie Thompson.  Debtor has entered into an employment agreement with Jamie Thompson ("Thompson") as of September 1, 2009 (the "Employment Agreement"), whereunder Thompson shall render services as President of Debtor to, among other responsibilities, manage and supervise Debtor's general business operations, including without limitation services in connection with the exploitation of the Liberation Assets.  Debtor hereby acknowledges and agrees that it shall use its best efforts to continue Thompson's Employment Agreement for a period of five (5) years from the date hereof.  During said period of the Employment Agreement, Thompson shall be primarily responsible for the exploitation of the Liberation Assets.

6.    Affirmative Covenants.  Debtor covenants and agrees that until such time as the Note is indefeasibly paid or otherwise satisfied in full, unless the Secured Party shall otherwise consent in writing:

(a)    Conduct of Business and Maintenance of Assets and Licenses. Debtor shall do or cause to be done all things reasonably necessary to preserve in full force and effect its existence, its corporate powers and authority, its qualifications to carry on business in all applicable jurisdictions, and all rights, interests and assets necessary to the conduct of its business, except where the failure to do so does not have a material adverse effect on the financial condition or operations of Debtor.

(b)    Protection of Security and Legal Proceedings.  Debtor shall, at its own expense, take any and all actions reasonably necessary to preserve, protect and defend the security interests of the Secured Party in the Collateral and the perfection and priority thereof against any and all adverse claims, including appearing in and defending all actions

- 3 -

and proceedings which purport to affect any of the foregoing.  Debtor shall promptly reimburse the Secured Party for any and all sums, including costs, expenses and actual attorneys' fees, which the Secured Party may pay or incur in defending, protecting or enforcing its security interest in the Collateral or the perfection or priority thereof.

(c)      Payment of Taxes.  Debtor shall pay or cause to be paid all taxes and other levies with respect to the Collateral when the same become due and payable, except for any taxes which are being diligently contested in good faith by appropriate proceedings and for which appropriate reserves have been established.

(d)      Use and Maintenance of Collateral.  Debtor shall comply in all material respects with all laws, statutes and regulations pertaining to its use and ownership of the Collateral and its conduct of its business; maintain all of the Collateral in good condition, reasonable wear and tear excepted, and keep accurate and complete books and records pertaining to the Collateral in accordance with generally accepted accounting principles, except where the failure to do any of the foregoing does not have a material adverse affect on the Collateral or the Secured Party's rights therein.

(e)      Inspection.  Debtor shall give the Secured Party such information as may be reasonably requested concerning the Collateral and shall during regular business hours and upon reasonable notice during the continuance of an Event of Default, permit the Secured Party and its agents and representatives to have full access to and the right to examine, audit and make copies and abstracts from any and all of Debtor's books and records pertaining to the Collateral, to confirm and verify the value of the Collateral and to do whatever else the Secured Party reasonably may deem necessary or desirable to protect its interests.  Furthermore, Debtor agrees to furnish promptly to the Secured Party such information regarding the financial condition or business of Debtor or the Collateral as the Secured Party may reasonably request, and all such information hereafter furnished to the Secured Party by Debtor will be true and correct in all material respects when furnished.

(f)      Notification.  Debtor shall notify the Secured Party in writing within ten (10) business days of the occurrence of any event which materially adversely affects the value of the Collateral, the ability of Debtor or the Secured Party to dispose of the Collateral or the rights and remedies of the Secured Party in relation thereto.

7.      Negative Covenants.  Debtor covenants and agrees that until such time as the Note is indefeasibly paid or otherwise satisfied in full, without the prior written consent of the Secured Party:

(a)      Sale or Hypothecation of Collateral.  Debtor shall not directly or indirectly, whether voluntarily, involuntarily, by operation of law or otherwise (i) sell, assign, license, transfer, exchange, lease, lend, grant any option with respect to or dispose of any of the Collateral or any of Debtor's rights therein, except for sales, assignments, licenses, transfers, exchanges, leases or loans in the ordinary course of the Debtor's business; nor (ii) create or permit to exist any lien on or with respect to any of the Collateral.  The

-4-

inclusion of "proceeds" as a component of the Collateral shall not be deemed a consent by the Secured Party to any sale, assignment, transfer, exchange, lease, loan, granting of an option with respect to or disposition of all or any part of the Collateral.

(b)     Change of Location or Name.   Debtor shall not, without giving to the Secured Party at least thirty (30) days' prior written notice (i) move its principal place of business; (ii) change its name, its trade or fictitious business name(s) or its organizational identification number; (iii) keep Collateral at locations other than its principal place of business, except as otherwise disclosed to Secured Party in writing; or (iv) change its type of organization, jurisdiction of organization or other legal structure.

8.     Secured Party Appointed Attorney-in-Fact.   Debtor hereby appoints the Secured Party as Debtor's attorney-in-fact with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time in the Secured Party's sole and absolute discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Security Agreement. Debtor acknowledges that the foregoing grant of power of attorney is coupled with an interest and is irrevocable.

9.     Secured Party May Perform.   If Debtor fails to perform any agreement or covenant contained herein, then the Secured Party in its discretion may perform or cause the performance of such agreement or covenant, and the reasonable expenses of the Secured Party incurred in connection therewith shall be payable by the Debtor. However, nothing in this Security Agreement shall obligate Secured Party to act, nor shall the actions of Secured Party under this section be construed as a waiver or cure of any such failure.

10.   Remedies upon Default.

(a) "Event of Default" shall mean the occurrence of any of the following events:

I.     The failure of Borrower to pay the Note when due.

II.     The failure, refusal or neglect of Debtor, Borrower or any guarantor to observe or perform for any reason any of the covenants, conditions, agreements or provisions contained in this Security Agreement or in any of the other agreements or instruments referenced herein or contemplated hereby (referred to herein individually as a "Loan Document" and collectively as the "Loan Documents") (other than the payment of the Note of which the failure to pay constitutes an Event of Default described in Section 9(a)I hereof), or to execute and deliver any documents, agreements or instruments reasonably requested by Secured Party hereunder or thereunder, provided that if such failure, refusal or neglect is capable of remedy within fifteen (15) days, the Debtor shall be entitled to cure the same within fifteen (15) days of Debtor's receipt of written notice from Secured Party of the occurrence of such failure, refusal or neglect.

III.     Any representation or warranty made by Debtor, Borrower or any guarantor in any Loan Document or any report, certificate, financial statement or other

- 5 -

Instrument furnished by or on behalf of Debtor in connection with any Loan Document shall prove to have been false or misleading in any material respect.

    iv.    Subject to the provisions of Section 6.6 of the Purchase Agreement, Secured Party shall cease to have valid and perfected first priority security interest at any time for any reason in the Collateral, or any portion thereof.

    v.    If any judgment against Debtor or any of its property or assets which would or might materially adversely affect (a) its ability to perform its obligations under any Loan Document; and/or (b) the Collateral and/or the Secured Party's rights therein, remains unpaid, unstayed or undismissed for a period of more than forty-five (45) days.

    vi.    Debtor shall be dissolved or shall sustain the loss, cancellation or forfeiture of its legal status or good standing by reason of any judicial, extrajudicial or administrative proceedings or otherwise, or shall (a) apply for or consent to the appointment of a receiver, trustee or liquidator of Debtor or of all or a substantial part of Debtor's assets; (b) be unable to, or admit in writing its inability to, pay its debts as they mature; (c) make a general assignment for the benefit of creditors; (d) be adjudicated a bankrupt or insolvent; (e) file a voluntary petition in bankruptcy or a petition or an answer seeking reorganization or an arrangement for the benefit of creditors or take advantage of any insolvency law in its capacity as a debtor; (f) interpose an answer admitting the material allegations of the petition filed against Debtor in any bankruptcy, reorganization or insolvency proceedings; (g) take any action which would have the effect of dissolving Debtor; or (h) take any action for the purpose of effecting any of the foregoing.

    vii.    Any (a) involuntary petition is filed against Debtor seeking to subject Debtor to any bankruptcy, insolvency or similar laws and such petition shall remain unstayed or not be withdrawn for a period of forty-five (45) days; or (b) an order, judgment or decree shall be entered against Debtor by any court of competent jurisdiction approving a petition seeking its reorganization or appointment of a receiver, trustee or liquidator of Debtor or of all or a substantial part of its assets and such order, judgment or decree shall continue and stay in effect for a period of forty-five (45) days.

    (b)    If an Event of Default exists, the Secured Party may exercise one or more of the following rights and remedies at any time or times and without notice to or demand upon Debtor:

    (i)    Declare the Note to be forthwith due and payable, whereupon the Note shall be accelerated and shall become immediately due and payable without presentation, demand or notice of any kind to the Debtor (all of which are hereby waived by Debtor ), except that if an Event of Default specified in Sections 9(a)(vi) and 9(a)(vii) shall occur, such acceleration shall be automatic and no declaration or other act of Secured Party shall be necessary to effect such acceleration;

    (ii)    Proceed to protect and enforce the rights of Secured Party to payment of the Note and its rights to proceed against the Collateral and exercise its remedies

whether by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision of any of the Loan Documents or any other legal or equitable right or remedy of Secured Party;

(iii)    In addition to those actions that may otherwise be permitted to be taken by Secured Party under any of the Loan Documents, with respect to the Collateral, take the following actions:

(a)    Collections, etc.  Secured Party may demand, sue for, collect or receive, in the name of Secured Party or in the name of Debtor, or otherwise, any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Collateral (but Secured Party shall be under no obligation to do so), or extend the time of payment, arrange for payment in installments, or otherwise modify the term of, or release, any of the Collateral, without thereby incurring responsibility to discharge, or discharging, or otherwise affecting any liability of Debtor hereunder. Secured Party shall not be required to take any steps to preserve any rights against other parties to the Collateral. Secured Party may (but is not obligated to) make such payments and take all such actions as Secured Party deems necessary to protect its security interest in the Collateral and/or the value thereof, and Secured Party is hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest or compromise any lien or encumbrance on the Collateral; and

(b)    Possession and Sale of Collateral, etc.  Secured Party may exercise in respect of the Collateral all rights and remedies hereunder and under the Loan Documents, all the rights and remedies of a secured party under the Code and all rights and remedies otherwise available to it. In addition, Secured Party may notify any and all account debtors of the Debtor to make all further payments to Secured Party, and enter upon each premises of wherever the Collateral may be and take possession of the Collateral and demand and receive such possession from any Person who has possession thereof; and take such measures as it may deem necessary or proper for the care or protection thereof, including the right to remove all or any portion of the Collateral (but Secured Party shall not be obligated to do so). With or without taking such possession, Secured Party may sell or cause to be sold, whenever Secured Party shall decide, in one or more sales or parcels, and at such price or prices and upon such other terms as may be commercially reasonable (irrespective of the impact of any such sales on the market price of such assets), and for cash or on credit or for future delivery, without assumption of any credit risk, all or any portion of the Collateral at any broker's board or at public or private sale. Secured Party may be the purchaser at any public or private sale to the extent permitted by law and provided such sale is conducted in accordance with the Code of any or all of the Collateral so sold and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of such assets sold at any such public or private sale, to use and apply the Note as a credit on account of the purchase price payable by Secured Party at such sale. Each purchaser (including the Secured Party) at any such sales shall thereafter hold the Collateral purchased absolutely

- 7 -

free from any claim or right of whatever kind, including any equity of redemption of the Debtor, any such demand, notice, claim, right and equity being hereby expressly waived and released. Debtor agree that, to the extent notice of sale shall be required by law, at least ten (10) days' notice of sale to the Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Secured Party shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice be made at the time and place to which it was so adjourned. Debtor hereby waive any claims against Secured Party arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Secured Party accepts the first offer received and does not offer such Collateral to more than one offeree, provided such private sale is conducted in a commercially reasonable manner.

(c)    Appointment of a Receiver.  Upon the occurrence of an Event of Default, the Secured Party shall be entitled to the appointment of a receiver, to take possession of all or any portion of the Collateral and to exercise such powers as the court shall confer upon the receiver.

(d)    Power of Attorney.  Debtor does hereby irrevocably make, constitute, and appoint the Secured Party and its designees as its true and lawful attorney-in-fact, with full power in the name of Secured Party and/or Debtor, to take the following actions upon the occurrence of an Event of Default: to endorse any notes, checks, drafts, money orders or other evidences of payment relating to the Collateral that may come into the possession of the Secured Party; to enforce all of Debtor's rights under and pursuant to all agreements with respect to the Collateral, all for the sole benefit of Secured Party, to enter into and perform such agreements as may be necessary in order to carry out the terms, covenants, and conditions of this Security Agreement which are required to be observed or performed by Debtor, to execute such other and further mortgages, pledges and assignments of the Collateral as Secured Party may require for the purpose of protecting, maintaining, or enforcing the security interests granted to Secured Party by this Security Agreement and the other Loan Documents, and to do any and all other things necessary or proper to carry out the intention of this Security Agreement and the other Loan Documents; and Debtor hereby ratifies and confirms all the Secured Party, as such attorney-in-fact, or its substitutes shall properly do by virtue of this power of attorney, provided, however, that Secured Party agrees to notify Debtor prior to any such endorsement, execution or action and to provide Debtor with a reasonable period to endorse or execute the subject documents on Debtor's own behalf.  Such powers of attorney are coupled with an interest and are therefore irrevocable.

(e)    Rights and Remedies Cumulative.  No right or remedy conferred upon Secured Party herein or in any of the other Loan Documents or otherwise available at law or in equity (or both) shall be exclusive of any other right or remedy contained herein or therein or otherwise made available. All such rights and remedies are

cumulative and are not exclusive of any right or remedy which Secured Party may otherwise have.

(f)   Application of Proceeds.  Any cash held by the Secured Party as Collateral and all cash proceeds received by either of the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to Secured Party pursuant to this Security Agreement) in whole or in part by the Secured Party against all or any part of the Note in such order as the Secured Party shall elect.  Any surplus of such cash or cash proceeds held by either of the Secured Party and remaining after payment in full of all the Note shall be paid over to Debtor or to whomsoever may be lawfully entitled to receive such surplus.

11.   Liability and Indemnification.  The powers conferred upon Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise such powers.  Nothing in this Security Agreement shall be deemed to constitute an assumption by either of the Secured Party of any liability or obligation of the Debtor with respect to any of the Collateral.  The Secured Party shall not be liable to either Debtor for any act (including, without limitation, any act of active negligence) or omission by the Secured Party under this Security Agreement unless the Secured Party's conduct constitutes willful misconduct or gross negligence.  Debtor agrees to indemnify and to hold the Secured Party harmless from and against all losses, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees and disbursements) with respect to (a) any action taken (including, without limitation, any act of active negligence) or any omission by either of the Secured Party with respect to the Payment Obligations or this Security Agreement, provided that Secured Party's conduct does not constitute willful misconduct or gross negligence, and (b) any claims arising out of Debtor's ownership of the Collateral or Secured Party's security interest therein.

12.   Expenses.  Debtor agrees to pay upon demand to the Secured Party any and all reasonable expenses, including the reasonable fees and expenses of its outside counsel and of any experts and agents which the Secured Party may incur in connection with (a) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (b) the exercise or enforcement of any of the rights of the Secured Party under the Payment Obligation and/or this Security Agreement, and (c) the failure by Debtor to perform or observe any of the provisions of the Payment Obligation and/or this Security Agreement.

13.   Security Interest Absolute.  All rights of the Secured Party and security interests hereunder shall be absolute and unconditional irrespective of:

(a)   any lack of validity or enforceability of the Purchase Agreement or any other Loan Document;

- 9 -

(b)   any change in the time, manner or place of payment of, or in any other term of, all or any of the Note, or any other amendment or waiver of or any consent to any departure from any of the Loan Documents; or

(c)   any furnishing, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Note.

14.   Amendments, Waiver.  No amendment or waiver of any provision of this Security Agreement nor consent to any departure by Debtor herefrom shall in any event be effective unless the same shall be in writing and signed by the Secured Party and Debtor and/, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose any party for which given.

15.   Notices.  All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered by messenger or overnight delivery service, or sent by first class mail (or air mail where available), postage prepaid, certified or registered, return receipt requested, as set forth in the Purchase Agreement or at such other address as may be furnished in writing.  Any notice given by messenger or overnight delivery service as provided in this Section 15 shall be deemed given when delivered if during normal business hours on a business day (or if not, the next business day after delivery); any notice given by first class mail (or air mail where available), postage prepaid, certified or registered, return receipt requested shall be deemed given five (5) business days after the date of mailing.  Any party may by notice to the other change the address at which notices and demands may be given to it.

16.   Continuing Security Interest; Release of Security Interest Upon Payment.  This Security Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until indefeasible payment or other satisfaction in full of the Note, (b) be binding upon Debtor, and its successors and assigns, (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its successors, transferees and assigns, (d) constitute the entire agreement between Debtor and the Secured Party with respect to the subject matters covered hereby, and (e) be severable in the event that one or more of the provisions herein is determined to be illegal or unenforceable.  Upon the indefeasible payment or other satisfaction in full of the Note, the Secured Party, at the request and expense of Debtor, shall release the security interests in the Collateral granted herein and execute such termination statements as may be necessary therefore, to the extent that such Collateral shall not have been sold or otherwise applied pursuant to the terms hereof.

17.   Return of Collateral.  Subject to any duty imposed by law or otherwise to the holder of any subordinate lien on the Collateral known to the Secured Party, and subject to the direction of a court of competent jurisdiction, upon payment in full of the Note, Debtor shall be entitled to the return of all Collateral belonging to Debtor in the possession of the Secured Party; provided, however, that the Secured Party shall not be obligated to return to Debtor or deliver to the holder of any subordinate lien any such Collateral until it is

- 10 -

satisfied that all amounts with respect to the Note are no longer subject to being recaptured under applicable bankruptcy or insolvency laws or otherwise. The return of Collateral, however effected, shall be without recourse to the Secured Party and the Secured Party shall be entitled to receive appropriate documentation to such effect. The return of Collateral shall be effected without representation or warranty and shall not entitle Debtor to any right to any endorsement.

18. <u>Governing Law; Terms.</u> This Security Agreement shall be deemed to have been made in the state of Utah and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and construed in accordance with the internal laws of the state of Utah. Debtor hereby consents to the jurisdiction of any Utah state or United States Federal court sitting in Utah with respect to disputes arising out of this Security Agreement.

19. <u>Waiver of Jury Trial.</u> Debtor HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY. Any legal action or proceeding with respect to this Security Agreement must be brought in the federal or state courts located in the State of Utah, unless Secured Party elects to bring such legal action or proceeding elsewhere. Debtor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the federal or state courts located in the State of Utah as having proper venue. Debtor hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Security Agreement brought in the aforesaid Utah courts and irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum, and also consents to the service of process by any means authorized by the State of Utah.

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

Debtor:
CAMELOT DISTRIBUTION GROUP, INC., a Nevada corporation

By: _____
Robert P. Atwell, CEO

- 11 -

Secured Party:
INCENTIVE CAPITAL, LLC, a Utah corporation

By: _____
                                    , President



10 UNIVERSAL CITY PLAZA, NBC/UNIVERSAL BUILDING, 20TH FLOOR, UNIVERSAL CITY, CA 91608
P: 818.308.8858   F: 818.308.8848   E: INFO@CAMELOTFILMS.COM   W: WWW.CAMELOTENT.COM

Schedule 1

Certain distribution and license rights that have been acquired pursuant to distribution and license agreements entered into by Debtor with respect to the following films:

1. Samurai Avenger
2. First Strike
3. Screwball: The Ted Whitfield Story (aka The Wiffler)
4. The Fallen
5. One Lucky Dog (aka Weiner Dog Nationals)
6. Never Sleep Again
7. Hellraiser Unleashed
8. Pink!
9. Nude Nuns With Big Guns
10. Zombie Culture
11. National Lampoons Dirty Movie
12. Who Is KK Downey
13. Next of Kin

**EXHIBIT 3**

Exhibit 3

## SECURITY AND PARTICIPATION AGREEMENT

THIS SECURITY AND PARTICIPATION AGREEMENT ("Security Agreement"), dated as of April 27, 2010 by and between Camelot Film Group, Inc., a Nevada corporation ("Debtor") and Incentive Capital, LLC, a Utah limited liability company ("Secured Party"), is made with reference to the following facts:

    A.    Debtor has executed or shall execute and deliver to Secured Party simultaneously herewith that certain Promissory Note -Term Loan (the "Note") in the original principal amount of $650,000 in connection with a secured term loan (the "Loan") from Secured Party to Debtor.

    B.    Debtor has agreed to grant the Secured Party a security interest in the property hereinafter described as security for the prompt and complete payment of the payment and other obligations of the Debtor to the Secured Party under the Note.

    C.    Debtor has agreed to grant the Secured Party a continuing profit participation in the revenue actually received by Debtor from the Debtor's exploitation of the Liberation Assets, as set forth in this Security Agreement.

    D.    The property covered by this Security Agreement includes certain assets (the "Liberation Assets") purchased substantially simultaneously herewith from CMBG Advisors, Inc., a California corporation in its sole and limited capacity as assignee for the benefit of creditors of Liberation Group, Inc. ("CMBG") pursuant to an Asset Purchase Agreement of even date (the "Asset Purchase Agreement") as well as other assets of Debtor as set forth hereinbelow.

    E.    Secured Party and CMBG have entered into an Intercreditor Agreement (the "Intercreditor Agreement") contemporaneously herewith setting forth the agreed rights and obligations of each as secured parties with respect to the Liberation Assets, it being expressly understood and agreed that Secured Party shall at all times have and maintain a first priority security interest in the Liberation Assets, and CMBG shall at all times have and maintain a second priority security interest in the Liberation Assets.

    NOW, THEREFORE, in consideration of the foregoing and the mutual promises and other agreements hereinafter contained, and subject to the terms and conditions of the other Intercreditor Agreement, Debtor hereby agrees with Secured Party for the benefit of Secured Party as follows:

    1.    <u>Grant of Security Interest.</u>

    Debtor hereby grants to the Secured Party a continuing first priority security interest in all property identified on Schedule 1 attached hereto and by this reference incorporated herein, and all products and proceeds thereof, including (a) all Liberation Assets; (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or

- 1 -

other exploitation of the Liberation Assets in all media, from all sources, worldwide during the term hereof; and (c) other assets of the Debtor as set forth on said Schedule 1 (collectively, the "Collateral"). Terms used in this Security Agreement are used as defined in (i) the Utah Uniform Commercial Code in effect from time to time; or (ii) the Asset Purchase Agreement.

2.  Profit Participation.

(a)  Commencing on the date of this Security Agreement, the Debtor shall pay to the Secured Party ten percent (10%) of one hundred percent (100%) of all gross revenues actually received thereafter by Debtor within 14 days of receiving any such revenue, CMGR or their respective subsidiaries, successors and assigns (collectively "Camelot"), from any third party paying Camelot revenues in connection with Camelot's exploitation of the Liberation Assets in all media, worldwide, from all sources (the "Camelot Revenue"), for an initial period of five (5) years ("Initial Period") from the date of this Security Agreement ("Secured Party Initial Revenue Participation"). After the Initial Period, Camelot shall pay the Secured Party two and one-half percent (2.5%) of all such revenues, calculated as set forth above (the "Final Secured Party Revenue Participation"), it being understood that the Secured Party shall receive the Final Secured Party Revenue Participation for so long as Camelot receives Camelot Revenue from exploiting the Liberation Assets. In the event of a sale of all or a portion of the Liberation Assets to a third party during the Initial Period, the Secured Party shall receive ten percent (10%) of the monies received by Camelot from such sale; provided, however, that if such sale occurs after the Initial Period, then the Secured Party shall receive two and one-half percent (2.5%) of the monies received by Camelot from such sale. Payments shall be made payable to Incentive Capital, LLC.

(b)  Debtor shall render detailed statements (including, without limitation, an accounting of all revenue and expenses related to the disposition or other exploitation of the Collateral and its several parts) to the Secured Party on a quarterly basis, commencing as of the end of the first quarter in which Debtor receives any Camelot Revenue. Each statement shall be delivered to Secured Party within sixty (60) days after the end of the applicable quarter, accompanied with payment of the applicable amount, if any, shown due to Secured Party. In addition to the quarterly detailed accounting of Camelot Revenue and expenses, Debtor shall provide to Secured Party on a monthly basis a general statement indicating the total gross revenues received for or in connection with the disposition or other exploitation of the Collateral for the previous month. Debtor will maintain accurate records in local currency of all financial records regarding Camelot Revenue using generally accepted accounting principles on a consistent, uniform and nondiscriminatory basis until three (3) years after each such statement and during any period while a dispute about payments remains unresolved. Such records will include all receipts derived, all recoupable expenses paid, and all other information necessary to render any statement due. Debtor will also maintain full and accurate copies of every statement, contract, electronic record, audit report, correspondence and other records relating to the Camelot Revenue, and shall make available such records for inspection and copying by Secured Party at the Debtor's principal place of business during normal business hours.

- 2 -

(c)   The Secured Party, on thirty (30) days prior written notice, may examine and copy, through its auditors, Debtor's financial records regarding Camelot Revenue twice only in any year period. Such examination shall be at the Secured Party's expense unless it uncovers an underpayment, uncontested or later determined due, of more than ten percent (10%) of the amount shown due Secured Party on the statements, in which case Debtor shall pay on demand the reasonable costs of such examination.

3.   Security for Obligations.   This Security Agreement secures, and the Collateral, including the Liberation Assets, is collateral security for, the prompt payment or performance in full when due, whether at stated maturity, by acceleration or otherwise (including the payment of amounts which would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. Section 362(a)), to Secured Party of Debtor's indebtedness and other obligations now existing or hereafter arising to Secured Party with respect to the Note, whether for principal or interest (including, without limitation, interest which, but for the filing of a petition in bankruptcy, would accrue on such obligations) or payments of fees, expenses or otherwise pursuant to the Note and/or any other documents or instrument executed pursuant thereto or hereto (all such obligations being the "Note").

4.   Actions to Perfect.   Debtor hereby authorizes Secured Party at any time and from time to time to file one or more financing or continuation statements describing the Collateral. Debtor further agrees that at any time and from time to time, at the expense of the Debtor, Debtor will promptly execute and deliver all further instruments and documents, and take all further action that may be reasonably necessary or desirable, or that Secured Party may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Such actions may include, without limitation, the delivery to Secured Party of Collateral for which delivery is required to perfect, the signature by bailees or depository banks on control agreements in favor of Secured Party with respect to Collateral in the possession of bailees, or complying with the provisions of any applicable statutes governing perfection or protection of the security interest granted hereby in the Collateral.

5.   Representations and Warranties.   Debtor represents and warrants as follows:

(a)   Status of Debtor; Authorization.   Debtor (i) is a corporation duly organized, validly existing and in good standing under the laws of the state of Nevada, and (ii) is duly qualified or licensed to conduct business in each jurisdiction in which the nature of its business or assets requires such qualification or licensing under applicable law except where the failure to be so qualified would not have a material adverse effect on the business, operations or financial condition of Debtor. Debtor has the requisite power and authority to own its assets and to transact the business in which it is presently engaged and in which it proposes to engage and to grant to Secured Party the security interests in and in the Collateral as herein provided. Debtor has taken all action necessary to authorize the

- 3 -

execution and delivery of the Note and this Security Agreement, and the consummation of the transactions contemplated thereby and hereby.

(b)   Binding Security Agreement. This Security Agreement constitutes the legal, valid and binding agreement and obligation of Debtor, enforceable against Debtor in accordance with its terms, except as enforceability may be limited by the bankruptcy, insolvency, fraudulent conveyance, and similar laws and equitable principles affecting the enforcement of creditors' rights generally.

(c)   Title to Collateral. Except as otherwise expressly acknowledged and contemplated in the Purchase Agreement, such Debtor has good and marketable title to all and every part of the Collateral, free and clear of any mortgage, pledge, lien, security interest, encumbrance, conditional sale contract or other title retention agreement, or any other adverse claim of any nature whatsoever (collectively, "Lien") except for (x) the first priority security interest granted to the Secured Party hereby; and (y) the second priority security interest granted to CMBG as provided for in the Asset Purchase Agreement (referred to herein collectively as the "Permitted Liens"). No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed with respect to the Permitted Liens.

(d)   No Default or Required Consent. Except as otherwise expressly acknowledged and contemplated in the Asset Purchase Agreement, the execution, delivery and performance of this Security Agreement by Debtor, and the effectuation by the Secured Party of any of its rights and remedies thereunder or hereunder, whether upon default or otherwise, (x) will not result in a breach of or constitute a default under (i) the certificate of incorporation or bylaws or other charter provision of Debtor, or (ii) any other agreement or instrument to which Debtor is a party or by which any of the Collateral is bound except, in the case of clause (ii), where such breach or default would not have a material adverse effect on the Collateral or on the business, operations or financial condition of Debtor, (y) will not violate any law or any rule or regulation of any administrative agency or any order, writ, injunction or decree of any court or administrative agency, and (z) does not require the consent of any person, entity or governmental agency or any notice or filing with any governmental or regulatory body, except as shall have been previously obtained, given or made or where the failure to obtain such consent would not have a material adverse effect on the Collateral or on the business, operations or financial condition of Debtor.

(e)   Perfection. Debtor's exact legal name, type of organization and jurisdiction of organization is set forth in the introduction of this Security Agreement. Debtor's organizational identification number is NV20071127932. Debtor's principal place of business is located at the address set forth on the date hereof in Section 14 of this Security Agreement. Upon (i) the execution and delivery of this Security Agreement by Debtor; and (ii) the proper and timely filing of a financing statement with the Secretary of State of Nevada, the Secured Party will have a first perfected first priority security interest in and to the Collateral.

- 4 -

(f)   Employment of Jamie Thompson.  Camelot Distribution Group, Inc. ("CDG") has entered into an employment agreement with Jamie Thompson ("Thompson") as of September 1, 2009 (the "Employment Agreement"), whereunder Thompson shall render services as President of CDG to, among other responsibilities, manage and supervise CDG's general business operations, including without limitation services in connection with the exploitation of the Liberation Assets.  Debtor hereby acknowledges and agrees that it shall use its best efforts to continue Thompson's Employment Agreement for a period of five (5) years from the date hereof.  During said period of the Employment Agreement, Thompson shall be primarily responsible for the exploitation of the Collateral.

6.   Affirmative Covenants.  Debtor covenants and agrees that until such time as the Note is indefeasibly paid or otherwise satisfied in full, unless the Secured Party shall otherwise consent in writing:

(a)   Conduct of Business and Maintenance of Assets and Licenses.  Debtor shall do or cause to be done all things reasonably necessary to preserve in full force and effect its existence, its corporate powers and authority, its qualifications to carry on business in all applicable jurisdictions, and all rights, interests and assets necessary to the conduct of its business, except where the failure to do so does not have a material adverse effect on the financial condition or operations of Debtor.

(b)   Protection of Security and Legal Proceedings.  Subject to the provisions of Section 6.5 of the Purchase Agreement pursuant to which the Secured Party expressly understands and acknowledges that Debtor may have no obligation to defend adverse claims with respect to, and certain items of the Collateral may be sold, assigned or abandoned by Debtor as Debtor may determine in its sole discretion, Debtor shall, at its own expense, take any and all actions reasonably necessary to preserve, protect and defend the security interests of the Secured Party in the Collateral and the perfection and priority thereof against any and all adverse claims, including appearing in and defending all actions and proceedings which purport to affect any of the foregoing.  Debtor shall promptly reimburse the Secured Party for any and all sums, including costs, expenses and actual attorneys' fees, which the Secured Party may pay or incur in defending, protecting or enforcing its security interest in the Collateral or the perfection or priority thereof.

(c)   Payment of Taxes.  Debtor shall pay or cause to be paid all taxes and other levies with respect to the Collateral when the same become due and payable, except for any taxes which are being diligently contested in good faith by appropriate proceedings and for which appropriate reserves have been established.

(d)   Use and Maintenance of Collateral.  Debtor shall comply in all material respects with all laws, statutes and regulations pertaining to its use and ownership of the Collateral and its conduct of its business; maintain all of the Collateral in good condition, reasonable wear and tear excepted, and keep accurate and complete books and records pertaining to the Collateral in accordance with generally accepted accounting principles, except where the failure to do any of the foregoing does not have a material adverse affect on the Collateral or the Secured Party's rights therein.

-5-

(e)    Inspection.  Debtor shall give the Secured Party such information as may be reasonably requested concerning the Collateral and shall during regular business hours and upon reasonable notice during the continuance of an Event of Default, permit the Secured Party and its agents and representatives to have full access to and the right to examine, audit and make copies and abstracts from any and all of Debtor's books and records pertaining to the Collateral, to confirm and verify the value of the Collateral and to do whatever else the Secured Party reasonably may deem necessary or desirable to protect its interests. Furthermore, Debtor agrees to furnish promptly to the Secured Party such information regarding the financial condition or business of Debtor or the Collateral as the Secured Party may reasonably request, and all such information hereafter furnished to the Secured Party by Debtor will be true and correct in all material respects when furnished.

(f)    Notification.  Debtor shall notify the Secured Party in writing within ten (10) business days of the occurrence of any event which materially adversely affects the value of the Collateral, the ability of Debtor or the Secured Party to dispose of the Collateral or the rights and remedies of the Secured Party in relation thereto.

7.    Negative Covenants.  Debtor covenants and agrees that until such time as the Note is indefeasibly paid or otherwise satisfied in full, without the prior written consent of the Secured Party:

(a)    Sale or Hypothecation of Collateral.  Except as otherwise provided in Section 6.5 of the Purchase Agreement, Debtor shall not directly or indirectly, whether voluntarily, involuntarily, by operation of law or otherwise (i) sell, assign, license, transfer, exchange, lease, lend, grant any option with respect to or dispose of any of the Collateral or any of Debtor's rights therein, except for sales, assignments, licenses, transfers, exchanges, leases or loans in the ordinary course of the Debtor's business; nor (ii) create or permit to exist any lien on or with respect to any of the Collateral, other than Permitted Liens. The inclusion of "proceeds" as a component of the Collateral shall not be deemed a consent by the Secured Party to any sale, assignment, transfer, exchange, lease, loan, granting of an option with respect to or disposition of all or any part of the Collateral.

(b)    Change of Location or Name.  Debtor shall not, without giving to the Secured Party at least thirty (30) days' prior written notice (i) move its principal place of business; (ii) change its name, its trade or fictitious business name(s) or its organizational identification number; (iii) keep Collateral at locations other than its principal place of business, except as otherwise disclosed to Secured Party in writing; or (iv) change its type of organization, jurisdiction of organization or other legal structure.

8.    Secured Party Appointed Attorney-In-Fact.  Debtor hereby appoints the Secured Party as Debtor's attorney-in-fact with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time in the Secured Party's sole and absolute discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this

- 6 -

Security Agreement. Debtor acknowledges that the foregoing grant of power of attorney is coupled with an interest and is irrevocable.

9.    Secured Party May Perform.  If either Debtor fails to perform any agreement or covenant contained herein, then the Secured Party in its discretion may perform or cause the performance of such agreement or covenant, and the reasonable expenses of the Secured Party incurred in connection therewith shall be payable by the Debtor. However, nothing in this Security Agreement shall obligate Secured Party to act, nor shall the actions of Secured Party under this section be construed as a waiver or cure of any such failure.

10.   Remedies upon Default.

(a) "Event of Default" shall mean the occurrence of any of the following events:

i.    The failure to pay the Note when due.

ii.   The failure, refusal or neglect of Debtor to observe or perform for any reason any of the covenants, conditions, agreements or provisions contained in this Security Agreement or in any of the other agreements or instruments referenced herein or contemplated hereby (referred to herein individually as a "Loan Document" and collectively as the "Loan Documents") (other than  the payment of the Note of which the failure to pay constitutes an Event of Default described in Section 9(a) hereof) or to execute and deliver any documents, agreements or instruments reasonably requested by Secured Party hereunder or thereunder, provided that if such failure, refusal or neglect is capable of remedy within fifteen (15) days  the Debtor shall be entitled to cure the same within fifteen (15) days of Debtor's receipt of written notice from Secured Party of the occurrence of such failure, refusal or neglect.

iii.  Any representation or warranty made by Debtor in any Loan Document or any report, certificate, financial statement or other instrument furnished by or on behalf of Debtor in connection with any Loan Document shall prove to have been false or misleading in any material respect.

iv.   Subject to the provisions of Section 6.5 of the Purchase Agreement, Secured Party shall cease to have valid and perfected first priority security interest at any time for any reason in the Collateral, or any portion thereof (subject to Permitted Liens).

v.    Subject to the provisions of Section 6.5 of the Purchase Agreement, if any judgment against Debtor or any of its property or assets which would or might materially adversely affect (a) its ability to perform its obligations under any Loan Document; and/or (b) the Collateral and/or the Secured Party's rights therein, remains unpaid, unstayed or undismissed for a period of more than forty-five (45) days.

vi.   Debtor shall be dissolved or shall sustain the loss, cancellation or forfeiture of its legal status or good standing by reason of any judicial, extrajudicial or

administrative proceedings or otherwise, or shall (a) apply for or consent to the appointment of a receiver, trustee or liquidator of Debtor or of all or a substantial part of Debtor's assets; (b) be unable to, or admit in writing its inability to, pay its debts as they mature; (c) make a general assignment for the benefit of creditors; (d) be adjudicated a bankrupt or insolvent; (e) file a voluntary petition in bankruptcy or a petition or an answer seeking reorganization or an arrangement for the benefit of creditors or take advantage of any insolvency law in its capacity as a debtor; (f) interpose an answer admitting the material allegations of the petition filed against Debtor in any bankruptcy, reorganization or insolvency proceedings; (g) take any action which would have the effect of dissolving Debtor; or (h) take any action for the purpose of affecting any of the foregoing.

vii.   Any (a) involuntary petition is filed against Debtor seeking to subject Debtor to any bankruptcy, insolvency or similar laws and such petition shall remain unstayed or not be withdrawn for a period of forty-five (45) days; or (b) an order, judgment or decree shall be entered against Debtor by any court of competent jurisdiction approving a petition seeking its reorganization or appointment of a receiver, trustee or liquidator of Debtor or of all or a substantial part of its assets and such order, judgment or decree shall continue and stay in effect for a period of forty-five (45) days.

(b)   If an Event of Default exists, the Secured Party may exercise one or more of the following rights and remedies at any time or times and without notice to or demand upon Debtor:

(i)   Declare the Note to be forthwith due and payable, whereupon the Note shall be accelerated and shall become immediately due and payable without presentation, demand or notice of any kind to the Debtor (all of which are hereby waived by Debtor ), except that if an Event of Default specified in Sections 9(a)(vi) and 9(a)(vii) shall occur, such acceleration shall be automatic and no declaration or other act of Secured Party shall be necessary to effect such acceleration;

(ii)   Proceed to protect and enforce the rights of Secured Party to payment of the Note and its rights to proceed against the Collateral and exercise its remedies whether by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision of any of the Loan Documents or any other legal or equitable right or remedy of Secured Party;

(iii)   In addition to those actions that may otherwise be permitted to be taken by Secured Party under any of the Loan Documents, with respect to the Collateral, take the following actions:

(a)   Collections, etc. Secured Party may demand, sue for, collect or receive, in the name of Secured Party or in the name of Debtor, or otherwise, any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Collateral (but Secured Party shall be under no obligation to do so), or extend the time of payment, arrange for payment in installments, or otherwise modify the term of, or release, any of the

- 8 -

Collateral, without thereby incurring responsibility to discharge, or discharging, or otherwise affecting any liability of Debtor hereunder. Secured Party shall not be required to take any steps to preserve any rights against other parties to the Collateral. Secured Party may (but is not obligated to) make such payments and take all such actions as Secured Party deems necessary to protect its security interest in the Collateral and/or the value thereof, and Secured Party is hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest or compromise any lien or encumbrance on the Collateral; and

        (b)     _Possession and Sale of Collateral, etc._  Secured Party may exercise in respect of the Collateral all rights and remedies hereunder and under the Loan Documents, all the rights and remedies of a secured party under the Code and all rights and remedies otherwise available to it. In addition, Secured Party may notify any and all account debtors of the Debtor to make all further payments to Secured Party, and enter upon each premises of wherever the Collateral may be and take possession of the Collateral and demand and receive such possession from any Person who has possession thereof; and take such measures as it may deem necessary or proper for the care or protection thereof, including the right to remove all or any portion of the Collateral (but Secured Party shall not be obligated to do so). With or without taking such possession, Secured Party may sell or cause to be sold, whenever Secured Party shall decide, in one or more sales or parcels, and at such price or prices and upon such other terms as may be commercially reasonable (irrespective of the impact of any such sales on the market price of such assets), and for cash or on credit or for future delivery, without assumption of any credit risk, all or any portion of the Collateral at any broker's board or at public or private sale. Secured Party may be the purchaser at any public or private sale to the extent permitted by law and provided such sale is conducted in accordance with the Code of any or all of the Collateral so sold and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of such assets sold at any such public or private sale, to use and apply the Note as a credit on account of the purchase price payable by Secured Party at such sale. Each purchaser (including the Secured Party) at any such sales shall thereafter hold the Collateral purchased absolutely free from any claim or right of whatever kind, including any equity of redemption of the Debtor, any such demand, notice, claim, right and equity being hereby expressly waived and released. Debtor agree that, to the extent notice of sale shall be required by law, at least ten (10) days' notice of sale to the Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Secured Party shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice be made at the time and place to which it was so adjourned. Debtor hereby waive any claims against Secured Party arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Secured Party accepts the first offer received and does not offer such Collateral to more than one offeree, provided such private sale is conducted in a commercially reasonable manner.

- 9 -

(c)   Appointment of a Receiver.  Upon the occurrence of an Event of Default, the Secured Party shall be entitled to the appointment of a receiver, to take possession of all or any portion of the Collateral and to exercise such powers as the court shall confer upon the receiver.

(d)   Power of Attorney.  Debtor does hereby irrevocably make, constitute, and appoint the Secured Party and its designees as its true and lawful attorney-in-fact, with full power in the name of Secured Party and/or Debtor, to take the following actions upon the occurrence of an Event of Default: to endorse any notes, checks, drafts, money orders or other evidences of payment relating to the Collateral that may come into the possession of the Secured Party; to enforce all of Debtor's rights under and pursuant to all agreements with respect to the Collateral, all for the sole benefit of Secured Party; to enter into and perform such agreements as may be necessary in order to carry out the terms, covenants, and conditions of this Security Agreement which are required to be observed or performed by Debtor; to execute such other and further mortgages, pledges and assignments of the Collateral as Secured Party may require for the purpose of protecting, maintaining, or enforcing the security interests granted to Secured Party by this Security Agreement and the other Loan Documents, and to do any and all other things necessary or proper to carry out the intention of this Security Agreement and the other Loan Documents; and Debtor hereby ratifies and confirms all the Secured Party, as such attorney-in-fact, or its substitutes shall properly do by virtue of this power of attorney, provided, however, that Secured Party agrees to notify Debtor prior to any such endorsement, execution or action and to provide Debtor with a reasonable period to endorse or execute the subject documents on Debtor's own behalf.  Such powers of attorney are coupled with an interest and are therefore irrevocable.

(e)   Rights and Remedies Cumulative.   No right or remedy conferred upon Secured Party herein or in any of the other Loan Documents or otherwise available at law or in equity (or both) shall be exclusive of any other right or remedy contained herein or therein or otherwise made available.  All such rights and remedies are cumulative and are not exclusive of any right or remedy which Secured Party may otherwise have.

(f)   Application of Proceeds.  Any cash held by the Secured Party as Collateral and all cash proceeds received by either of the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to Secured Party pursuant to this Security Agreement) in whole or in part by the Secured Party against all or any part of the Note in such order as the Secured Party shall elect.  Any surplus of such cash or cash proceeds held by either of the Secured Party and remaining after payment in full of all the Note shall be paid over to Debtor or to whomsoever may be lawfully entitled to receive such surplus.

11.   Liability and Indemnification.  The powers conferred upon Secured Party

- 10 -

hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise such powers. Nothing in this Security Agreement shall be deemed to constitute an assumption by either of the Secured Party of any liability or obligation of the Debtor with respect to any of the Collateral. The Secured Party shall not be liable to either Debtor for any act (including, without limitation, any act of active negligence) or omission by the Secured Party under this Security Agreement unless the Secured Party's conduct constitutes willful misconduct or gross negligence. Debtor agrees to indemnify and to hold the Secured Party harmless from and against all losses, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees and disbursements) with respect to (a) any action taken (including, without limitation, any act of active negligence) or any omission by either of the Secured Party with respect to the Payment Obligations or this Security Agreement, provided that Secured Party's conduct does not constitute willful misconduct or gross negligence, and (b) any claims arising out of Debtor's ownership of the Collateral or Secured Party's security interest therein.

12.     Expenses. Debtor agrees to pay upon demand to the Secured Party any and all reasonable expenses, including the reasonable fees and expenses of its outside counsel and of any experts and agents which the Secured Party may incur in connection with (a) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (b) the exercise or enforcement of any of the rights of the Secured Party under the Payment Obligation and/or this Security Agreement, and (c) the failure by Debtor to perform or observe any of the provisions of the Payment Obligation and/or this Security Agreement.

13.     Security Interest Absolute. Except as otherwise provided herein or in the Purchase Agreement or in the Intercreditor Agreement, all rights of the Secured Party and security interests hereunder shall be absolute and unconditional irrespective of:

(a)     any lack of validity or enforceability of the Purchase Agreement or any other Loan Document;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Note, or any other amendment or waiver of or any consent to any departure from any of the Loan Documents; or

(c)     any furnishing, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Note.

14.     Amendments, Waiver. No amendment or waiver of any provision of this Security Agreement nor consent to any departure by Debtor herefrom shall in any event be effective unless the same shall be in writing and signed by the Secured Party and Debtor and/, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose any party for which given.

- 11 -

15.   Notices. All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered by messenger or overnight delivery service, or sent by first class mail (or air mail where available), postage prepaid, certified or registered, return receipt requested, as set forth in the Purchase Agreement or at such other address as may be furnished in writing. Any notice given by messenger or overnight delivery service as provided in this Section 15 shall be deemed given when delivered if during normal business hours on a business day (or if not, the next business day after delivery); any notice given by first class mail (or air mail where available), postage prepaid, certified or registered, return receipt requested shall be deemed given five (5) business days after the date of mailing. Any party may by notice to the other change the address at which notices and demands may be given to it.

16.   Continuing Security Interest; Release of Security Interest Upon Payment. This Security Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until indefeasible payment or other satisfaction in full of the Note, (b) be binding upon Debtor, and its successors and assigns, (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its successors, transferees and assigns, (d) constitute the entire agreement between Debtor and the Secured Party with respect to the subject matters covered hereby, and (e) be severable in the event that one or more of the provisions herein is determined to be illegal or unenforceable. Upon the indefeasible payment or other satisfaction in full of the Note, the Secured Party, at the request and expense of Debtor, shall release the security interests in the Collateral granted herein and execute such termination statements as may be necessary therefore, to the extent that such Collateral shall not have been sold or otherwise applied pursuant to the terms hereof.

17.   Return of Collateral. Subject to any duty imposed by law or otherwise to the holder of any subordinate lien on the Collateral known to the Secured Party, and subject to the direction of a court of competent jurisdiction, upon payment in full of the Note, Debtor shall be entitled to the return of all Collateral belonging to Debtor in the possession of the Secured Party; provided, however, that the Secured Party shall not be obligated to return to Debtor or deliver to the holder of any subordinate lien any such Collateral until it is satisfied that all amounts with respect to the Note are no longer subject to being recaptured under applicable bankruptcy or insolvency laws or otherwise. The return of Collateral, however effected, shall be without recourse to the Secured Party and the Secured Party shall be entitled to receive appropriate documentation to such effect. The return of Collateral shall be effected without representation or warranty and shall not entitle Debtor to any right to any endorsement.

18.   Governing Law; Terms. This Security Agreement shall be deemed to have been made in the state of Utah and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and construed in accordance with the internal laws of the state of Utah. Debtor hereby consents to the jurisdiction of any Utah state or United States Federal court sitting in Utah with respect to disputes arising out of this Security Agreement.

- 12 -

19.   Waiver of Jury Trial.  Debtor HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.   Any legal action or proceeding with respect to this Security Agreement must be brought in the federal or state courts located in the State of Utah, unless Secured Party elects to bring such legal action or proceeding elsewhere. Debtor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the federal or state courts located in the State of Utah as having proper venue. Debtor hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Security Agreement brought in the aforesaid Utah courts and irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum, and also consents to the service of process by any means authorized by the State of Utah.

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

Debtor:
CAMELOT FILM GROUP, INC., a Nevada corporation

By: _____
      Robert P. Atwell, CEO

Secured Party:
INCENTIVE CAPITAL, LLC, a Utah corporation

By: _____
                              , President

- 13 -

**EXHIBIT 4**

Exhibit 4

## COMMERCIAL GUARANTY

THIS COMMERCIAL GUARANTY (as the same may from time to time be amended, restated or otherwise modified, "*Guaranty*") is made as of the 27th day of April, 2010, by CAMELOT DISTRIBUTION GROUP, INC., a Delaware corporation in good standing in the State of California, with a place of business at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608, and its successors and assigns ("*Guarantor*"), in order to induce INCENTIVE CAPITAL, LLC, a Utah limited liability company with offices at 2755 E. Cottonwood Parkway, Suite 100, Salt Lake City, UT 84121, and its successors and assigns ("*Lender*") to extend credit (the "*Loan*") to CAMELOT FILM GROUP, INC., a Nevada corporation in good standing in the State of California, with a place of business at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608, and its successors and assigns ("*CFG*") ("*CFG*", also referred to herein as the "*Borrower*"), and in consideration thereof, and other good and valuable consideration, hereby unconditionally and absolutely guarantees the punctual and full performance of all Obligations (as hereinafter defined) of CFG to Lender.

As used herein, "*Obligations*" means every liability, now or hereafter owing to Lender or any affiliate of Lender ("*Lender Affiliate*") by Borrower, and includes, without limitation, every liability, whether owing by only Borrower or by Borrower with one or more others in a several, joint or joint and several capacity, whether owing absolutely or contingently, whether created by note, overdraft, guaranty of payment or other contract, tort, statute or other operation of law, whether incurred directly to Lender or acquired by Lender by purchase, pledge or otherwise and whether participated to or from Lender in whole or in part and all costs and expenses, including attorneys' fees, incurred by Lender in connection with the collection of any portion of the indebtedness. Any capitalized terms used but not defined herein shall have the meaning assigned it in that certain Promissory Note of even date herewith between Lender and Borrower (the "*Note*").

Guarantor deems it to be in the direct pecuniary and business interests of Guarantor that Lender extend credit to Borrower and understands that Lender is willing to extend credit to Borrower only upon certain terms and conditions, one of which is that Guarantor guarantee the payment of the Obligations, and this Guaranty is being executed and delivered in consideration of Lender extending credit to Borrower and for other valuable consideration. Guarantor acknowledges that the consideration for this Guaranty is not a mere recital and is adequate regardless of actual amount.

**Unconditional Guaranty.** Subject to the collection priority provisions contained hereinbelow, Guarantor hereby absolutely and unconditionally guarantees the prompt payment in full of all of the Obligations as and when the respective parts thereof become due and payable. Notwithstanding any provision to the contrary contained in this Guaranty or in any other Guaranty held by Lender guaranteeing the Obligations, Lender agrees that it shall seek satisfaction of the Obligations in the following order of priority: First, from the Borrower; Second, from the Guarantor hereunder, pursuant to this Guaranty; Third, from Camelot Entertainment Group, Inc pursuant to its Commercial Guaranty of the Obligations; and Fourth,

1

from Robert P. Atwell, pursuant to his Guaranty of the Obligations. If the Obligations, or any part thereof, shall not be paid in full when due and payable, then the Lender shall have the right to proceed directly against the Borrower and the various Guarantors in the foregoing order of priority to collect the payment in full of the Obligations. This is a guaranty of payment and not merely a guaranty of collection, and Guarantor hereby waives each and every guarantorship and suretyship defense, generally unless otherwise herein agreed. The "*Obligor*" means any entity, or any of its property, that is or shall be obligated on the Obligations or any part thereof in any manner and includes, without limitation, Borrower or Guarantor, and any other co-maker, endorser, guarantor of payment, subordinating creditor, assignor, grantor of a security interest, pledgor, mortgagor or any hypothecator of property. "*Collateral*" means, collectively, all property securing the Obligations or any part thereof at the time in question.

Payments. Whenever Lender shall credit any payment to the Obligations or any part thereof, whatever the source or form of payment, the credit shall be conditional as to Guarantor unless and until the payment shall be final and valid as to all the world. Without limiting the generality of the foregoing, Guarantor agrees that if any check or other instrument so applied shall be dishonored by the drawer or any party thereto, or if any proceeds of Collateral or payment so applied shall thereafter be recovered by any trustee in bankruptcy or any other person, Lender, in each case, may reverse any entry relating thereto on its books and Guarantor shall remain liable therefore.

Continuing Guaranty. Regardless of the duration of time, and irrespective of any act, omission or course of dealing whatever on the part of Lender, Guarantor's liabilities and other obligations under this Guaranty shall remain in full effect until the payment in full of the Obligations. Without limiting the generality of the foregoing:

(a) Lender shall not at any time be under any duty to Guarantor to grant any financial accommodation to Borrower, irrespective of any duty or commitment, if any, of Lender to Borrower, or to follow or direct the application of the proceeds of any such financial accommodation except to the extent otherwise provided herein.

(b) Guarantor waives (i) notice of the incurring of any Obligations by Borrower or the terms and conditions thereof, (ii) presentment, demand for payment and notice of dishonor of the Obligations or any part thereof, or any other indebtedness incurred by Borrower to Lender, and (iii) notice of any indulgence granted to any Obligor However, Guarantor does not waive any other notice to which Guarantor might be entitled, and Lender hereby agrees to provide such notices to Guarantor.

(c) Lender, in its sole discretion, may, without any prejudice to its rights under this Guaranty, at any time or times, without notice to or the consent of Guarantor, and provided any such action does not materially adversely affect Lender's obligation to seek payment of the Obligations in the order of priorities set forth hereinabove, (i) grant Borrower whatever financial accommodations that Lender may from time to time deem advisable, even if Borrower might be in default in any respect and even if those financial accommodations might not constitute indebtedness the payment of which is guaranteed hereunder; (ii) assent to any renewal, extension,

2



consolidation or refinancing of the Obligations or any part thereof; (iii) grant any waiver or consent or forbear from exercising any right, power or privilege that Lender may have or acquire; (iv) assent to any amendment, deletion, addition, supplement or other modification in, to or of any writing evidencing or securing any Obligations or pursuant to which any Obligations are created; (v) grant any other indulgence to any Obligor; or (vi) accept any Collateral for, or any other Obligor upon, the Obligations or any part thereof.

(d)    Guarantor's liabilities and other obligations under this Guaranty shall be absolute and unconditional subject to the Lender's obligation to seek payment of the Obligations in the order of priorities set forth hereinabove.

    Warranties.  Guarantor represents and warrants that (a) Guarantor has legal power and right to execute and deliver this Guaranty and to perform and observe the provisions hereof; (b) this Guaranty, when executed, is legal and binding upon Guarantor in every respect; (c) no litigation or proceeding is pending or threatened against Guarantor before any court or any administrative agency that would materially adversely affect Guarantor's obligations to the Lender hereunder; (d) Guarantor has received consideration that is the reasonable equivalent value of the obligations and liabilities that Guarantor has incurred to Lender; (e) Guarantor is not insolvent, as defined in any applicable state or federal statute, nor will Guarantor be rendered insolvent by the execution and delivery of this Guaranty to Lender; and (f) Guarantor does not intend to, nor does Guarantor believe that Guarantor will, incur debts beyond Guarantor's ability to pay such debts as they mature.

    Solvency of Obligor.  Without limiting the generality of any of the other provisions hereof, Guarantor specifically agrees that upon the dissolution of any Obligor and/or the filing or other commencement of any bankruptcy or insolvency proceedings by, for or against any Obligor, including without limitation, any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate any Obligor, and if the Borrower and other Obligors as the case may be are not paying the Obligations pursuant to the terms of the Note in the order of priorities set forth in this Guaranty, then Lender, in its sole discretion, may declare the unpaid principal balance of and accrued interest on the Obligations to be forthwith due and payable in full without notice.  Upon the occurrence of any of the events enumerated in the immediately preceding sentence, Guarantor shall, upon Lender's demand, whenever made, pay to Lender an amount equal to the then unpaid principal balance of and accrued interest on the Obligations.

    Waiver.  To the extent permitted by law, Guarantor waives any claim or other right that Guarantor might now have or hereafter acquire against Borrower or any other Obligor that arises from the existence or performance of Guarantor's liabilities or other obligations under this Guaranty, including, without limitation, any right of subrogation, exoneration, indemnification, and any right to participate in any claim or remedy of Lender against Borrower or any Collateral that Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.



3

**Notices.** All notices, requests, demands and other communications provided for hereunder shall be in writing and mailed or delivered at the address specified on the front page of this Guaranty. All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered or forty-eight (48) hours after being deposited in the mails with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation of receipt, except that notices from Guarantor to Lender pursuant to any of the provisions hereof shall not be effective until received by Lender.

**Successors and Assigns.** This Guaranty shall bind Guarantor and Guarantor's successors and assigns and shall inure to the benefit of Lender and its successors and assigns, including (without limitation) each holder of any note evidencing any Obligations. If, at any time, one or more provisions of this Guaranty is or becomes invalid, illegal or unenforceable in whole or in part, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. This Guaranty constitutes a final written expression of all of the terms of this Guaranty, is a complete and exclusive statement of those terms and supersedes all oral representations, negotiations and prior writings, if any, with respect to the subject matter hereof. The relationship between Guarantor and Lender with respect to this Guaranty is and shall be solely that of debtor and creditor, respectively, and, except as otherwise provided herein, Lender shall have no fiduciary obligation toward Guarantor with respect to this Guaranty or the transactions contemplated hereby; provided, however, that Lender shall have an obligation to act in good faith toward Guarantor with respect to this Guaranty or the transactions contemplated hereby.

**Collateral.** This Guaranty is secured by all of the collateral described in the Security Agreement of even date herewith between Borrower and Lender.

**Independent Judgment.** Guarantor (a) warrants that Guarantor has not relied on any information about the Borrower, the Collateral, or any other Obligor provided directly or indirectly by Lender; (b) warrants that Guarantor is familiar with Borrower, Borrower's affairs, and the Collateral; (c) warrants that Guarantor has been provided with all information concerning Borrower, Borrower's affairs, and the Collateral that Guarantor has requested; (d) warrants that Guarantor has had adequate opportunity to seek and evaluate professional advice concerning Borrower, the Collateral, and this Guaranty from advisors of Guarantor's choosing, including financial and legal advice; (e) agrees that Lender has no obligation to provide Guarantor any information about the Borrower, any Obligor, or the Collateral; and (f) agrees that Guarantor may not rely on any information about Borrower, any Obligor, or the Collateral provided by Lender.

**Set Off.** Guarantor: (a) agrees that upon the occurrence and continuation of an event of default under the Obligations which is not waived by the Lender, Lender has the right, in addition to all other rights and remedies available to it, to set off the unpaid balance of the Obligations against any debt owing to Guarantor by Lender; (b) hereby grants, pledges, and assigns to Lender a security interest in, and lien upon, all cash, negotiable instruments, securities, deposit accounts, and other cash equivalents, whether collected or in the process of collection, whether matured or

4

unmatured, now or hereafter in the possession of Lender and upon which Guarantor has or may hereafter have any claim; and (c) agrees, to the fullest extent Guarantor may effectively do so under applicable law, that any holder of a participation in the Obligations, with the exception of the applicable bank(s) which is (are) a holder(s) of a participation in the Obligations by virtue of its banking relationship with Guarantor on unrelated accounts, may exercise rights of set-off or counterclaim and other rights with respect to such participation as fully as if such holder of a participation were a direct creditor of Guarantor pursuant to this Guaranty in the amount of such participation.

**Savings Clause.** Notwithstanding anything to the contrary herein, the Guarantor's obligations hereunder shall not exceed the maximum amount that would not be subject to avoidance under fraudulent conveyance, fraudulent transfer, and other similar laws.

**Governing Law.** The provisions of this Guaranty and the respective rights and duties of Guarantor and Lender hereunder shall be governed by and construed in accordance with Utah law and any applicable federal laws. Guarantor hereby irrevocably submits to the non-exclusive jurisdiction of any Utah state or federal court sitting in Salt Lake County, over any action or proceeding arising out of or relating to this Guaranty, or any document related to the Obligations, and Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Utah state or federal court. The Guarantor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

Executed as of the date set forth above.

CAMELOT DISTRIBUTION GROUP, INC.

BY: _____

Robert P. Atwell, CEO

5

**EXHIBIT 5**

Exhibit 5

# COMMERCIAL GUARANTY

THIS COMMERCIAL GUARANTY (as the same may from time to time be amended, restated or otherwise modified, "*Guaranty*") is made as of the 27th day of April, 2010, by CAMELOT ENTERTAINMENT GROUP, INC., a Delaware corporation, having a usual place of business at 8001 Irvine Center Drive, Suite 400, Irvine, California 92618, and its successors and assigns ("*Guarantor*"), in order to induce INCENTIVE CAPITAL, LLC, a Utah limited liability company with offices at 2755 E. Cottonwood Parkway, Suite 100, Salt Lake City, UT 84121, and its successors and assigns ("*Lender*") to extend credit (the "*Loan*") to CAMELOT FILM GROUP, INC., a Nevada corporation in good standing in the State of California, with a place of business at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608, and its successors and assigns ("*CFG*", also referred to herein as the "*Borrower*"), and in consideration thereof, and other good and valuable consideration, hereby unconditionally and absolutely guarantees the punctual and full performance of all Obligations (as hereinafter defined) of CFG to Lender.

As used herein, "*Obligations*" means every liability, now or hereafter owing to Lender or any affiliate of Lender ("*Lender Affiliate*") by Borrower, and includes, without limitation, every liability, whether owing by only Borrower or by Borrower with one or more others in a several, joint or joint and several capacity, whether owing absolutely or contingently, whether created by note, overdraft, guaranty of payment or other contract, or by a quasi-contract, tort, statute or other operation of law, whether incurred directly to Lender or acquired by Lender by purchase, pledge or otherwise and whether participated to or from Lender in whole or in part and all costs and expenses, including attorneys' fees, incurred by Lender in connection with the collection of any portion of the indebtedness. Any capitalized terms used but not defined herein shall have the meaning assigned it in that certain Promissory Note of even date herewith between Lender and Borrower (the "*Note*").

Guarantor deems it to be in the direct pecuniary and business interests of Guarantor that Lender extend credit to Borrower and understands that Lender is willing to extend credit to Borrower only upon certain terms and conditions, one of which is that Guarantor guarantee the payment of the Obligations, and this Guaranty is being executed and delivered in consideration of Lender extending credit to Borrower and for other valuable consideration. Guarantor acknowledges that the consideration for this Guaranty is not a mere recital and is adequate regardless of actual amount.

**Unconditional Guaranty.** Subject to the collection priority provisions contained hereinbelow, Guarantor hereby absolutely and unconditionally guarantees the prompt payment in full of all of the Obligations as and when the respective parts thereof become due and payable. Notwithstanding any provisions to the contrary contained in this Guaranty or in any other Guaranty held by Lender guaranteeing the Obligations, Lender agrees that it shall seek satisfaction of the Obligations in the following order of priority: First, from the Borrower; Second, from Camelot Distribution Group, Inc. pursuant to its Commercial Guaranty of the Obligations; Third, from the Guarantor hereunder, pursuant to this Guaranty; and Fourth from Robert P. Atwell pursuant to his personal Guaranty of the Obligations. If the Obligations, or any

1

part thereof, shall not be paid in full when due and payable, then the Lender shall have the right to proceed directly against the Borrower and the various Guarantors in the foregoing order of priority to collect the payment in full of the Obligations. This is a guaranty of payment and not merely a guaranty of collection, and Guarantor hereby waives each and every guarantorship and suretyship defense, generally unless otherwise herein agreed. The "*Obligor*" means any entity, or any of its property, that is or shall be obligated on the Obligations or any part thereof in any manner and includes, without limitation, Borrower or Guarantor, and any other co-maker, endorser, guarantor of payment, subordinating creditor, assignor, grantor of a security interest, pledgor, mortgagor or any hypothecator of property. "*Collateral*" means, collectively, all property securing the Obligations or any part thereof at the time in question.

Payments. Whenever Lender shall credit any payment to the Obligations or any part thereof, whatever the source or form of payment, the credit shall be conditional as to Guarantor unless and until the payment shall be final and valid as to all the world. Without limiting the generality of the foregoing, Guarantor agrees that if any check or other instrument so applied shall be dishonored by the drawer or any party thereto, or if any proceeds of Collateral or payment so applied thereafter be recovered by any trustee in bankruptcy or any other person, Lender, in each case, may reverse any entry relating thereto on its books and Guarantor shall remain liable therefore.

Continuing Guaranty. Regardless of the duration of time, and irrespective of any act, omission or course of dealing whatever on the part of Lender, Guarantor's liabilities and other obligations under this Guaranty shall remain in full effect until the payment in full of the Obligations. Without limiting the generality of the foregoing:

(a)     Lender shall not at any time be under any duty to Guarantor to grant any financial accommodation to Borrower, irrespective of any duty or commitment, if any, of Lender to Borrower, or to follow or direct the application of the proceeds of any such financial accommodation except to the extent otherwise provided herein.

(b)     Guarantor waives (i) notice of the incurring of any Obligations by Borrower or the terms and conditions thereof, (ii) presentment, demand for payment and notice of dishonor of the Obligations or any part thereof, or any other indebtedness incurred by Borrower to Lender, and (iii) notice of any indulgence granted to any Obligor. However, Guarantor does not waive (any other notice to which Guarantor might be entitled, and Lender hereby agrees to provide such notices to Guarantor.

(c)     Lender, in its sole discretion, may, without any prejudice to its rights under this Guaranty, at any time or times, without notice to or the consent of Guarantor, and provided any such action does not materially adversely affect Lender's obligation to seek payment of the Obligations in the order of priorities set forth hereinabove, (i) grant Borrower whatever financial accommodations that Lender may from time to time deem advisable, even if Borrower might be in default in any respect and even if those financial accommodations might not constitute indebtedness the payment of which is guaranteed hereunder; (ii) assent to any renewal, extension, consolidation or refinancing of the Obligations or any part thereof; (iii) grant any waiver or

2



consent or forbear from exercising any right, power or privilege that Lender may have or acquire; (iv) assent to any amendment, deletion, addition, supplement or other modification in, to or of any writing evidencing or securing any Obligations or pursuant to which any Obligations are created; (v) grant any other indulgence to any Obligor; or (vi) accept any Collateral for, or any other Obligor upon, the Obligations or any part thereof.

(d)   Guarantor's liabilities and other obligations under this Guaranty shall be absolute and unconditional subject to the Lender's obligation to seek payment of the Obligations in the order of priorities set forth hereinabove.

Warranties.   Guarantor represents and warrants that (a) Guarantor has legal power and right to execute and deliver this Guaranty and to perform and observe the provisions hereof; (b) this Guaranty, when executed, is legal and binding upon Guarantor in every respect; (c) no litigation or proceeding is pending or threatened against Guarantor before any court or any administrative agency that would materially adversely affect Guarantor's obligations to the Lender hereunder; (d) Guarantor has received consideration that is the reasonable equivalent value of the obligations and liabilities that Guarantor has incurred to Lender; (e) Guarantor is not insolvent, as defined in any applicable state or federal statute, nor will Guarantor be rendered insolvent by the execution and delivery of this Guaranty to Lender; and (f) Guarantor does not intend to, nor does Guarantor believe that Guarantor will, incur debts beyond Guarantor's ability to pay such debts as they mature.

Solvency of Obligor.   Without limiting the generality of any of the other provisions hereof, Guarantor specifically agrees that upon the dissolution of any Obligor and/or the filing or other commencement of any bankruptcy or insolvency proceedings by, for or against any Obligor, including without limitation, any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate any Obligor, and if the Borrower and other Obligors as the case may be are not paying the Obligations pursuant to the terms of the Note in the order of priorities set forth in this Guaranty, then Lender, in its sole discretion, may declare the unpaid principal balance of and accrued interest on the Obligations to be forthwith due and payable in full without notice.   Upon the occurrence of any of the events enumerated in the immediately preceding sentence, Guarantor shall, upon Lender's demand, whenever made, pay to Lender an amount equal to the then unpaid principal balance of and accrued interest on the Obligations.

Waiver.   To the extent permitted by law, Guarantor waives any claim or other right that Guarantor might now have or hereafter acquire against Borrower or any other Obligor that arises from the existence or performance of Guarantor's liabilities or other obligations under this Guaranty, including, without limitation, any right of subrogation, exoneration, indemnification, and any right to participate in any claim or remedy of Lender against Borrower or any Collateral that Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.

3

Notices.   All notices, requests, demands and other communications provided for hereunder shall be in writing and mailed or delivered at the address specified on the front page of this Guaranty. All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered or forty-eight (48) hours after being deposited in the mails with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation of receipt, except that notices from Guarantor to Lender pursuant to any of the provisions hereof shall not be effective until received by Lender.

Successors and Assigns.  This Guaranty shall bind Guarantor and Guarantor's successors and assigns and shall inure to the benefit of Lender and its successors and assigns, including (without limitation) each holder of any note evidencing any Obligations.  If, at any time, one or more provisions of this Guaranty is or becomes invalid, illegal or unenforceable in whole or in part, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  This Guaranty constitutes a final written expression of all of the terms of this Guaranty, is a complete and exclusive statement of those terms and supersedes all oral representations, negotiations and prior writings, if any, with respect to the subject matter hereof.  The relationship between Guarantor and Lender with respect to this Guaranty is and shall be solely that of debtor and creditor, respectively, and, except as otherwise provided herein, Lender shall have no fiduciary obligation toward Guarantor with respect to this Guaranty or the transactions contemplated hereby; provided, however, that Lender shall have an obligation to act in good faith toward Guarantor with respect to this Guaranty or the transactions contemplated hereby.

Collateral.  This Guaranty is secured by all of the collateral described in the Security Agreement of even date herewith between Borrower and Lender.

Independent Judgment.  Guarantor (a) warrants that Guarantor has not relied on any information about the Borrower, the Collateral, or any other Obligor provided directly or indirectly by Lender; (b) warrants that Guarantor is familiar with Borrower, Borrower's affairs, and the Collateral; (c) warrants that Guarantor has been provided with all information concerning Borrower, Borrower's affairs, and the Collateral that Guarantor has requested; (d) warrants that Guarantor has had adequate opportunity to seek and evaluate professional advice concerning Borrower, the Collateral, and this Guaranty from advisors of Guarantor's choosing, including financial and legal advice; (e) agrees that Lender has no obligation to provide Guarantor any information about the Borrower, any Obligor, or the Collateral; and (f) agrees that Guarantor may not rely on any information about Borrower, any Obligor, or the Collateral provided by Lender.

Set Off.  Guarantor:  (a) agrees that upon the occurrence and continuation of an event of default under the Obligations which is not waived by the Lender, Lender has the right, in addition to all other rights and remedies available to it, to set off the unpaid balance of the Obligations against any debt owing to Guarantor by Lender; (b) hereby grants, pledges, and assigns to Lender a security interest in, and lien upon, all cash, negotiable instruments, securities, deposit accounts, and other cash equivalents, whether collected or in the process of collection, whether matured or unmatured, now or hereafter in the possession of Lender and upon which Guarantor has or may

4

hereafter have any claim; and (c) agrees, to the fullest extent Guarantor may effectively do so under applicable law, that any holder of a participation in the Obligations, with the exception of the applicable bank(s) which is (are) a holder(s) of a participation in the Obligations by virtue of its banking relationship with Guarantor on unrelated accounts, may exercise rights of set-off or counterclaim and other rights with respect to such participation as fully as if such holder of a participation were a direct creditor of Guarantor pursuant to this Guaranty in the amount of such participation.

**Savings Clause.** Notwithstanding anything to the contrary herein, the Guarantor's obligations hereunder shall not exceed the maximum amount that would not be subject to avoidance under fraudulent conveyance, fraudulent transfer, and other similar laws.

**Governing Law.** The provisions of this Guaranty and the respective rights and duties of Guarantor and Lender hereunder shall be governed by and construed in accordance with Utah law and any applicable federal laws. Guarantor hereby irrevocably submits to the non-exclusive jurisdiction of any Utah state or federal court sitting in Salt Lake County, over any action or proceeding arising out of or relating to this Guaranty, or any document related to the Obligations, and Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Utah state or federal court. The Guarantor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

Executed as of the date set forth above.

Guarantor:
CAMELOT ENTERTAINMENT GROUP, INC.

BY: _____
      Robert P. Atwell, CEO

**EXHIBIT 6**

Exhibit 6

## COMMERCIAL GUARANTY

THIS COMMERCIAL GUARANTY (as the same may from time to time be amended, restated or otherwise modified, "*Guaranty*") is made as of the 2? day of April, 2010, by ROBERT P. ATWELL, individually and his heirs, executors, administrators, personal representatives and assigns ("*Guarantor*"), in order to induce INCENTIVE CAPITAL, LLC, a Utah limited liability company with offices at 2755 E. Cottonwood Parkway, Suite 100, Salt Lake City, UT 84121, and its successors and assigns ("*Lender*") to extend credit (the "*Loan*") to CAMELOT FILM GROUP, INC., a Nevada corporation in good standing in the State of California, with a place of business at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608, and its successors and assigns ("*CFG*, also referred to herein as the "*Borrower*"), and in consideration thereof, and other good and valuable consideration, hereby unconditionally and absolutely guarantees the punctual and full performance of all Obligations (as hereinafter defined) of CFG to Lender.

As used herein, "*Obligations*" means every liability, now or hereafter owing to Lender or any affiliate of Lender ("*Lender Affiliate*") by Borrower, and includes, without limitation, every liability, whether owing by only Borrower or by Borrower with one or more others in a several, joint or joint and several capacity, whether owing absolutely or contingently, whether created by note, overdraft, guaranty of payment or other contract, or by a quasi-contract, tort, statute or other operation of law, whether incurred directly to Lender or acquired by Lender by purchase, pledge or otherwise and whether participated to or from Lender in whole or in part and all costs and expenses, including attorneys' fees, incurred by Lender in connection with the collection of any portion of the indebtedness. Any capitalized terms used but not defined herein shall have the meaning assigned it in that certain Promissory Note of even date herewith between Lender and Borrower (the "*Note*").

Guarantor deems it to be in the direct pecuniary and business interests of Guarantor that Lender extend credit to Borrower and understands that Lender is willing to extend credit to Borrower only upon certain terms and conditions, one of which is that Guarantor guarantee the payment of the Obligations, and this Guaranty is being executed and delivered in consideration of Lender extending credit to Borrower and for other valuable consideration. Guarantor acknowledges that the consideration for this Guaranty is not a mere recital and is adequate regardless of actual amount.

Unconditional Guaranty. Subject to the collection priority provisions contained hereinbelow, Guarantor hereby absolutely and unconditionally guarantees the prompt payment in full of all of the Obligations as and when the respective parts thereof become due and payable. Notwithstanding any provisions to the contrary contained in this Guaranty or in any other Guaranty held by Lender guaranteeing the Obligations, Lender agrees that it shall seek satisfaction of the Obligations in the following order of priority: First, from the Borrower; Second, from Camelot Distribution Group, Inc. pursuant to its Commercial Guaranty of the Obligations; Third, from Camelot Entertainment Group, Inc., pursuant to its Commercial Guaranty of the Obligations; and Fourth from the Guarantor hereunder, pursuant to this Guaranty. If the Obligations, or any part thereof, shall not be paid in full when due and payable,

1

then the Lender shall have the right to proceed directly against the Borrower and the various Guarantors in the foregoing order of priority to collect the payment in full of the Obligations. This is a guaranty of payment and not merely a guaranty of collection, and Guarantor hereby waives each and every guarantorship and suretyship defense, generally unless otherwise herein agreed. The "*Obligor*" means any entity, or any of its property, that is or shall be obligated on the Obligations or any part thereof in any manner and includes, without limitation, Borrower or Guarantor, and any other co-maker, endorser, guarantor of payment, subordinating creditor, assignor, grantor of a security interest, pledgor, mortgagor or any hypothecator of property. "*Collateral*" means, collectively, all property securing the Obligations or any part thereof at the time in question.

**Payments.** Whenever Lender shall credit any payment to the Obligations or any part thereof, whatever the source or form of payment, the credit shall be conditional as to Guarantor unless and until the payment shall be final and valid as to all the world. Without limiting the generality of the foregoing, Guarantor agrees that if any check or other instrument so applied shall be dishonored by the drawer or any party thereto, or if any proceeds of Collateral or payment so applied shall thereafter be recovered by any trustee in bankruptcy or any other person, Lender, in each case, may reverse any entry relating thereto on its books and Guarantor shall remain liable therefore.

**Continuing Guaranty.** Regardless of the duration of time, and irrespective of any act, omission or course of dealing whatever on the part of Lender, Guarantor's liabilities and other obligations under this Guaranty shall remain in full effect until the payment in full of the Obligations. Without limiting the generality of the foregoing:

(a)      Lender shall not at any time be under any duty to Guarantor to grant any financial accommodation to Borrower, irrespective of any duty or commitment, if any, of Lender to Borrower, or to follow or direct the application of the proceeds of any such financial accommodation except to the extent otherwise provided herein.

(b)      Guarantor waives (i) notice of the incurring of any Obligations by Borrower or the terms and conditions thereof, (ii) presentment, demand for payment and notice of dishonor of the Obligations or any part thereof, or any other indebtedness incurred by Borrower to Lender, and (iii) notice of any indulgence granted to any Obligor. However, Guarantor does not waive (any other notice to which Guarantor might be entitled, and Lender hereby agrees to provide such notices to Guarantor.

(c)      Lender, in its sole discretion, may, without any prejudice to its rights under this Guaranty, at any time or times, without notice to or the consent of Guarantor, and provided any such action does not materially adversely affect Lender's obligation to seek payment of the Obligations in the order of priorities set forth hereinabove, (i) grant Borrower whatever financial accommodations that Lender may from time to time deem advisable, even if Borrower might be in default in any respect and even if those financial accommodations might not constitute indebtedness the payment of which is guaranteed hereunder; (ii) assent to any renewal, extension, consolidation or refinancing of the Obligations or any part thereof; (iii) grant any waiver or

2



consent or forbear from exercising any right, power or privilege that Lender may have or acquire; (iv) assent to any amendment, deletion, addition, supplement or other modification in, to or of any writing evidencing or securing any Obligations or pursuant to which any Obligations are created; (v) grant any other indulgence to any Obligor; or (vi) accept any Collateral for, or any other Obligor upon, the Obligations or any part thereof.

(d)     Guarantor's liabilities and other obligations under this Guaranty shall be absolute and unconditional subject to the Lender's obligation to seek payment of the Obligations in the order of priorities set forth hereinabove.

Warranties.  Guarantor represents and warrants that (a) Guarantor has legal power and right to execute and deliver this Guaranty and to perform and observe the provisions hereof; (b) this Guaranty, when executed, is legal and binding upon Guarantor in every respect; (c) no litigation or proceeding is pending or threatened against Guarantor before any court or any administrative agency that would materially adversely affect Guarantor's obligations to the Lender hereunder; (d) (e) Guarantor is not insolvent, as defined in any applicable state or federal statute, nor will Guarantor be rendered insolvent by the execution and delivery of this Guaranty to Lender; and (f) Guarantor does not intend to, nor does Guarantor believe that Guarantor will, incur debts beyond Guarantor's ability to pay such debts as they mature.

Solvency of Obligor.  Without limiting the generality of any of the other provisions hereof, Guarantor specifically agrees that upon the dissolution of any Obligor and/or the filing or other commencement of any bankruptcy or insolvency proceedings by, for or against any Obligor, including without limitation, any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate any Obligor, and if the Borrower and other Obligors as the case may be are not paying the Obligations pursuant to the terms of the Note in the order of priorities set forth in this Guaranty, then Lender, in its sole discretion, may declare the unpaid principal balance of and accrued interest on the Obligations to be forthwith due and payable in full without notice.  Upon the occurrence of any of the events enumerated in the immediately preceding sentence, Guarantor shall, upon Lender's demand, whenever made, pay to Lender an amount equal to the then unpaid principal balance of and accrued interest on the Obligations.

Waiver.  To the extent permitted by law, Guarantor waives any claim or other right that Guarantor might now have or hereafter acquire against Borrower or any other Obligor that arises from the existence or performance of Guarantor's liabilities or other obligations under this Guaranty, including, without limitation, any right of subrogation, exoneration, indemnification, and any right to participate in any claim or remedy of Lender against Borrower or any Collateral that Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.

Notices.  All notices, requests, demands and other communications provided for hereunder shall be in writing and mailed or delivered at the address specified on the front page of

3

this Guaranty. All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered or forty-eight (48) hours after being deposited in the mails with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation of receipt, except that notices from Guarantor to Lender pursuant to any of the provisions hereof shall not be effective until received by Lender.

Successors and Assigns. This Guaranty shall bind Guarantor and Guarantor's heirs, executors, administrators, personal representatives and assigns, and shall inure to the benefit of Lender and its successors and assigns, including (without limitation) each holder of any note evidencing any Obligations. If, at any time, one or more provisions of this Guaranty is or becomes invalid, illegal or unenforceable in whole or in part, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. This Guaranty constitutes a final written expression of all of the terms of this Guaranty, is a complete and exclusive statement of those terms and supersedes all oral representations, negotiations and prior writings, if any, with respect to the subject matter hereof. The relationship between Guarantor and Lender with respect to this Guaranty is and shall be solely that of debtor and creditor, respectively, and, except as otherwise provided herein, Lender shall have no fiduciary obligation toward Guarantor with respect to this Guaranty or the transactions contemplated hereby; provided, however, that Lender shall have an obligation to act in good faith toward Guarantor with respect to this Guaranty or the transactions contemplated hereby.

Collateral. This Guaranty is secured by all of the collateral described in the Security Agreement of even date herewith between Borrower and Lender.

Independent Judgment. Guarantor (a) warrants that Guarantor has not relied on any information about the Borrower, the Collateral, or any other Obligor provided directly or indirectly by Lender; (b) warrants that Guarantor is familiar with Borrower, Borrower's affairs, and the Collateral; (c) warrants that Guarantor has been provided with all information concerning Borrower, Borrower's affairs, and the Collateral that Guarantor has requested; (d) warrants that Guarantor has had adequate opportunity to seek and evaluate professional advice concerning Borrower, the Collateral, and this Guaranty from advisors of Guarantor's choosing, including financial and legal advice; (e) agrees that Lender has no obligation to provide Guarantor any information about the Borrower, any Obligor, or the Collateral; and (f) agrees that Guarantor may not rely on any information about Borrower, any Obligor, or the Collateral provided by Lender.

Set Off. Guarantor: (a) agrees that upon the occurrence and continuation of an event of default under the Obligations which is not waived by the Lender, Lender has the right, in addition to all other rights and remedies available to it, to set off the unpaid balance of the Obligations against any debt owing to Guarantor by Lender; (b) hereby grants, pledges, and assigns to Lender a security interest in, and lien upon, all cash, negotiable instruments, securities, deposit accounts, and other cash equivalents, whether collected or in the process of collection, whether matured or unmatured, now or hereafter in the possession of Lender and upon which Guarantor has or may hereafter have any claim; and (c) agrees, to the fullest extent Guarantor may effectively do so under applicable law, that any holder of a participation in the Obligations, with the exception of

4

the applicable bank(s) which is (are) a holder(s) of a participation in the Obligations by virtue of its banking relationship with Guarantor on unrelated accounts, may exercise rights of set-off or counterclaim and other rights with respect to such participation as fully as if such holder of a participation were a direct creditor of Guarantor pursuant to this Guaranty in the amount of such participation.

Savings Clause.   Notwithstanding anything to the contrary herein, the Guarantor's obligations hereunder shall not exceed the maximum amount that would not be subject to avoidance under fraudulent conveyance, fraudulent transfer, and other similar laws.

Governing Law.   The provisions of this Guaranty and the respective rights and duties of Guarantor and Lender hereunder shall be governed by and construed in accordance with Utah law and any applicable federal laws.   Guarantor hereby irrevocably submits to the non-exclusive jurisdiction of any Utah state or federal court sitting in Salt Lake County, over any action or proceeding arising out of or relating to this Guaranty, or any document related to the Obligations, and Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Utah state or federal court.   The Guarantor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

Executed as of the date set forth above.

Guarantor:

ROBERT P. ATWELL, Individually

5

Legal Tabs Co. 1-800-322-3022

Recycled  Stock # R-EX-5-B

**EXHIBIT 7**

Exhibit 7

<u>ASSET PURCHASE AGREEMENT</u>

THIS ASSET PURCHASE AGREEMENT ("*Agreement*") is made as of April 28, 2010, by and between CMBG ADVISORS, INC., a California corporation, in its sole and limited capacity as assignee for the benefit of creditors of Liberation Entertainment, Inc. (the "*Seller*"); and CAMELOT FILM GROUP, INC., a Nevada corporation ("CFG" or "Buyer"), and a wholly-owned subsidiary of CAMELOT ENTERTAINMENT GROUP, INC., a Delaware corporation ("CMGR").

## RECITALS

A.      Liberation Entertainment, Inc., a Delaware corporation ("*Liberation*"), with principal offices located at 1990 Westwood Boulevard, Penthouse 3, Los Angeles, California 90025, pursuant to that certain General Assignment made by Liberation in favor of Seller dated as of January 29, 2010 (the "*General Assignment*"), transferred ownership of its right, title and interest in and to all of its tangible and intangible assets, wherever located, including, without limitation, all of Liberation's accounts receivable, contract rights, certificates of deposit, letters of credit, available access passwords to computers and other media, license rights and rights to payment that are uncollected as the date of Closing (collectively, the "*Liberation Assets*") to Seller, and in so doing has also designated Seller to act, pursuant to California law, as the Assignee for the Benefit of Creditors of Liberation. A true copy of the duly-executed General Assignment is attached hereto as <u>Exhibit A</u>.

B.      Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Assets (as defined in Section 1.1 below), on the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, and in consideration of the mutual covenants and agreements set forth in this Agreement, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      <u>PURCHASE AND SALE OF ASSETS</u>

1.1      <u>Agreement to Sell and Purchase the Assets</u>. Subject to the terms and conditions of this Agreement, and in reliance on the representations, warranties and covenants set forth in this Agreement, Seller hereby agrees to sell, assign, transfer and convey to Buyer at the Closing (as defined in Section 2.2 below), and Buyer hereby agrees to purchase and acquire from Seller at the Closing, all of Seller's right, title and interest in and to all of the Liberation Assets including without limitation, to the extent of Seller's right, title or interest therein, if any, (a) all accounts receivable related to the Liberation Assets as of the date of Closing, as defined below, (b) all accounts receivable related to the "Restricted Liberation Assets" (as defined in Section 9.2.4 below) as of the date of the Closing; (c) all other Assets as described and identified on Schedule 1.1 annexed hereto and by this reference made a part hereof; and (d) any and all other Assets not

described or identified on Schedule 1.1 (collectively, the "*Assets*"); provided, however, that notwithstanding anything to the contrary contained in this Agreement, the Assets shall not include (a) cash held by Seller on account of Assets at the Closing; and (b) subject to the provisions of Section 1.3 below, each "Restricted Liberation Asset" (as identified in Section 9.2.4.), but only to the extent that, by the Closing, the Buyer has been unable to negotiate and resolve any third party claim that such third party's consent is required to transfer such Restricted Liberation Asset ("Claim"). The Assets will be sold, assigned, transferred and conveyed to Buyer (subject to the provisions of Section 1.6 below) on the Closing Date "as is" and "where is", with no representations or warranties other than those specifically set forth hereinbelow.

1.2    **Buyer's Post-Closing Right to Collect Revenues and Resolve Claims With Respect to Restricted Liberation Assets.**  Following the Closing, Buyer shall have the exclusive right, and shall use good faith best efforts, to negotiate and resolve all Claims relating to consent with respect to transferability of a Restricted Liberation Asset raised by a third party. Further, Buyer shall have the exclusive right to collect and retain any revenues derived from the post-Closing distribution and other exploitation of such Restricted Liberation Asset to the extent ultimately agreed upon between Buyer and the applicable third party(ies).

1.3    **Resolved and Unresolved Claims.**  In the event Buyer successfully resolves a Claim(s), the Restricted Liberation Asset(s) relating to such Claim(s) shall be deemed an Asset transferred pursuant to this Agreement. To the extent that the Claims are not resolved within one hundred twenty (120) days following the Closing, then Buyer shall cease and desist from exploiting any such Asset, its rights set forth in Section 1.2 shall cease, and Seller shall own and dispose of such Asset(s) subject to such unresolved Claims, in its discretion. For purposes of Sections 1.1, 1.2 and 1.3, successfully resolving a Claim shall mean Buyer's and Seller's receipt of a written notification from a third party claimant advising that such third party claimant consents to or does not oppose the transfer of the subject Restricted Liberation Asset by Seller to Buyer.

1.4    **No Representations or Warranties by Seller.**  The parties acknowledge that the Buyer, and not the Seller or Liberation, have generated the Schedule 1.1 list of Assets from the data in the Seller's data bank stored on Liberation's server and elsewhere, including but not limited to copyright information, creditor lists, websites, copyrights, trademarks, registration marks, patents, advertising and marketing graphics and materials, logos, deals by library titles and distribution agreements, DVD inventory reports, film elements and materials in storage, rights and terms of each Liberation library title, rights termination correspondence, files on all library titles, and miscellaneous furniture, fixtures and office equipment. It is expressly acknowledged and agreed that, except as may otherwise be provided herein, neither Liberation nor the Seller shall make any representation(s) or warranty(ies) whatsoever regarding the content and completeness of the Schedule 1.1 listing of Assets, including, without limitation, any representation or warranty that (a) Liberation and/or the Seller has or had at any time any ownership interest whatsoever in any particular item of the Assets; and (b) any of the Assets are, or might become, subject to claims and/or liens by third parties.



2

1.5    Liberation's Accounts Receivable; Notices to Liberation Account Debtors and Other Third Party Licensees.

1.5.1    Within ten (10) calendar days from the date of Closing, the Buyer shall, execute and deliver to each account debtor and to each third party licensor from whom Liberation licensed any rights comprising the Assets written notice advising each such account debtor and/or such third party licensee of the sale and assignment of the Liberation accounts receivable to the Buyer, and directing each such account debtor and such third party licensee to henceforth make payments directly to the Buyer.

1.5.2    In the event the Seller receives any accounts receivable, license payments or royalty payments that constitute Assets from and after the date of Closing hereunder, the Seller shall hold such payments in trust for Buyer and then forthwith deliver any such payments in kind directly to the Buyer at the following address: Camelot Entertainment Group, Inc., 8001 Irvine Center Drive, Suite 400, Irvine, CA 92618, Attention: Accounting Department.

1.6    Asset Transfer; Passage of Title; Delivery.

1.6.1    Title Passage.  Upon the Closing, title to all of the Assets shall pass to Buyer.  Upon successful resolution of a Claim, title to the subject Restricted Liberation Asset shall pass to the Buyer.

1.6.2    Delivery of Assets.  On the Closing Date (as defined in Section 2.2) or as soon thereafter as is reasonably practicable, but no later than 5 business days after the Closing Date, Seller shall transfer physical possession of the tangible Assets to the Buyer or to the Buyer's authorized agent, provided, however, that the expenses of retrieving, removing and transferring the Assets to Buyer as necessary shall be borne exclusively by Buyer and the Seller shall fully comply with its undertakings as set forth in this Agreement regarding obtaining possession, custody and control of the Assets.  It is expressly understood and agreed that Seller shall promptly pay all storage costs incurred with respect to the Assets prior to Closing to the extent necessary to assure that possession of the such Assets can be delivered to the Buyer free and clear of warehouseman's liens or the like ("Storage Costs").  Seller shall execute and deliver to Buyer such laboratory access letters or the like provided by Buyer in a form reasonably acceptable to Seller and Buyer authorizing Buyer to take possession, custody and control of the tangible Assets for all locations where the tangible Assets may be located both inside and outside California.

1.6.3    Seller's access to Liberation's Business Records.  The parties agree that Seller shall retain Liberation's original minute book, corporate records, payroll records and personnel files and files for prior years' tax returns, provided that all business records of Liberation relating to the Assets shall be delivered to Buyer at the Closing.  To the extent that the Seller may, in its sole determination, require business records of Liberation to administer the assignment estate or wind up the business of Liberation or file tax returns, Buyer shall provide Seller with access to all such records at reasonable times and upon reasonable notice, including



3

the right to photocopy any such business records at Seller's expense, and, as necessary, to have access to original business records.

2.   PURCHASE PRICE; CLOSING

2.1   Purchase Price.   In consideration of the sale, transfer, conveyance and assignment of all the Assets to Buyer, the Buyer and CMGR jointly and severally agrees to pay and deliver the following consideration:

2.1.1.   At Closing, the sum of Five Hundred Thousand Dollars ($500,000.00) to Seller in cash or immediately available funds via wire transfer in accordance with the wiring instruction annexed hereto as Schedule 2.1.1.

2.1.2   On or before the Due Date (as defined below) either (a) deliver to creditors of Liberation identified by Seller Four Hundred Fifty Thousand Dollars ($450,000.00) in fully paid and non-assessable shares of CMGR Common Stock pursuant to and in compliance with Section 7.4 hereof, or (b) deliver to Seller the sum of Four Hundred Fifty Thousand Dollars ($450,000.00) in cash or immediately available funds via wire transfer in accordance with the wiring instruction annexed hereto as Schedule 2.1.1.   The "Due Date" shall be the date that is one eighty hundred (180) days after the date that Seller supplies the list of creditors referred to in Section 7.4.1.

2.1.3   As additional consideration for the specific assets of Liberation related to the animated television series entitled "Wolverine" (collectively referred to as "Wolverine"), subject only to the Buyer being able to retain the DVD and television distribution rights to Wolverine (the "Rights"), on or before the one year anniversary of the Closing Date (the "Post-Closing One-Year Period"), the Buyer shall pay the Seller the sum of Ninety Thousand Dollars ($90,000.00) in cash or immediately available funds via wire transfer in accordance with the wiring instruction annexed hereto as Schedule 2.1.1.

2.1.4   Notwithstanding anything to the contrary contained hereinabove, during the Post-Closing One-Year Period, Buyer will pay Seller a monthly fee of twenty (20%) of the first Fifteen Thousand Dollars ($15,000.00) collected by Buyer in connection with retaining the Rights.   In the event that Buyer is fully-recouped of its actual out-of-pocket costs incurred in retaining the Rights.   In the event that Buyer is fully-recouped of its actual out-of-pocket costs prior to the end of the Post-Closing One-Year Period, then Seller would receive ten percent (10%) of all Wolverine monies which Buyer collects during the remainder of the Post-Closing One-Year Period, up to a maximum of Ninety-Thousand Dollars ($90,000.00).   All monies paid to Seller pursuant to this Section 2.1.4 shall be applied and serve to reduce any monies due pursuant to Section 2.1.3 above, or Section 2.1.5 below, whichever is applicable.

2.1.5   In the event that Buyer is unable to retain the Rights by the end of the Post-Closing One-Year Period, then Buyer shall continue to pay Seller the applicable monthly fee percentage delineated in Section 2.1.4 above until Seller has been paid One Hundred Twenty Thousand Dollars ($120,000.00), at which point Seller would cease to share in any such

4

Wolverine revenue whatsoever, and Buyer's obligations to Seller regarding Wolverine pursuant to this Agreement shall cease and terminate.

2.1.6  Buyer agrees that it will comply with Schedule 2.1.6 hereof with respect to certain reporting rights of Seller.

2.2.  Closing.  The consummation of the purchase and sale of the Assets contemplated hereby will take place at a closing to be held at the offices of the Seller at a mutually-agreeable time on or before April 28, 2010, unless such date is extended by the approval of both Buyer and Seller (the *"Closing Date"*).

2.3 Allocation of Purchase Price.  Seller shall prepare an allocation of the Purchase Price among the Liberation Assets in accordance with section 1060 of the Internal Revenue Code of 1986, as amended ("Code") and the regulations promulgated thereunder and as necessary to comply with any provision of state or local law, including and sales or other transfer taxes. Seller shall deliver such allocations to Buyer within 30 days after the Closing or as soon thereafter as practicable.  Buyer agrees to fully cooperate with Seller and respond to all reasonable requests for information in connection with the preparation of such allocations. Seller will reasonably consult with Buyer regarding the preparation of any sales Tax returns in connection with the sale of the Liberation Assets, but the Seller's decision with respect to all of Seller's sales and other Tax matters, including the filing of sales Tax returns, will be in the Seller's sole discretion.  In the event that material new information arises after the Closing that is relevant to the application of the sales Tax to the sale of the Liberation Assets, then, at the reasonable request of Buyer, Seller shall take such reasonable steps as may be appropriate to seek a refund of excessive Taxes otherwise paid in connection with the transactions contemplated hereby.  To the extent that Buyer and Seller agree in a writing signed by an authorized representative of both Buyer and Seller on an allocation of the Purchase Price for purposes of section 1060 of the Code, then Seller and Buyer shall report, act and file income tax returns consistent with such agreed allocation. As used in this Agreement, *"Tax"* or *"Taxes"* shall mean, unless qualified, all income, excise, gross receipts, ad valorum, sales, use, employment, franchise, profits, excise, gains, privilege, occupation, property, transfer, unemployment compensation, social security, payroll, license, school, intangibles or other taxes, fees, stamp taxes, duties, charges, levies or assessments of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax or additional amounts imposed by any governmental entity having jurisdiction over the assessment, determination, collection, or other imposition of any Tax.

3.  OBLIGATIONS ASSUMED.

3.1  No Monetary Liabilities or Obligations Assumed by Buyer.  Except as expressly provided in this Agreement, Buyer shall not assume or become obligated in any way to pay any liabilities, debts or obligations of Seller or of Liberation whatsoever, including, but not limited to, any liabilities or obligations now or hereafter arising from Liberation's and/or Seller's business activities that took place prior to the Closing. Upon the Closing, Buyer assumes and agrees to perform all obligations under contracts and agreements contained in the Assets, and

5

Buyer shall be solely responsible for all obligations and liabilities arising as a result of distribution and/or exploitation of the Assets after the Closing (including, without limitation, participations and residuals due to guild or collective bargaining agreements; provided, however, that the obligations being assumed by Buyer hereunder shall be limited in each case to that portion of those obligations and liabilities (the "Assumed Liabilities") that occur or are incurred or are related to the period of time after the Closing.

3.2     No Obligations to Third Parties.  The execution and delivery of this Agreement shall not be deemed to confer any rights upon any person(s) or entity(ies) other than the parties hereto, or make any person or entity a third party beneficiary of this Agreement, or to obligate either party to any person or entity other than the parties to this Agreement.  The provisions hereof shall in no way expand the rights or remedies of third parties against Buyer as compared to the rights and remedies such parties would have against Seller and/or Liberation if the Closing were not consummated.

3.3     Transfer Taxes.  Buyer shall indemnify and pay to Seller upon demand all sales, use, transfer, excise, stamp or other Taxes resulting from the sale of the Assets and the assumption of the Assumed Liabilities contemplated by this Agreement, if any. Buyer shall pay the amount of $10,000 to Seller at the Closing in partial payment of such Taxes.  When Seller has determined the amount of sales Taxes due, Seller will provide Buyer with a notice of the amount of such sales Taxes.  If the amount of such sales Taxes is greater than $10,000, then Buyer shall promptly pay Seller in the same manner as payments are made at the Closing an amount equal to (i) the amount of such sales Taxes, less (ii) the $10,000 paid to Seller at Closing. If the amount of such sales Taxes is less than $10,000, then Seller shall promptly pay Buyer an amount equal to (i) the $10,000 paid to Seller at Closing, less (ii) the amount of such sales Taxes.

4.     REPRESENTATIONS AND WARRANTIES OF BUYER AND CMGR.

Buyer and CMGR hereby jointly and severally represent and warrant to Seller that all the following statements are true, accurate and correct:

4.1     Due Organization.  CFG is a corporation duly organized, validly existing, and in good standing under the laws of the State of Nevada, and is in good standing and qualified to do business in the State of California and in every jurisdiction where required to be qualified to do business. CMGR is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware, and is in good standing and qualified to do business in the State of California and in every jurisdiction where required to be qualified to do business.

4.2     Power and Authority; Enforceability.  Each such party has all necessary power and authority to enter into this Agreement and all other documents that such party is required to execute and deliver hereunder, and holds or will timely hold all permits, licenses, orders and approvals of all federal, state and local governmental or regulatory bodies necessary and required therefor.  The signing, delivery and performance by such party of this Agreement, and the consummation of all the transactions contemplated hereby, have been duly and validly authorized by such party.  This Agreement, when signed and delivered by such party, will be duly and

6



validly executed and delivered and will be the valid and binding obligation of such party, enforceable against such party in accordance with its terms, subject to the laws relating to bankruptcy, insolvency and relief of debtors, and rules and laws governing specific performance, injunctions, relief and other equitable remedies.

4.3    Authorization for this Agreement.  No authorization, approval, consent of, or filing with any governmental body, department, bureau, agency, public board, authority or other third party is required for the consummation by such party of the transactions contemplated by this Agreement, other than the registration of the issuance and sale of the Common Stock with the Securities and Exchange Commission and the continued listing of the CMGR Common Stock with the OTCBB.

4.4    Litigation.  There is no litigation, suit, action, arbitration, inquiry, investigation or proceeding pending or, to the knowledge of such party, threatened, before any court, agency or other governmental body against such party (or any corporation or entity affiliated with such party) which seeks to enjoin or prohibit or otherwise prevent the transactions contemplated hereby.

4.5    Capitalization:

4.5.1  CMGR is a reporting company under the Securities Exchange of 1934, as amended, and is current in filing all reports due thereunder.  As of the Closing Date, the authorized capital stock of 20,000,000,000 consists of 19,900,000,000 shares of Common Stock, par value $0.0001, 8,748,116,075 of which are issued and outstanding, and 100,000,000 shares of Preferred Stock, par value $0.0001, 50,443,032 of which are issued and outstanding.

4.5.2  All issued and outstanding shares of the stock of CMGR (i) have been duly authorized and validly issued and are fully paid and nonassessable; and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

4.6    Financial Statements.  The financial statements for 2009 through September 30, 2009 provided to the Seller by any of the Buyer in connection with the transactions contemplated by this Agreement were true and accurate as of the date(s) of the same.

4.7    Material Information.  The Buyer have provided Seller with all information requested by the Seller in connection with its decision to accept the CMGR Common Stock as partial consideration for the purchase price for the Assets under this Agreement. Neither this Agreement, the Exhibits hereto, nor any other document delivered by the Buyer to Seller or their attorneys or agents in connection herewith or with the transactions contemplated hereby, contain any untrue statement of a material fact nor omit to state a material fact necessary in order to make the statements contained herein or therein not misleading.



5.    REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller represents and warrants to Buyer that all of the following statements are true, accurate and correct:

5.1    Corporate Organization.  Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of California.

5.2    Power and Authority; Enforceability.  Seller has all necessary power and authority to enter into this Agreement and all other documents that Seller is required to execute and deliver hereunder as the Assignee under the General Assignment under the laws of the State of California.  The signing, delivery and performance by Seller of this Agreement, and the consummation of all the transactions contemplated hereby, have been duly and validly authorized by Seller.  This Agreement, when signed and delivered by Seller, will be duly and validly executed and delivered and will be the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the laws relating to bankruptcy, insolvency and relief of debtors, and rules and laws governing specific performance, injunctions, relief and other equitable remedies.

5.3    Litigation.  To the best actual knowledge of Seller, without any diligence or inquiry, there is no litigation, suit, action, arbitration, inquiry, investigation or proceeding pending before any court, agency or other governmental body against Seller and/or Liberation which seeks to enjoin or prohibit or otherwise prevent the transactions contemplated hereby.

5.4    Assets.  Seller has not transferred title to any of the Assets to any third party other than to Buyer and has not granted any security interest(s) in any of the Assets to any third party.

6.    DISCLAIMER OF ALL OTHER REPRESENTATIONS.

6.1    The parties hereby agree that Seller sells, assigns, transfers and conveys the Assets to Buyer "as is" and "where is", and that Seller is not making and has not made any representations or warranties whatsoever except as expressly set forth herein, and, by way of illustration and not of limitation, Seller expressly disclaims any representation or warranty as to merchantability, fitness or use.  Anything to the contrary contained herein notwithstanding, Seller expressly disclaims any representation or warranty of whatsoever kind and nature with respect to the transferability and/or assignability of any of the Assets.

6.2    BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS." BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR

8

INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN.

6.3    BUYER ACKNOWLEDGES TO SELLER THAT BUYER HAS HAD AND WILL CONTINUE TO HAVE THE OPPORTUNITY TO CONDUCT PRIOR TO AND FOLLOWING THE CLOSING SUCH INSPECTIONS AND INVESTIGATIONS OF THE ASSETS AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF IN ITS SOLE AND ABSOLUTE DISCRETION AS TO THE NATURE, CONTENT, QUALITY AND TRANSFERABILITY, ETC., OF THE ASSETS AND ITS ACQUISITION THEREOF. BUYER FURTHER WARRANTS AND REPRESENTS TO SELLER THAT BUYER WILL RELY SOLELY ON ITS OWN REVIEW AND OTHER INSPECTIONS AND INVESTIGATIONS IN THIS TRANSACTION AND NOT UPON THE INFORMATION PROVIDED BY OR ON BEHALF OF SELLER, OR ITS AGENTS, EMPLOYEES OR REPRESENTATIVES WITH RESPECT THERETO. BUYER HEREBY ASSUMES THE RISK THAT ADVERSE MATTERS INCLUDING, BUT NOT LIMITED TO, LATENT OR PATENT DEFECTS, ADVERSE PHYSICAL OR OTHER ADVERSE MATTERS, MAY NOT HAVE BEEN REVEALED BY BUYER'S REVIEW AND INSPECTIONS AND INVESTIGATIONS OF THE ASSETS.

6.4    BUYER ACKNOWLEDGES THAT SOME ASSETS MAY CONTAIN THIRD-PARTY INTELLECTUAL PROPERTY THAT MAY HAVE BEEN LICENSED BY LIBERATION OR OTHERWISE ACQUIRED BY LIBERATION THAT MAY CONTAIN RESTRICTIONS ON TRANSFER OR AS TO WHICH TRANSFER MAY BE PROHIBITED BY LAW. BUYER UNDERSTANDS THAT NO CONSENT OF THIRD PARTIES WAS OBTAINED BY SELLER PRIOR TO THE ASSIGNMENT AND SALE OF THE ASSETS TO BUYER PURSUANT TO THIS AGREEMENT, AND WILL NOT BE OBTAINED OR SOUGHT BY SELLER AS PART OF THIS AGREEMENT. BUYER SHALL ACCEPT FULL RESPONSIBILITY FOR COMMUNICATING WITH THIRD PARTIES WHOSE INTELLECTUAL PROPERTY MAY BE INCLUDED IN THE ASSETS TRANSFERRED HEREBY, AND AT ITS OPTION AND IN ITS SOLE AND ABSOLUTE DISCRETION BUYER SHALL EITHER (i) OBTAIN REQUIRED CONSENTS IF ANY FROM THIRD PARTIES AND PAY ANY AND ALL LICENSING OR OTHER FEES, COSTS, EXPENSES OR CHARGES AS MAY BE REQUIRED AND THAT MAY BE ASSOCIATED WITH USING AND EXPLOITING SAID ASSETS AFTER THE CLOSING; (ii) NOT USE OR EXPLOIT SUCH ASSET, AND RETURN SUCH ASSET TO THE APPROPRIATE THIRD PARTY ON SUCH TERMS AS THE BUYER MAY DETERMNE IN ITS SOLE DISCRETION; OR (iii) USE GOOD FAITH, BEST EFFORTS TO NEGOTIATE AND RESOLVE ANY CONSENT TO TRANSFER ISSUES DIRECTLY WITH ANY SUCH THIRD PARTY(IES). WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER, AS ASSIGNEE FOR THE BENEFIT OF CREDITORS OF LIBERATION, EXPRESSLY DISCLAIMS ANY LIABILITY WHATSOEVER WITH RESPECT TO THE TRANSFER TO BUYER OF RIGHTS IN THE ASSETS, INCLUDING RESTRICTED LIBERATION ASSETS, FROM AND AFTER THE CLOSING DATE.

7.    COVENANTS OF BUYER.

   7.1    Taxes and any Other Charges Related to the Sale.  Buyer agrees to promptly pay or reimburse Seller for all applicable sales, transfer, use or other Taxes, including interest and penalties, imposed on and/or related to the sale of the Assets to Buyer under this Agreement by any tax authority or other governmental agency and to defend, indemnify and hold Seller harmless from and against any such taxes, duties, claims, or charges for payment thereof by any tax authority or other governmental agency including all reasonable, outside attorney and accountancy fees and other expenses incurred in any audit or dispute resolution proceedings in connection therewith.

   7.2    Further Assurances.  Buyer shall cooperate with Seller and promptly sign and deliver to Seller any and such additional documents, instruments, endorsements and related information and take actions as Seller may reasonably request for the purpose of effecting the transfer of Seller's right, title and interest in and to the Assets and the Restricted Liberation Assets to Buyer, and/or carrying out the provisions of this Agreement, including the preparation of all Tax returns of Seller and Liberation.

   7.3    Property Held in Trust.  To the extent that Buyer receive physical possession of any property which is not a Asset hereunder, Buyer agree to hold such property in trust for the owner of such property and to return such property to its owner upon request and proof of ownership from such owner.

   7.4    Agreement to Register and Issue Stock.

      7.4.1  CMGR shall file a registration statement with the Securities and Exchange Commission (the "Commission") within thirty (30) days after Seller provides a final stockholder recipient list comprised of the creditors of Liberation to Buyer, in accordance with the Commission's rules and regulations, registering Four Hundred Fifty Thousand Dollars ($450,000) in Common Stock of CMGR (the "CMGR Common Stock") based upon the price per share as defined below for delivery upon effectiveness of the registration statement to the creditors of Liberation.  CMGR shall use its best efforts to cause the registration statement to become effective no later than one hundred (100) days after such filing, subject to comments and requirements of the Commission ("Registration").  The price per share shall be equal to the ninety (90) day average closing price of the Common Stock of CMGR on the OTCBB (as defined below) immediately prior to the issuance of the CMGR Common Stock to the creditors of Liberation in accordance with Section 2.1.2 hereof.

      7.4.2  CMGR covenants, represents and warrants that, upon issuance of the CMGR Common Stock to the creditors of Liberation identified by Seller, such CMGR Common Stock shall be duly authorized and validly issued, fully paid and non-assessable and issued in compliance with all applicable state and federal laws concerning the issuance of securities.  Such CMGR Common Stock shall be freely transferable by the holder thereof without further registration, qualification or listing.  Once the CMGR Common Stock certificates are delivered,

10

said CMGR Common Stock will continue to be listed on the Over the Counter Bulletin Board ("*OTCBB*"), or a national exchange, and eligible for immediate sale.

7.5     **Security Interest.**  In order to provide Seller with acceptable security to assure that the Buyer fully complies with its obligations to Seller as set forth in Section 2.1 above and Section 11 below, Buyer shall grant to Seller a second priority security interest in and to the Assets, which security interest shall be second in priority to that of Buyer's lender, which shall be granted a first priority security interest in the Assets. Such security interest shall be evidenced by a Security Agreement and UCC-1 Financing Statement executed by the Buyer in favor of the Seller substantially in the form of Exhibit D annexed hereto and by this reference incorporated herein. In connection therewith, Seller expressly agrees to enter into an Intercreditor Agreement (the "*Intercreditor Agreement*") with Buyer's lender setting forth Seller's and Buyer's lenders respective rights, responsibilities and obligations with respect to realizing on their respective security interests in the Assets in the event of default by Buyer under Sections 2.1.2, 2.1.3 and 11 of this Agreement, substantially in the form annexed hereto as Exhibit E.

7.6     **Conduct of Business Post-Closing; Potential Legal Actions.**  Buyer agrees that should Buyer determine in its sole and absolute discretion that the cost of defending claims of third parties with respect to Assets and/or Restricted Liberation Assets acquired under this Agreement outweighs the cost and benefit of defending against such claims, Buyer will at its option settle with any such claimant on such terms as the Buyer may determine in its sole discretion, which may include selling, assigning or abandoning to such claimant Buyer's interest in any such Assets in whole or in part.

7.6.1   **Exploitation of Assets in Accordance with Pre-Closing Agreements.**  Buyer agrees that if it elects to exploit an Asset, then it shall exploit such Asset either in accordance with any applicable pre-Closing agreement or contract between a third party and Liberation or Liberation's predecessors-in-interest with respect to such Asset, or in accordance with any new and/or renegotiated agreement governing any such Asset between Buyer or Buyer's assignee and the applicable third party, such election to be in Buyer's sole and absolute discretion; **provided, however,** that if Buyer elects to exploit any such Asset in accordance with a pre-Closing agreement or contract, Buyer shall be liable for the Assumed Liabilities (pursuant to Section 3.1 above) only, and not be liable for any liabilities arising from or out of Liberation's and/or Seller's business activities that took place prior to the Closing.

7.6.2   **Suspension of Use or Exploitation of Asset.**  If a third party ("*Third Party Plaintiff*") commences an action in a court of competent jurisdiction or an arbitration proceeding (each a "*Legal Action*") against Seller and/or any of its officers, directors, owners, agents or attorneys (each, a "*Seller Party*" and collectively, the "*Seller Parties*"), with respect to any Asset transferred by Seller to Buyer pursuant to the terms of this Agreement, which Legal Action alleges a breach of a contractual term requiring such Third Party Plaintiff's consent to transfer such Asset (the "*Subject Asset*"); and if, in the good faith opinion of Seller, either (a) Buyer's indemnification under Section 11 may be insufficient to protect the Seller Parties from a Loss in connection with such Legal Action, or (b) after providing the Buyer a period of two (2) business days to consult with Seller regarding the potential exposure or liability of any Seller

11

Party as a result of such Legal Action, Seller determines that further, sale, distribution, licensing, use or other exploitation (collectively "*Exploitation*") of the Subject Asset would materially increase the legal exposure or liability of any Seller Party, then Buyer shall, immediately upon the written request of Seller (the "*Cease and Desist Notice*"), cease and desist, and, to the fullest extent that Buyer has the right to do so with respect to the Subject Asset, shall use its best efforts to cause its subdistributors or sales agents to cease and desist, from further exploitation of such Subject Asset (which shall include the suspension of the Subject Asset from further exhibition or sale) from and after the date of such Cease and Desist Notice, until such time as (i) each Seller Party has been dismissed from such Legal Action with prejudice or (ii) such Legal Action is otherwise fully and finally resolved with respect to the legal exposure or liability of each Seller Party arising from the transfer of the Subject Asset. Notwithstanding anything contained in this Section 7.6.2 to the contrary, Buyer shall have the right, in its sole discretion, to return the Subject Asset to the Third Party Plaintiff and, following dismissal of all claims against each Seller Party arising from the transfer by Seller to Buyer of such Subject Asset, and the reimbursement under Section 11 of all of the expenses of each Seller Party arising from the Legal Action relating to such Subject Asset, Buyer's obligations under this Section 7.6.2 and under Section 11 with respect thereto shall terminate. Seller agrees to use its best efforts to seek the resolution of any Legal Action relating to any Subject Asset, including without limitation issues relating to consent to transfer, as promptly and economically as possible, provided that the parties acknowledge and agree that Seller best efforts in this instance shall be subject to the fact that the handling and defense of such Legal Action will be governed by the provisions of Section 11.

8.    **COVENANTS OF SELLER.**

Seller covenants and agrees with Buyer as follows:

8.1    **Further Assurances.**  Seller shall cooperate with Buyer and promptly sign and deliver to Buyer any and such additional documents, instruments, endorsements and related information and take actions as Buyer may reasonably request for the purpose of effecting the transfer of Seller's title to the Assets and the Restricted Liberation Assets, if applicable, to Buyer, and/or carrying out the provisions of this Agreement, provided, however, that Seller shall be reimbursed for its reasonable, actual, out-of-pocket costs and expenses incurred in providing such documents, instruments, endorsements or related information, which additional documents, instruments, endorsements or related information shall be prepared solely by Buyer.

9.    **CONDITIONS TO CLOSING.**

9.1    **Conditions to Buyer's Obligations.**  The obligations of Buyer hereunder shall be subject to the satisfaction and fulfillment of each of the following conditions, except as Buyer may expressly waive the same in writing:

9.1.1    **Accuracy of Representations and Warranties.**  The representations and warranties made herein by Seller shall be true and correct in all material respects, and not misleading in any material respect, on and as of the date given, and on and as of the Closing Date

with the same force and effect as though such representations and warranties were made on and as of the Closing Date.

9.1.2   Compliance.   As of the Closing Date, Seller shall have complied in all material respects with, and shall have fully performed, in all material respects, all conditions, covenants and obligations of this Agreement imposed on Seller and required to be performed or complied with by Seller at, or prior to, the Closing Date.

9.1.3   Delivery of Closing Documents.   Seller shall have delivered, and Buyer shall have received, the documents described in Section 10.2 hereof.

9.2   Conditions to Seller's Obligations.   The obligations of Seller hereunder shall be subject to the satisfaction and fulfillment of each of the following conditions, except as Seller may expressly waive the same in writing:

9.2.1   Accuracy of Representations and Warranties.   The representations and warranties made herein by Buyer in Section 4 hereof shall be true and correct in all material respects, and not misleading in any material respect, on and as of the date given, and on and as of the Closing Date with the same force and effect as though such representations and warranties were made on and as of the Closing Date.

9.2.2   Compliance.   The Buyer shall have complied in all material respects with, and shall have fully performed, the terms, conditions, covenants and obligations of this Agreement imposed thereon to be performed or complied with by the Buyer at, or prior to, the Closing Date.

9.2.3   Delivery of Closing Documents.   The Buyer shall have delivered, and Seller shall have received, the documents described in Section 10.1 hereof.

9.2.4   Restricted Liberation Assets.   Buyer and Seller acknowledge that underlying agreements or contracts with respect to the Restricted Liberation Assets listed on Schedule 9.2.4 hereto may each require consent for the transfer of such Restricted Liberation Asset, regardless of any potential contractual liability for monies due as a result of a pre-Closing breach or default of such underlying agreements or contracts. To the extent that such consent for transfer is not obtained prior to the Closing for any such Restricted Liberation Asset, then such Restricted Liberation Asset is designated as such for purposes of Section 1.1 hereof.

9.2.5   Escrow.   The Buyer shall have deposited the Reserved Shares with the Transfer Agent in the name of the Escrow Agent (each as defined in Section 11.2.6 hereof).

10.   CLOSING OBLIGATIONS.

10.1   Buyer's Closing Obligations.   At the Closing, Buyer shall deliver to Seller the following:

13

10.1.1  Payment of the cash portion of the purchase price by wire transfer to Seller pursuant to subsection 2.1.1 above and the payment in accordance with subsection 3.3 above;

10.1.2  The Bill of Sale Agreement, in the form attached hereto as **Exhibit C**, signed by an authorized officer of the Buyer on behalf of the Buyer;

10.1.3  The Assignment and Assumption Agreement, in the form attached hereto as **Exhibit B**, signed by an authorized officer of the Buyer on behalf of the Buyer;

10.1.4  The Security Agreement, in the form attached hereto as **Exhibit D**, signed by an authorized officer of the Buyer on behalf of the Buyer;

10.1.5  A certificate of the Secretary of CFG and CMGR, attaching true, correct and complete copies of (a) the Certificate of Incorporation and Bylaws of such party as amended to date; (b) resolutions of the Board of Directors of such party approving and authorizing the execution, delivery and performance of the agreements and documents executed in connection herewith;

10.1.6  An agreement of Clarity withdrawing the claim filed by Clarity in the General Assignment and terminating and waiving all of Clarity's claims against Liberation, in form and substance satisfactory to Seller;

10.1.7  A guaranty of CMGR in the form attached hereto as **Exhibit F**;

10.1.8  A resale certificate of Buyer in form and substance reasonably satisfactory to Seller;

10.1.9  Such other documents, instruments and agreements as Seller may reasonably request.

10.2  **Seller's Closing Obligations.**  At the Closing, Seller shall deliver to Buyer the following:

10.2.1  The Assets in accordance with Section 1.6;

10.2.2  The Assignment and Assumption Agreement, in the form attached hereto as **Exhibit B**, signed by an authorized officer of Seller on behalf of Seller;

10.2.3  The Bill of Sale Agreement, in the form attached hereto as **Exhibit C**, signed by an authorized officer of each Seller on behalf of Seller;

10.2.5  The Intercreditor Agreement in the form attached hereto as **Exhibit E**, signed by an authorized officer of Seller on behalf of Seller; and

14

10.2.6 Such other documents, instruments and agreements as Buyer may reasonably request.

## 11. INDEMNIFICATION.

11.1 **Indemnified Losses.** For the purpose of this Section 11.1 and when used elsewhere in this Agreement, "*Loss*" shall mean and include any and all liability, loss, damage, claim, expense, cost, fine, fee, penalty, obligation or injury including, without limitation, those resulting from any and all actions, suits, proceedings, demands, assessments, judgments, award or arbitration, together with reasonable costs and expenses including the reasonable outside attorneys' fees and other legal costs and expenses relating thereto.

11.2 **Indemnification By Buyer.** Buyer (referred to herein as the "Indemnifying Party") agrees to defend, indemnify and hold harmless Seller, any parent, subsidiary or affiliate of Seller and any director, officer, employee, stockholder, agent or attorney of Seller or of any parent, subsidiary or affiliate of Seller (each, an "Indemnified Party") from and against and in respect of any Loss which arises out of or results from:

11.2.1 any breach by CMGR or CFG of any covenant, representation or warranty made herein;

11.2.2 the use and exploitation of the Assets after the Closing, including any actions pursuant to Sections 6.4 and/or 7.6 above;

11.2.3 Claims by third parties with respect to any of the Assets arising out of the transfer of the Assets with or without the consent of a third party as may be required pursuant to the terms and conditions of a third party's agreement(s) with Liberation or Liberation's predecessor(s)-in-interest (other than Storage Costs and any other costs and expenses which Seller agrees to bear under this Agreement), it being expressly understood and agreed that Buyer's indemnification pursuant to Section 11 shall not extend to any liabilities arising from or out of Liberation's and/or Seller's business activities that took place prior to the Closing;.

11.2.4 the Assumed Liabilities; and

11.2.5 Any costs of removal (excluding Storage Costs), post-Closing holdover costs, damages and expenses and any injuries incurred by or in connection with Buyer's access to and use of the premises of the Seller or of Liberation in connection with due diligence and/or the transfer and removal of the Assets as contemplated herein.

11.2.6 As additional security to assure Seller that the Buyer fully complies with its obligations to Seller as set forth in this Section 11, Buyer shall at its own expense, establish a stock reserve account (the "Reserve Account") in the name of a mutually approved Escrow Agent (the "Escrow Agent") with the transfer agent of CMGR stock ("Transfer Agent") into which Reserve Account Buyer shall deposit on the Closing Date a sufficient number of registered shares of CMGR common stock having a market value of at least One Hundred Thousand

15

Dollars ($100,000.00) (the "Reserved Shares") for sale of said Reserved Shares in accordance with the procedures set forth below. The Reserved Shares shall be sold from time to time by the Escrow Agent as may be necessary to reimburse Seller for all Covered Legal Expenses, as defined below. The parties will negotiate in good faith and enter into standard Escrow and Reserve agreements within two business days following the Closing Date, which shall contain, among other provisions, the deposit of the Reserved Shares with the Transfer Agent in the name of the Escrow Agent and the periodic sale thereof by the Escrow Agent in connection with the payment to Seller of its Covered Legal Expenses and the circumstances that would trigger the termination of the Escrow Agreement, as further described below. For purposes of the Reserve Account, "Covered Legal Expenses" shall mean the reasonable, actual, out-of-pocket legal fees and expenses incurred by Seller in connection with any Legal Action against any Seller Party. Five (5) business days after receipt by Escrow Agent and Buyer of reasonable documentation of such Seller Legal Expenses, Escrow Agent shall initiate the sale of the requisite amount of Reserved Shares to pay for such Covered Legal Expenses and pay to Seller cash via wire transfer of immediately available funds an amount equal to such Covered Legal Expenses. Upon the earlier of (a) Seller's written acknowledgement to Buyer that all such potential claims have been resolved to Seller's satisfaction, or (b) one (1) year from the date of this Agreement, the Escrow Agent will return all unsold Reserved Shares to Buyer, and close the Reserve Account and the Escrow Account, and the obligations of the Buyer to the Seller pursuant to this Section 11.2.6. shall cease and terminate.

11.3    Procedure.

11.3.1    Notice.  In the event that Indemnified Party seeks to be indemnified against a Loss, it shall give written notice thereof to the Indemnifying Party as appropriate. Notwithstanding the foregoing, the rights of any Indemnified Party to be indemnified in respect of any Loss resulting from the asserted liability shall not be adversely affected by the Indemnified Party's failure to give or delay in giving notice unless (and then only to the extent that) the Indemnifying Party is materially prejudiced thereby.

11.3.2    Defense.  If any claim, demand or liability is asserted by any third party against any Indemnified Party, the Indemnifying Party shall be entitled to participate therein and defend any action or proceeding brought against the Indemnified Party in respect of matters embraced by the indemnity, and the Indemnifying Party shall have the right to conduct and control the defense subject to the Indemnified Party's approval in writing of outside counsel selected by the Indemnifying Party. After notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of such claim or action, the Indemnifying Party shall not be liable to the Indemnified Party under this Section 11.3 for any reasonable legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof other than reasonable costs of investigation. In any action defended by the Indemnifying Party the Indemnified Party shall have the right to be represented by its own counsel at its own expense unless (1) the employment of such counsel shall have been authorized in writing by the Indemnifying Party; or (2) the Indemnifying Party shall not have properly employed counsel reasonably satisfactory to such Indemnified Party to have charge of the defense of such action; in each of such cases such fees and expenses shall be paid and advanced by the Indemnifying Party.

16

In addition, if the named parties to any such action, suit or proceeding (including any impleaded parties) shall include both such Indemnified Party and Indemnifying Party, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from, or additional to, those available to the Indemnifying Party, and if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action, suit or proceeding on behalf of such Indemnified Party, and the Indemnified Party may participate in the defense of such action, suit or proceeding and such fees and expenses shall be paid and advanced by the Indemnifying Party; it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys (in addition to any local counsel for all such Indemnified Party). The Indemnifying Party will not, without Indemnified Party's written consent, settle or compromise any indemnifiable claim or consent to the entry of any judgment in respect thereof unless such settlement, compromise or consent includes an unconditional release of the Indemnified Party from all liability in respect of such indemnifiable claim. The parties shall cooperate in the defense of all third party claims which may give rise to indemnifiable claims hereunder.

12.   **MISCELLANEOUS.**

     12.1    Expenses.  Except as otherwise provided herein, each of the parties hereto shall bear its own expenses (including without limitation attorneys' fees) in connection with the negotiation and consummation of the transaction contemplated hereby.

     12.2    Notices.  Any notice required or permitted to be given under this Agreement shall be in writing and shall be personally or sent by certified or registered United States mail, postage prepaid, or sent by nationally recognized overnight express courier and addressed as follows:

     12.2.1  If to Seller:

          CMBG Advisors, Inc.
          848 Leonard Road
          Los Angeles, CA  90049
          Attention:  James Baer, President

          With copy to:

          Mara Morner-Ritt, Esq.
          Baer & Troff, LLP
          c/o Brandon & Morner-Ritt, P.C.
          2001 Wilshire Boulevard, Suite 400
          Santa Monica, CA  90403

12.2.2 <u>If to Buyer</u>:

Camelot Entertainment Group, Inc.
8001 Irvine Center Drive, Suite 400
Irvine, CA 92618
Attention: Robert P. Atwell, Chairman and CEO

<u>With copy to</u>:

J. A. Ted Baer, Esq.
21 East Canon Perdido Street, Suite 223
Santa Barbara, CA 93101

Any such Notices shall be deemed to have been duly given and effective:

(i)     Upon receipt if delivered in person; or

(ii)    On the date of machine transmittal (except if sent after 5:00 p.m. recipient's time, then the Notice shall be deemed given at 9:00 a.m. on the next business day) when electronically transmitted by facsimile or email, with a copy also given as described in (iv); or

(iii)   One (1) day after deposit with a national overnight delivery service; or

(iv)    Three (3) days after deposit with the United States Post Office by certified mail, return receipt requested, postage prepaid.

Any party to whom Notices are to be sent pursuant to this Agreement may from time to time change its address, facsimile number, or email address for future communication hereunder by giving Notice in the manner prescribed herein to all other parties named in this Section 12.2, provided that the change shall not be effective until five (5) business days after the Notice of change has been given.

12.3    <u>Entire Agreement; Survival</u>. This Asset Purchase Agreement, the Schedules and Exhibits hereto (which are incorporated herein by reference) and any agreements to be executed and delivered in connection herewith, together constitute the entire agreement and understanding between the parties and there are no agreements or commitments with respect to the transactions contemplated herein except as set forth in this Agreement. This Agreement supersedes any prior offer, agreement or understanding between the parties with respect to the transactions contemplated hereby. The representations and warranties contained in this Agreement will survive the Closing.

12.4    <u>Amendment; Waiver</u>. Any term or provision of this Agreement may be amended only by a writing signed by duly-authorized officers of both the Seller and the Buyer. The observance of any term or provision of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a writing signed by the party to be bound by such waiver. No waiver by a party of any breach of this Agreement will be deemed to constitute a waiver of any other breach or any succeeding breach.

18

12.5    Execution in Counterparts.  For the convenience of the parties, this Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

12.6    Benefit and Burden.  This Agreement shall be binding upon, shall inure to the benefit of, and be enforceable by and against, the parties hereto and their respective successors and permitted assigns.

12.7    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of California (excluding application of any choice of law doctrines that would make applicable the law of any other state or jurisdiction) and, where appropriate, applicable federal law.

12.8    Severability.  If any provision of this Agreement is for any reason and to any extent deemed to be invalid or unenforceable, then such provision shall not be voided but rather shall be enforced to the maximum extent then permissible under then applicable law and so as to reasonably effect the intent of the parties hereto, and the remainder of this Agreement will remain in full force and effect.

12.9    Attorneys' Fees.  Should a suit or arbitration be brought to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees to be fixed in amount by the Court or the Arbitrator(s) (including without limitation costs, expenses and fees on any appeal).  The prevailing party will be entitled to recover its costs of suit or arbitration, as applicable, regardless of whether such suit or arbitration proceeds to a final judgment or award.

12.10    Survival.  The representations, warranties, covenants and agreements made herein shall survive the closing of the transactions contemplated hereby.



IN WITNESS WHEREOF, Buyer and Seller executed and delivered this Agreement by their duly authorized representatives as of the Effective Date.

SELLER:

CMBG Advisors, Inc., in its sole and limited capacity as Assignee for the Benefit of Creditors of Liberation Entertainment, Inc.

By: _____
   James Baer, President

BUYER:

Camelot Film Group, Inc.

By: _____
   Robert P. Atwell, President

WITH RESPECT TO OBLIGATIONS PURSUANT TO SECTION 2.1, SECTION 4 AND SECTION 7 ONLY:

Camelot Entertainment Group, Inc.

By: _____
   Robert P. Atwell, President

20

04/26/2011  13:23   13103150310          BRANDON MCMERRITT              PAGE  02/02

IN WITNESS WHEREOF, Buyer and Seller executed and delivered this Agreement by their duly authorized representatives as of the Effective Date.

SELLER:                                   BUYER:

CMBG Advisors, Inc., in its sole and      Camelot Film Group, Inc.
limited capacity as Assignee for the Benefit
of Creditors of Liberation Entertainment, Inc.

By: _____              By: _____
    James Baer, President                     Robert P. Atwell, President

                                          WITH RESPECT TO OBLIGATIONS
                                          PURSUANT TO SECTION 2.1, SECTION 4
                                          AND SECTION 7 ONLY:

                                          Camelot Entertainment Group, Inc.

                                          By: _____
                                              Robert P. Atwell, President

20

Legal Tabs Co. 1-800-322-3022

Recycled  Stock # R-EX-5-B

**EXHIBIT 8**

Exhibit 8

Incentive Capital LLC
2755 E. Cottonwood Parkway
Suite 100
Salt Lake City, UT 84121

As of April 7, 2010

Re:   Escrow Agreement ("Escrow Agreement") between Camelot Film Group, Inc. ("CFG") and Incentive Capital LLC (the "Lender")

Dear Sirs:

Reference is made to Camelot Entertainment Group's ("CEG") guarantee (the "CEG Guarantee") of CFG's obligations as defined in the loan documents of even date between the Lender and CFG ("Loan Documents")  relating to the acquisition by Camelot of the Liberation Entertainment Library assets.

Please confirm your agreement to the terms of this Escrow Agreement by signing and returning to us the enclosed copy:

1.   **Undertakings**

   (a)   CEG shall forthwith deliver to the undersigned escrow agent ("Escrow Agent") a Certificate of Designation (the "Certificate") in the form annexed hereto as Exhibit A, authorizing the issuance of Six Hundred Fifty Thousand Dollars ($650,000.00) worth of CEG Class F Convertible Preferred shares (the "Pledged Shares"), which shall be held in accordance with, and subject to, the terms of this Escrow Agreement.

   (b)   CEG shall also forthwith deliver to the Escrow Agent a certificate constituting the Pledged Shares (made out to the Lender) (the "Certificate"), which shall be convertible into fully paid and non-assessable shares of CEG common stock ("Common Stock") at a price based on the ninety (90) day average price of the Common Stock immediately prior to the conversion of the stock. While in escrow, none of CEG or its affiliates shall transfer, assign or encumber any of the Pledged Shares or the Certificate.

   (c)   If the total consideration received by the Lender from loan payments, distribution revenue generated by Camelot Distribution Group, Inc. and/or CFG, and all other sources as more fully discussed and agreed to in the Loan Documents, is less than Six Hundred Fifty Thousand Dollars ($650,000.00), plus applicable interest, in the aggregate, by the time all of said Common Stock has been delivered and is eligible for sale, then CEG shall issue additional shares of CEG Common Stock to the Lender until the Lender has received Common Stock that has a fair market value in an amount not less than Six Hundred Fifty Thousand Dollars ($650,000.00), plus applicable interest.

   (d)   Escrow Agent will hold the Pledged Shares and the Certificate in accordance with the terms of this Escrow Letter.

(e) If the Escrow Agent receives written notice from CEG and the Lender on or before the expiration of the Loan Documents that the Lender has been fully paid pursuant to the Loan Documents, the Escrow Agent will transfer the Pledged Shares to Camelot unencumbered within five (5) business days of such notification; or

(f) If the Lender notifies the Escrow Agent in writing (but such notification cannot occur before the maturity date of loan set forth in the Loan Documents), with a copy to CEG, that Lender has not been fully paid pursuant to the Loan Documents, and such notification is not objected to by CEG in writing within five (5) business days after its receipt of such notice, the Escrow Agent shall transfer to the Lender the Pledged Shares and the Certificate in an amount equal to the remaining balance, plus accrued and unpaid interest, of the Note, unencumbered, within five (5) business days of such notification.

(g) In the event that such notification from the Lender is disputed by CEG in writing, then the Escrow Agent shall hold the Pledged Shares, subject to parties resolving the dispute either voluntarily or through mutually-acceptable dispute resolution in the State of Utah. Notwithstanding the foregoing, unless CEG produces to the Escrow Agent (at the same time it provides the Escrow Agent its written objection) evidence of a money transfer (i.e. wire, check or cash) in an amount that would completely pay off the loan discussed herein and prior to or on the maturity date set forth in the Loan Documents, Escrow Agent shall release the Pledged Shares and the Certificate to the Lender.

(h) All notices shall be in writing by email and fax to the addresses set forth in the Loan Documents, with a hard copy delivered personally as to addresses in the Los Angeles metropolitan area or sent by Federal Express or UPS as to addressees outside of the Los Angeles metropolitan area, to the respective addresses set forth below.

2. **Miscellaneous**

(a) The transfer of the Pledged Shares to the Lender, or back to Camelot, hereunder shall be made to the applicable party via Federal Express at Camelot's expense upon five (5) business days prior notice, unless the parties agree in writing on a different manner of transfer of the Pledged Shares.

(b) Upon receipt of the Pledged Shares and the Certificate from the Escrow Agent, whether to Camelot (upon payoff of the loan discussed herein) or to the Lender (if the Lender is not fully paid in accordance with the Loan Documents), the Escrow Agent shall be discharged from any other obligations to the Lender, and this Escrow Agreement shall terminate.

At all times after the date of this Escrow Agreement the parties shall execute all such documents and do all such acts and things as may reasonably be required for the purpose of giving full effect to this Escrow Agreement.

All rights under this Escrow Agreement are personal to the Parties and may not be assigned by either Party without the prior written consent of the other Party.

This Escrow Agreement and any documents referred to in it, constitute the whole agreement between the Parties and supersede any previous arrangement, understanding or agreement between them relating to the subject matter they cover, and may not be modified and/or amended without the prior written consent of both Parties.

Except as expressly provided in this Escrow Agreement, a person who is not a party to this Escrow Agreement shall not have any right to enforce any term of this Escrow Agreement.

These Escrow Instructions and this Escrow Agreement shall be governed by the internal laws of the State of Utah applicable to contracts negotiated and entered into and performed wholly within the State of Utah.

Accepted and Agreed:

CAMELOT ENTERTAINMENT GROUP, INC.

BY:

Name:

Title:

INCENTIVE CAPITAL LLC

BY:

Name:

Title:

Yours faithfully   PIA ANDERSON DORIUS REYNARD Moss

ESCROW AGENT

# CAMELOT ENTERTAINMENT GROUP, INC.

## CERTIFICATE OF DESIGNATION
## OF CLASS F CONVERTIBLE PREFERRED STOCK

Pursuant to Section 151 of the
General Corporation Law of the State of Delaware

Camelot Entertainment Group, Inc., a corporation organized and existing under the General Corporation Law of the State of Delaware, in accordance with the provisions of Section 103 thereof, DOES HEREBY CERTIFY:

That pursuant to the authority invested to the Board of Directors of the Corporation in accordance with the provisions of the Certificate of Incorporation of said Corporation, as amended, (the "Certificate of Incorporation"), and Article 5 of the Corporation's By-Laws, as amended, (the "By-Laws"), the said Board of Directors on April 27, 2010, adopted the following resolution creating a class of five million (5,000,000) shares of Preferred Stock designated as "Class F Convertible Preferred Stock."

RESOLVED that, pursuant to the authority vested in the Board of Directors of this Corporation in accordance with the provisions of the Certificate of Incorporation and the By-Laws, a class of Preferred Stock, par value $.0001 per share, of the Corporation be and hereby is created and that the designation and number of shares thereof and the voting and other powers, preferences, limitations, restrictions and relative rights thereof are as follows:

### Class F Convertible Preferred Stock

1.    Designation and Amount; Additional Restrictions.   There shall be a class of Preferred Stock that shall be designated as "Class F Convertible Preferred Stock," and the number of shares constituting such class shall be 5,000,000. Such number of shares may be increased or decreased by resolution of the Board of Directors; provided, however, that no decrease shall reduce the number of shares of Class F Convertible Preferred Stock to less than the number of shares then issued and outstanding plus the number of shares issuable upon exercise of outstanding rights, options or warrants or upon conversion of outstanding securities issued by the Corporation. It is hereby acknowledged by the Corporation and its undersigned officers below that the primary reason for the authorization and creation of the particular class of stock described in this Section is to pledge a sufficient number of shares of Class F Convertible Preferred Stock to more fully collateralize a loan being made by Incentive Capital, LLC ("Lender") to Camelot Film Group, Inc. ("CFG"), an affiliate company to the Corporation. Therefore, the Corporation shall immediately upon execution of this document along with that certain Escrow Agreement between Lender and CFG of even date herewith, issue the prescribed number of shares of Class F Convertible Preferred Stock to Lender, which shares shall be immediately placed in escrow pending the full payment of the loan described herein and the full compliance of CFG with the terms and conditions of said escrow agreement. In order to preserve and protect the value of such shares, the Corporation hereby declares that it shall not (i) encumber, (ii) issue, transfer or assign to anyone other than Lender, or (iii)

otherwise compromise any of the authorized shares of the Class F Convertible Preferred Stock, whether issued or unissued, until the loan contemplated herein is completely satisfied.

2.      Ranking.  As to the payment of dividends and as to the distribution of assets upon liquidation, dissolution or winding up, the Class F Convertible Preferred Stock shall rank senior to the Corporation's Class A Convertible Preferred Stock, Class C Convertible Preferred Stock Class D Convertible Preferred Stock, Common Stock,  and equal to all other classes or class of stock issued by the Corporation, including Class B and E Convertible Preferred Stock, except as otherwise approved by the affirmative vote or consent of the holders of a majority of the shares of Class F Stock.

3.      Dividends and Distributions.  Subject to the rights of the holders of any shares of any class or series of stock of the Corporation ranking prior and superior to the shares of Class F Convertible Preferred Stock with respect to dividends, the holders of shares of Class F Convertible Preferred Stock, in preference to the holders of shares of any class or series of stock of the Corporation ranking junior to the Class F Convertible Preferred Stock thereof, shall be entitled to receive dividends, out of funds legally available therefor.  Said dividends shall be payable only when as, and if declared by the Board of Directors, and shall not be cumulative.

4.      Voting Rights.  The holders of shares of Class F Convertible Preferred Stock shall have the following voting rights:

(A) Each share of Class F Convertible Preferred Stock shall entitle the holder thereof to a number of votes equal to one (1) vote.

(B) Except as required by law, holders of Class F Convertible Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for taking any corporate action.

5.      Conversion.

(A) Right to Convert.  Holders of Class F Convertible Preferred Stock shall have the right to convert any or all of their Class F Convertible Preferred Stock into Six Hundred Fifty Thousand Dollars ($650,000.00) in shares of fully paid and nonassessable shares of Common Stock at a price based on the ninety (90) day average price of the Common Stock immediately prior to conversion on or after December 31, 2010. Holders of Class F Convertible Preferred Stock shall have the right to convert any or all of their Class F Convertible Preferred Stock into 10 shares in shares of fully paid and nonassessable shares of Common Stock for each share of Class F Convertible Preferred Stock held.  In addition, holders of Class F Convertible Preferred Stock will have the right to convert, as described below, upon an initial or secondary public offering of the Common Stock by the Corporation or in the event of a change in control as defined in the Rules and Regulations of the Securities and Exchange Commission on or after December 31, 2010.

2

(B) <u>Mechanics of Conversion</u>.

(i) Any holder of Class F Convertible Preferred Stock may exercise the right to convert such shares into Common Stock by delivering to the Corporation during regular business hours, at the office of the Corporation or any transfer agent of the Corporation or at such other place as may be designated by the Corporation, the certificate or certificates for the shares to be converted (the "Class F Preferred Certificate"), duly endorsed or assigned in blank to the Corporation (if required by it).

(ii) Each Class F Preferred Certificate shall be accompanied by written notice stating that such holder elects to convert such shares and stating the name or names (with address) in which the certificate or certificates for the shares of Common Stock (the "Common Certificate") are to be issued. Such conversion shall be deemed to have been effected on the date when such delivery is made, and such date is referred to herein as the "Conversion Date."

(iii) As promptly as practicable thereafter, the Corporation shall issue and deliver to or upon the written order of such holder, at the place designated by such holder, a certificate or certificates for the number of shares of Common Stock to which such holder is entitled.

(iv) The person in whose name the certificate or certificates for Common Stock are to be issued shall be deemed to have become a holder of record of Common Stock on the applicable Conversion Date, unless the transfer books of the Corporation are closed on such Conversion Date, in which event the holder shall be deemed to have become the stockholder of record on the next succeeding date on which the transfer books are open, provided that the Conversion Price shall be that Conversion Price in effect on the Conversion Date.

(v) Upon conversion of only a portion of the number of shares covered by a Class F Preferred Certificate, the Corporation shall issue and deliver to or upon the written order of the holder of such Class F Preferred Certificate, at the expense of the Corporation, a new certificate covering the number of shares of the Class F Convertible Preferred Stock representing the unconverted portion of the Class F Preferred Certificate, which new certificate shall entitle the holder thereof to all the rights, powers and privileges of a holder of such shares.

(C) <u>Conversion Fees</u>. The Corporation shall pay all documentary, stamp or other transactional taxes (excluding income taxes) attributable to the issuance or delivery of shares of capital stock of the Corporation upon conversion of any shares of Class F Convertible Preferred Stock; provided, however, that the Corporation shall not be required to pay any taxes which may be payable in respect of any transfer involved in the issuance or delivery of any certificate for such shares in a name other than that of the holder of the Class F Convertible Preferred Stock in respect of which such shares of Class F Convertible Preferred Stock are being issued.

(D) <u>Reservation of Stock</u>. The Corporation shall reserve out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the Class F Convertible Preferred Stock sufficient shares of Common Stock to provide for the conversion

3

of all outstanding shares of Class F Convertible Preferred Stock. In the event there are not sufficient shares of Common Stock available at the time of issuance to provide for the conversion of all outstanding shares of Class F Convertible Preferred Stock, the Corporation shall take whatever steps are necessary to insure that the authorized but unissued shares of Common Stock will be available as soon as practicable following any issuance of Class F Convertible Preferred Stock as provided for herein.

(B) Status of Common Stock. All shares of Common Stock which may be issued in connection with the conversion provisions set forth herein will, upon issuance by the Corporation, be validly issued, fully paid and nonassessable, not subject to any preemptive or similar rights and free from all taxes, liens or charges with respect thereto created or imposed by the Corporation.

6.      Reacquired Shares. Any shares of Class F Convertible Preferred Stock converted or otherwise acquired by the Corporation in any manner whatsoever shall be retired promptly after the acquisition thereof. Upon their retirement, at the sole discretion of the Corporation, all such shares shall either be (i) permanently retired, or (ii) become authorized but unissued shares of Preferred Stock that may be reissued as part of a new series of Preferred Stock (to be created by resolution or resolutions of the Board of Directors, subject to any conditions and restrictions on issuance set forth herein).

7.      Merger, Consolidation, Etc.   Should the Corporation enter into any merger, consolidation, combination or other transaction in which the outstanding shares of Common Stock are exchanged for or changed into other stock or securities, cash and/or any other property, then each share of Class F Convertible Preferred Stock shall at the same time be similarly exchanged or changed in an amount per share equal to 100 shares of the Corporation's Common Stock, into which or for which each share of Common Stock is changed or exchanged.

8.      Liquidation Rights.

(A) Upon any liquidation, dissolution or winding up of the Corporation, voluntary or otherwise, the holders of Class F Convertible Preferred Stock shall rank senior and prior to holders of the Corporation's Class A Convertible Preferred Stock, Class C Convertible Preferred Stock, Class D Convertible Preferred Stock, Common Stock, and equal to all other classes or class of stock issued by the Corporation, including Class B and Class E Convertible Preferred, except as otherwise approved by the affirmative vote or consent of the holders of at least a majority of Class F Stock outstanding pursuant to Section 5(A) hereof.

(B) In the event of any liquidation, dissolution or winding-up of the affairs of the Corporation, the sole participation to which the holders of shares of Class F Convertible Preferred Stock then outstanding shall be entitled, out of the assets of the Corporation legally available for distribution to its stockholders, whether from capital, surplus or earnings, to receive, before any payment shall be made to the holders of the Corporation's Class A Convertible Preferred Stock, Class C Convertible Preferred Stock, Class D Convertible Preferred Stock, Common Stock or any other class or series of stock ranking on Liquidation junior to such Class F Stock, an amount per share equal to $1.00. If upon any such Liquidation of the Corporation, the

4

remaining assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Class F Stock the full amount to which they shall be entitled, the holders of shares of Class F Stock and any class or series of stock ranking on liquidation on a parity with the Class F Stock shall share pari passu in any distribution of the remaining assets and funds of the Corporation in proportion to the respective liquidation amounts of the Preferred Stock that would otherwise be payable to the holders of Preferred Stock with respect to the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

(C) Neither the merger nor consolidation of the Corporation into or with another corporation nor the merger or consolidation of any other corporation into or with the Corporation shall be deemed to be a liquidation, dissolution or winding up of the Corporation within the meaning of this Section 8.

9.   Certain Covenants.  Any registered holder of Class F Convertible Preferred Stock may proceed to protect and enforce its rights and the rights of such holders by any available remedy by proceeding at law or in equity to protect and enforce any such rights, whether for the specific enforcement of any provision in this Certificate of Designation or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

10.   Amendment.  At any time that any shares of Class F Convertible Preferred Stock are outstanding, the Restated Certificate of Incorporation of the Corporation shall not be amended in any manner which would materially alter or change the powers, preferences or special rights of the Class F Convertible Preferred Stock so as to affect it adversely without the affirmative vote of the holders of two-thirds of the outstanding shares of Class F Convertible Preferred Stock, voting separately as a class.

11.   Notice to the Corporation.  All notices and other communications required or permitted to be given to the Corporation hereunder shall be made by first-class mail, postage prepaid, to the Corporation at its principal executive offices (currently located on the date of the adoption of these resolutions) at the following address: 8001 Irvine Center Drive Suite 400 Irvine, California 92618. Any notice to the stockholders shall me made to their address as set forth on the books and records of the Corporation.

IN WITNESS WHEREOF, the undersigned have executed this Certificate of Designation to be duly executed on behalf of the Corporation effective April 27, 2010.

CAMELOT ENTERTAINMENT GROUP, INC.

Robert Atwell, President

George Jackson, Secretary

5

Legal Tabs Co. 1-800-322-3022

Recycled  Stock # R-EX-5-B

**EXHIBIT 9**

Exhibit 9

**Via E-Mail and Certified Mail**

Re:   Satisfaction of Loan and Guaranty

Reference is made to that certain Escrow Agreement (the "Agreement") ... of April 7, 2010, between Camco Entertainment Group, Inc. ... Incentive Capital, LLC ("Lender") ... Capitalized terms used but not ... shall have the meanings ascribed to them in the Agreement. This ... represents CEG and CFG in this matter.

... pursuant to the Loan Documents and the Agreement, and as of ... 2010, CEG, on behalf of CFG, has issued 1,912,666 shares of CEG ... per share Preferred Stock ("Phase I" Shares) to Lender which ... combined with the existing Phase I Shares issued to Lender also ... of 666,666 shares of CEG Common Stock at a conversion ... per share, for a aggregate value of $666,666 ... of the obligations of CEG and CFG under the Loan Documents ...

Michael T. O'Brien

Legal Tabs Co. 1-800-322-3022

Recycled    Stock # R-EX-5-B

**EXHIBIT 10**

Exhibit 10

 PIA
ANDERSON
DORIUS
REYNARD
MOSS

February 9, 2011

**DELIVERED VIA CERTIFIED MAIL.**

Camelot Distribution Group, Inc.
10 Universal City Plaza NBC/Universal Bldg.
20th Floor
Universal City, CA 91608

Camelot Entertainment Group, Inc.
8801 Irvine Center Drive
Suite 400
Irvine, CA 92618

NOTICE OF DISPOSITION OF COLLATERAL BY PUBLIC SALE

Debtors: Camelot Distribution Group, Inc. and Camelot Entertainment Group, Inc.

Secured Party: Incentive Capital, LLC

Collateral: All of Debtor's rights to the film library described herein below and referred to as the "Distribution Assets", along with all products and proceeds of or from (a) the Distribution Assets; and (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Distribution Assets in all media, from all sources, worldwide during the term hereof. The Distribution Assets include without limitation the following films, and all of Debtor's right, title and interest therein, including distribution rights, royalty interests, and contract/account payments: Samurai Avenger: First Strike; Screwball; The Ted Whitfield Story (aka The Wiffer!); The Fallen; One Lucky Dog (aka Weiner Dog Nationals); Never Sleep Again; Hellraiser Unleashed; Fink!; Nude Nuns With Big Guns; Zombie Culture; National Lampoons Dirty Movie; Who Is KK Downey; and Next of Kin.

To be a qualified bidder, one must be prepared to tender to the secured party or its designee conducting the sale a $10,000.00 cashier's check at the sale and a cashier's check for the balance of the purchase price within 24 hours after the sale. We will sell the above described collateral to the highest qualified bidder at a public sale to be held as follows:

Date:  Monday, February 21, 2011
Time:  9:00 a.m.
Place: Offices of Pia Anderson Dorius Reynard & Moss, 299 S. Main St., Suite 1710, Salt Lake City, UT 84111

THIS NOTICE IS AN ATTEMPT TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

PIA ANDERSON DORIUS REYNARD & MOSS

By: _____

Nathan S. Dorius



PIA
ANDERSON
DORIUS
REYNARD
MOSS

February 9, 2011

**DELIVERED VIA CERTIFIED MAIL **

Camelot Film Group, Inc.
10 Universal City Plaza NBC/Universal Building
Floor 20 Universal City, CA 91608

Camelot Entertainment Group, Inc.
8601 Irvine Center Drive
Suite 400
Irvine, CA 92618

## NOTICE OF DISPOSITION OF COLLATERAL BY PUBLIC SALE

Debtors: Camelot Film Group, Inc. and Camelot Entertainment Group, Inc.

Secured Party: Incentive Capital, LLC

Collateral: All of Debtor's personal property assets and interests as more particularly described in the Asset Purchase Agreement (the "Asset Purchase Agreement") dated April 28, 2010 between Camelot Film Group, Inc., a Nevada corporation, on the one hand, and CMBG Advisors, Inc., a California corporation in its sole and limited capacity as assignee for the benefit of creditors of Liberation Group, Inc., on the other hand, and all products and proceeds thereof, including without limitation (a) that certain film library referred to as the Liberation Assets (as defined in the Asset Purchase Agreement); (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Liberation Assets in all media, from all sources, worldwide during the term hereof; and (c) other assets of the Debtor as set forth in the Asset Purchase Agreement.

To be a qualified bidder, one must be prepared to tender to the secured party or its designee conducting the sale a $10,000.00 cashier's check at the sale and a cashier's check for the balance of the purchase price within 24 hours after the sale. We will sell the above described collateral to the highest qualified bidder at a public sale to be held as follows:

Date: Monday, February 21, 2011
Time: 9:00 a.m.
Place: Offices of Pia Anderson Dorius Reynard & Moss, 299 S. Main St., Suite 1710, Salt Lake City, UT 84111

THIS NOTICE IS AN ATTEMPT TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

PIA ANDERSON DORIUS REYNARD & MOSS

By: _____

Nathan S. Dorius

## Kathy Katzdorn

| | |
|---|---|
| **From:** | Robert M. Anderson |
| **Sent:** | Wednesday, February 16, 2011 2:01 PM |
| **To:** | Kathy Katzdorn |
| **Subject:** | FW: Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's Involvement in Operations |

Robert M. Anderson
36 So. State Street, Suite 1900
Salt Lake City, Utah 84111
801-237-0213

---

**From:** Robert M. Anderson
**Sent:** Tuesday, February 15, 2011 6:25 PM
**To:** Dale Gardiner
**Subject:** FW: Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's Involvement in Operations

fyl

Robert M. Anderson
36 So. State Street, Suite 1900
Salt Lake City, Utah 84111
801-237-0213

---

**From:** Evelyn Macia [mailto:emacia@archiveamerica.com]
**Sent:** Tuesday, February 15, 2011 10:37 AM
**To:** Robert M. Anderson
**Cc:** Andrew Blank
**Subject:** Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's Involvement in Operations

Hi, Bob,

Last night, Andy asked me to send you a brief summary of the impact that the April 1, 2009 accident had on the operations of the companies that comprise Blank Family Enterprises.

Blank Family Enterprises includes the following groups of operating companies:

- The **Archive America Group**, which operates off-site document storage centers in Miami, Tampa, and Dania Beach, Florida; Atlanta, Georgia; Chicago, Illinois; Worcester and Winchester, Massachusetts; and Los Angeles, California.
- The **Seaboard Warehouse Group**, which operates third party public warehouses in Miami and Tampa, Florida; and in Chicago, Illinois.
- **Precision Delivery Systems, Inc.**, which provides transportation services to customers of the Archive America Group and the Seaboard Warehouse Group.
- **WarelTis Technologies, LLC**, a start-up software development and professional services firm that has developed an enterprise content management software solution called Records Studio.

Andy is extremely involved in the operations of all of the companies listed above. As COO for these companies (and as COO/CFO for these companies through late October 2009), I generally speak with Andy several times per day, or every other day, to seek his counsel on strategic issues and customer issues. Other members of senior management also rely heavily on Andy's guidance in connection with proposals for new business and other operational matters. Andy's absence in the aftermath of the accident deprived the senior management team of the benefit of Andy's experience and input, and adversely impacted our companies and their operating results. Additionally, important issues that require approval from Andy due to their dollar significance or overall business impact (for example, credit memos, legal settlements, leases, proposals for prospective customers, marketing pieces and brochures, etc.) had to be put on hold until he was well enough to be able to provide the required feedback and/or approvals.

The **Archive America Group** relies heavily on Andy's business relationships and experience. Andy personally founded that line of business and knows it well. Without his involvement, we missed out on a number of opportunities for new business.

The **Seaboard Warehouse Group** is overseen by a Vice President of Warehousing, who was hired in May 2008. At the time of the accident, that Vice President was still relatively new to our Group, and he relied very heavily on Andy's guidance. Andy is the only other member of the senior management team who has experience in the third party public warehousing industry. Andy's inability to be involved in the operating decisions and sales and marketing efforts of the Seaboard Warehouse Group seriously impacted the operating results of that Group in 2009. The operating results of the three entities in that Group declined by 152% (Chicago), 74% (Tampa), and 35% (Miami). Without Andy's involvement, we lost a number of major customers and we missed the opportunity to win a number of proposals for new business that would have made significant contributions to the future profitability of these companies.

As a start-up software development company, **WarelTis Technologies** has had to rely on Andy's involvement in the product development roadmap, as well as on his personal relationships to generate sales opportunities. Andy has been the company's "rainmaker." For many months after the accident, Andy was unable to provide the development team with much-needed feedback, resulting in inefficiencies, longer product development cycles, and increased payroll and operating expenses. Additionally, his inability to continue his personal networking efforts lengthened the sales cycle for many opportunities, thereby adversely impacting the company's bottom line.

I hope that the above brief summary is helpful in evaluating the significant void that this terrible accident created for our companies. Please let me know if I can provide you with any additional details.

Warmest regards,

Evelyn

Evelyn Macia
Chief Operating Officer
Archive America Group of Companies
WarelTis Technologies, LLC
Seaboard Warehouse Group of Companies
Precision Delivery Systems, Inc.
National Brands, Inc.
3455 NW 54 Street
Miami, FL 33142
Telephone: (305) 633-8520
E-Mail: emacia@archiveamerica.com

2/16/2011

**KATHY KATZDORN**
**ASSISTANT TO ROBERT M. ANDERSON**

**VANCOTT**

36 SOUTH STATE STREET, SUITE 1900
SALT LAKE CITY, UT 84111
P 801.237.0232
F 801.237.0437
E kkatzdorn@vancott.com
www.vancott.com

**From:** Robert M. Anderson
**Sent:** Wednesday, February 16, 2011 2:01 PM
**To:** Kathy Katzdorn
**Subject:** FW: Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's Involvement in Operations

Robert M. Anderson
36 So. State Street, Suite 1900
Salt Lake City, Utah 84111
801-237-0213

**From:** Robert M. Anderson
**Sent:** Tuesday, February 15, 2011 6:25 PM
**To:** Dale Gardiner
**Subject:** FW: Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's Involvement in Operations

fyi

Robert M. Anderson
36 So. State Street, Suite 1900
Salt Lake City, Utah 84111
801-237-0213

**From:** Evelyn Macia [mailto:emacia@archiveamerica.com]
**Sent:** Tuesday, February 15, 2011 10:37 AM
**To:** Robert M. Anderson
**Cc:** Andrew Blank
**Subject:** Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's Involvement in Operations

Hi, Bob,

Last night, Andy asked me to send you a brief summary of the impact that the April 1, 2009 accident had on the operations of the companies that comprise Blank Family Enterprises.

Blank Family Enterprises includes the following groups of operating companies:

- The **Archive America Group**, which operates off-site document storage centers in Miami, Tampa, and Dania Beach, Florida; Atlanta, Georgia; Chicago, Illinois; Worcester and Winchester, Massachusetts; and Los Angeles, California.
- The **Seaboard Warehouse Group**, which operates third party public warehouses in Miami and Tampa, Florida; and in Chicago, Illinois.
- **Precision Delivery Systems, Inc.**, which provides transportation services to customers of the Archive America Group and the Seaboard Warehouse Group.
- **WareITis Technologies, LLC**, a start-up software development and professional services firm that has developed an enterprise content management software solution called Records Studio.

Andy is extremely involved in the operations of all of the companies listed above. As COO for these companies (and as COO/CFO for these companies through late October 2009), I generally speak with Andy several times per day, or every other day, to seek his counsel on strategic issues and customer issues. Other members of senior management also rely heavily on Andy's guidance in connection with proposals for new business and other operational matters. Andy's absence in the aftermath of the accident deprived the senior management team of the benefit of Andy's experience and input, and adversely impacted our companies and their operating results. Additionally, important issues that require approval from Andy due to their dollar significance or overall business impact (for example, credit memos, legal settlements, leases, proposals for prospective customers, marketing pieces and brochures, etc.) had to be put on hold until he was well enough to be able to provide the required feedback and/or approvals.

The **Archive America Group** relies heavily on Andy's business relationships and experience. Andy personally founded that line of business and knows it well. Without his involvement, we missed out on a number of opportunities for new business.

The **Seaboard Warehouse Group** is overseen by a Vice President of Warehousing, who was hired in May 2008. At the time of the accident, that Vice President was still relatively new to our Group, and he relied very heavily on Andy's guidance. Andy is the only other member of the senior management team who has experience in the third party public warehousing industry. Andy's inability to be involved in the operating decisions and sales and marketing efforts of the Seaboard Warehouse Group seriously impacted the operating results of that Group in 2009. The operating results of the three entities in that Group declined by 152% (Chicago), 74% (Tampa), and 35% (Miami). Without Andy's involvement, we lost a number of major customers and we missed the opportunity to win a number of proposals for new business that would have made significant contributions to the future profitability of these companies.

As a start-up software development company, **WareITis Technologies** has had to rely on Andy's involvement in the product development roadmap, as well as on his personal relationships to generate sales opportunities. Andy has been the company's "rainmaker." For many months after the accident, Andy was unable to provide the development team with much-needed feedback, resulting in inefficiencies, longer product development cycles, and increased payroll and operating expenses. Additionally, his inability to continue his personal networking efforts lengthened the sales cycle for many opportunities, thereby adversely impacting the company's bottom line.

I hope that the above brief summary is helpful in evaluating the significant void that this terrible accident created for our companies. Please let me know if I can provide you with any additional details.

Warmest regards,

Evelyn

Evelyn Macia
Chief Operating Officer
Archive America Group of Companies
WareITis Technologies, LLC
Seaboard Warehouse Group of Companies
Precision Delivery Systems, Inc.
National Brands, Inc.
3455 NW 54 Street
Miami, FL 33142
Telephone: (305) 633-8520
E-Mail: emacia@archiveamerica.com

**KATHY KATZDORN**
**ASSISTANT TO ROBERT M. ANDERSON**

**VANCOTT**

36 SOUTH STATE STREET, SUITE 1900
SALT LAKE CITY, UT 84111
P 801.237.0232
F 801.237.0437
E kkatzdorn@vancott.com
www.vancott.com

**From:** Robert M. Anderson
**Sent:** Wednesday, February 16, 2011 2:01 PM
**To:** Kathy Katzdorn
**Subject:** FW: Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's Involvement in Operations


Robert M. Anderson
36 So. State Street, Suite 1900
Salt Lake City, Utah 84111
801-237-0213


**From:** Robert M. Anderson
**Sent:** Tuesday, February 15, 2011 6:25 PM
**To:** Dale Gardiner
**Subject:** FW: Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's Involvement in Operations

fyi

Robert M. Anderson
36 So. State Street, Suite 1900
Salt Lake City, Utah 84111
801-237-0213


**From:** Evelyn Macia [mailto:emacia@archiveamerica.com]
**Sent:** Tuesday, February 15, 2011 10:37 AM
**To:** Robert M. Anderson
**Cc:** Andrew Blank
**Subject:** Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's Involvement in Operations

Hi, Bob,

Last night, Andy asked me to send you a brief summary of the impact that the April 1, 2009 accident had on the operations of the companies that comprise Blank Family Enterprises.

Blank Family Enterprises includes the following groups of operating companies:

- **The Archive America Group**, which operates off-site document storage centers in Miami, Tampa, and Dania Beach, Florida; Atlanta, Georgia; Chicago, Illinois; Worcester and Winchester, Massachusetts; and Los Angeles, California.
- **The Seaboard Warehouse Group**, which operates third party public warehouses in Miami and Tampa, Florida; and in Chicago, Illinois.
- **Precision Delivery Systems, Inc.**, which provides transportation services to customers of the Archive America Group and the Seaboard Warehouse Group.
- **WareITis Technologies, LLC**, a start-up software development and professional services firm that has developed an enterprise content management software solution called Records Studio.

Andy is extremely involved in the operations of all of the companies listed above. As COO for these companies (and as COO/CFO for these companies through late October 2009), I generally speak with Andy several times per day, or every other day, to seek his counsel on strategic issues and customer issues. Other members of senior management also rely heavily on Andy's guidance in connection with proposals for new business and other operational matters. Andy's absence in the aftermath of the accident deprived the senior management team of the benefit of Andy's experience and input, and adversely impacted our companies and their operating results. Additionally, important issues that require approval from Andy due to their dollar significance or overall business impact (for example, credit memos, legal settlements, leases, proposals for prospective customers, marketing pieces and brochures, etc.) had to be put on hold until he was well enough to be able to provide the required feedback and/or approvals.

The **Archive America Group** relies heavily on Andy's business relationships and experience. Andy personally founded that line of business and knows it well. Without his involvement, we missed out on a number of opportunities for new business.

The **Seaboard Warehouse Group** is overseen by a Vice President of Warehousing, who was hired in May 2008. At the time of the accident, that Vice President was still relatively new to our Group, and he relied very heavily on Andy's guidance. Andy is the only other member of the senior management team who has experience in the third party public warehousing industry. Andy's inability to be involved in the operating decisions and sales and marketing efforts of the Seaboard Warehouse Group seriously impacted the operating results of that Group in 2009. The operating results of the three entities in that Group declined by 152% (Chicago), 74% (Tampa), and 35% (Miami). Without Andy's involvement, we lost a number of major customers and we missed the opportunity to win a number of proposals for new business that would have made significant contributions to the future profitability of these companies.

As a start-up software development company, **WareITis Technologies** has had to rely on Andy's involvement in the product development roadmap, as well as on his personal relationships to generate sales opportunities. Andy has been the company's "rainmaker." For many months after the accident, Andy was unable to provide the development team with much-needed feedback, resulting in inefficiencies, longer product development cycles, and increased payroll and operating expenses. Additionally, his inability to continue his personal networking efforts lengthened the sales cycle for many opportunities, thereby adversely impacting the company's bottom line.

I hope that the above brief summary is helpful in evaluating the significant void that this terrible accident created for our companies. Please let me know if I can provide you with any additional details.

Warmest regards,

Evelyn

Evelyn Macia
Chief Operating Officer
Archive America Group of Companies
WarelTis Technologies, LLC
Seaboard Warehouse Group of Companies
Precision Delivery Systems, Inc.
National Brands, Inc.
3455 NW 54 Street
Miami, FL 33142
Telephone:  (305) 633-8520
E-Mail:  emacia@archiveamerica.com

**KATHY KATZDORN**
**ASSISTANT TO ROBERT M. ANDERSON**

**VANCOTT**

36 SOUTH STATE STREET, SUITE 1900
SALT LAKE CITY, UT 84111
P 801.237.0232
F 801.237.0437
E kkatzdorn@vancott.com
www.vancott.com

**From:** Robert M. Anderson
**Sent:** Wednesday, February 16, 2011 2:01 PM
**To:** Kathy Katzdorn
**Subject:** FW: Confidential -- Protected by Attorney-Client Privilege -- Information re Andy
Blank's Involvement in Operations


Robert M. Anderson
36 So. State Street, Suite 1900
Salt Lake City, Utah 84111
801-237-0213


**From:** Robert M. Anderson
**Sent:** Tuesday, February 15, 2011 6:25 PM
**To:** Dale Gardiner
**Subject:** FW: Confidential -- Protected by Attorney-Client Privilege -- Information re Andy
Blank's Involvement in Operations

fyi

Robert M. Anderson
36 So. State Street, Suite 1900
Salt Lake City, Utah 84111
801-237-0213


**From:** Evelyn Macia [mailto:emacia@archiveamerica.com]
**Sent:** Tuesday, February 15, 2011 10:37 AM
**To:** Robert M. Anderson
**Cc:** Andrew Blank
**Subject:** Confidential -- Protected by Attorney-Client Privilege -- Information re Andy Blank's
Involvement in Operations

Hi, Bob,

Last night, Andy asked me to send you a brief summary of the impact that the April 1, 2009
accident had on the operations of the companies that comprise Blank Family Enterprises.

Blank Family Enterprises includes the following groups of operating companies:

- The **Archive America Group**, which operates off-site document storage centers in Miami, Tampa, and Dania Beach, Florida; Atlanta, Georgia; Chicago, Illinois; Worcester and Winchester, Massachusetts; and Los Angeles, California.
- The **Seaboard Warehouse Group**, which operates third party public warehouses in Miami and Tampa, Florida; and in Chicago, Illinois.
- **Precision Delivery Systems, Inc.**, which provides transportation services to customers of the Archive America Group and the Seaboard Warehouse Group.
- **WarelTis Technologies, LLC**, a start-up software development and professional services firm that has developed an enterprise content management software solution called Records Studio.

Andy is extremely involved in the operations of all of the companies listed above. As COO for these companies (and as COO/CFO for these companies through late October 2009), I generally speak with Andy several times per day, or every other day, to seek his counsel on strategic issues and customer issues. Other members of senior management also rely heavily on Andy's guidance in connection with proposals for new business and other operational matters. Andy's absence in the aftermath of the accident deprived the senior management team of the benefit of Andy's experience and input, and adversely impacted our companies and their operating results. Additionally, important issues that require approval from Andy due to their dollar significance or overall business impact (for example, credit memos, legal settlements, leases, proposals for prospective customers, marketing pieces and brochures, etc.) had to be put on hold until he was well enough to be able to provide the required feedback and/or approvals.

The **Archive America Group** relies heavily on Andy's business relationships and experience. Andy personally founded that line of business and knows it well. Without his involvement, we missed out on a number of opportunities for new business.

The **Seaboard Warehouse Group** is overseen by a Vice President of Warehousing, who was hired in May 2008. At the time of the accident, that Vice President was still relatively new to our Group, and he relied very heavily on Andy's guidance. Andy is the only other member of the senior management team who has experience in the third party public warehousing industry. Andy's inability to be involved in the operating decisions and sales and marketing efforts of the Seaboard Warehouse Group seriously impacted the operating results of that Group in 2009. The operating results of the three entities in that Group declined by 152% (Chicago), 74% (Tampa), and 35% (Miami). Without Andy's involvement, we lost a number of major customers and we missed the opportunity to win a number of proposals for new business that would have made significant contributions to the future profitability of these companies.

As a start-up software development company, **WarelTis Technologies** has had to rely on Andy's involvement in the product development roadmap, as well as on his personal relationships to generate sales opportunities. Andy has been the company's "rainmaker." For many months after the accident, Andy was unable to provide the development team with much-needed feedback, resulting in inefficiencies, longer product development cycles, and increased payroll and operating expenses. Additionally, his inability to continue his personal networking efforts lengthened the sales cycle for many opportunities, thereby adversely impacting the company's bottom line.

I hope that the above brief summary is helpful in evaluating the significant void that this terrible accident created for our companies. Please let me know if I can provide you with any additional details.

Warmest regards,

Evelyn

Evelyn Macia
Chief Operating Officer
Archive America Group of Companies
WareITis Technologies, LLC
Seaboard Warehouse Group of Companies
Precision Delivery Systems, Inc.
National Brands, Inc.
3455 NW 54 Street
Miami, FL 33142
Telephone:  (305) 633-8520
E-Mail:  emacia@archiveamerica.com

**Kathy Katzdorn**

From:     Robert M. Anderson
Sent:     Wednesday, February 16, 2011 2:19 PM
To:       Kathy Katzdorn
Subject:  FW: Kolob

Prepare it as we discussed

Robert M. Anderson
36 So. State Street, Suite 1900
Salt Lake City, Utah 84111
801-237-0213

From: Stephen D. Swindle
Sent: Wednesday, February 16, 2011 11:46 AM
To: Robert M. Anderson
Subject: Kolob

Bob,

With respect to the payment by Kolob to Van Cott of $50,000, let me suggest the following:

1.      That all outstanding costs be paid first

2.      87.34% of the balance be applied to account no. 29024/68542 (the account which you bill under), and that 12.66% be applied to account no. 32354/69298 (the account which I bill under)

We should discuss the appropriate discount before the money is applied.

Thanks.


**STEPHEN D. SWINDLE**
ATTORNEY
V A N C O T T
36 SOUTH STATE STREET, SUITE 1900
SALT LAKE CITY, UT 84111
P 801.237.0276
F 801.237.0277
E sswindle@vancott.com
www.vancott.com

2/16/2011

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE
[CRC 3.221 Information about Alternative Dispute Resolution]
For additional ADR information and forms visit the Court ADR web application at www.lasuperiorcourt.org (click on ADR)

The plaintiff shall serve a copy of this Information Package on each defendant along with the complaint (Civil only)

**What is ADR:**
Alternative Dispute Resolution (ADR) is the term used to describe all the other options available for settling a dispute which once had to be settled in court. ADR processes, such as arbitration, mediation, neutral evaluation (NE), and settlement conferences, are less formal than a court process and provide opportunities for parties to reach an agreement using a problem solving approach.

There are many different kinds of ADR. All of them utilize a "neutral", an impartial person, to decide the case or help the parties reach an agreement.

**Mediation:**
In mediation, a neutral person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

> **Cases for Which Mediation May Be Appropriate**
> Mediation may be particularly useful when parties have a dispute between or among family members, neighbors, or business partners. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

> **Cases for Which Mediation May Not Be Appropriate**
> Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Arbitration:**
In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." Binding arbitration means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Nonbinding arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

> **Cases for Which Arbitration May Be Appropriate**
> Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

> **Cases for Which Arbitration May Not Be Appropriate**
> If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Neutral Evaluation:**
In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

> **Cases for Which Neutral Evaluation May Be Appropriate**
> Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

> **Cases for Which Neutral Evaluation May Not Be Appropriate**
> Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences:**
Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

## LOS ANGELES SUPERIOR COURT ADR PROGRAMS

**CIVIL:**

- Civil Action Mediation (Governed by Code of Civil Procedure (CCP) sections 1775-1775.15, California Rules of Court, rules 3.850-3.868 and 3.870-3.878, Evidence Code sections 1115-1128, and Los Angeles Superior Court rules, chapter 12.)
- Retired Judge Settlement Conference
- Neutral Evaluation (Governed by Los Angeles Superior Court Rules, chapter 12.)
- Judicial Arbitration (Governed by Code of Civil Procedure sections 1141.10-1141.31, California Rules of Court, rules 3.810-3.830, and Los Angeles Superior Court Rules, chapter 12.)
- Eminent Domain Mediation (Governed by Code of Civil Procedure section 1250.420.)
- Civil Harassment Mediation
- Small Claims Mediation

**FAMILY LAW (non-custody):**

- Mediation
- Forensic Certified Public Accountant (CPA) Settlement Conference
- Settlement Conference
- Nonbinding Arbitration (Governed by Family Code section 2554.)

**PROBATE:**

- Mediation
- Settlement Conferences

### NEUTRAL SELECTION

Parties may select a mediator, neutral evaluator, or arbitrator from the Court Party Select Panel or may hire someone privately, at their discretion. If the parties utilize the Random Select Mediation or Arbitration Panel, the parties will be assigned on a random basis the name of one neutral who meets the case criteria entered on the court's website.

### COURT ADR PANELS

| | |
|---|---|
| Party Select Panel | The Party Select Panel consists of mediators, neutral evaluators, and arbitrators who have achieved a specified level of experience in court-connected cases. The parties (collectively) may be charged $150.00 per hour for the first three hours of hearing time. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing. |
| Random Select Panel | The Random Select Panel consists of trained mediators, neutral evaluators, and arbitrators who have not yet gained the experience to qualify for the Party Select Panel, as well as experienced neutrals who make themselves available pro bono as a way of supporting the judicial system. It is the policy of the Court that all Random Select Panel volunteer mediators, neutral evaluators, and arbitrators provide three hours hearing time per case. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing. |
| Private Neutral | The market rate for private neutrals can range from $300-$1,000 per hour. |

### ADR ASSISTANCE

For assistance regarding ADR, please contact the ADR clerk at the courthouse in which your case was filed.

| COURTHOUSE | ADDRESS | ROOM | CITY | PHONE | FAX |
|---|---|---|---|---|---|
| Antonovich | 42011 4th St. West | Note | Lancaster, CA 93534 | (661)974-7275 | (661)974-7060 |
| Chatsworth | 9425 Penfield Ave. | 1200 | Chatsworth, CA 91311 | (818)576-8585 | (818)576-8687 |
| Compton | 200 W. Compton Blvd. | 1002 | Compton, CA 90220 | (310)603-3072 | (310)223-0337 |
| Glendale | 600 E. Broadway | 273 | Glendale, CA 91206 | (818)500-3160 | (818)548-6470 |
| Long Beach | 415 W. Ocean Blvd. | 316 | Long Beach, CA 90802 | (562)491-6272 | (562)437-3802 |
| Norwalk | 12720 Norwalk Blvd. | 308 | Norwalk, CA 90650 | (562)807-7243 | (562)462-8019 |
| Pasadena | 300 E. Walnut St. | 109 | Pasadena, CA 91101 | (626)356-5685 | (626)666-1774 |
| Pomona | 400 Civic Center Plaza | 106 | Pomona, CA 91766 | (909)620-3183 | (909)629-8283 |
| San Pedro | 505 S. Centre | 209 | San Pedro, CA 90731 | (310)519-6181 | (310)514-0314 |
| Santa Monica | 1725 Main St. | 203 | Santa Monica, CA 90401 | (310)260-1829 | (310)319-6130 |
| Stanley Mosk | 111 N. Hill St. | 113 | Los Angeles, CA 90012 | (213)974-5425 | (213)633-5115 |
| Torrance | 825 Maple Ave. | 100 | Torrance, CA 90503 | (310)222-1701 | (310)782-7326 |
| Van Nuys | 6230 Sylmar Ave. | 418 | Van Nuys, CA 91401 | (818)374-2337 | (818)902-2440 |

Partially Funded by the Los Angeles County Dispute Resolution Program
A complete list of the County Dispute Resolution Programs is available online and upon request in the Clerk's Office

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the Chapter Seven Rules, as applicable in the Central District, are summarized for your assistance.

## APPLICATION

The Chapter Seven Rules were effective January 1, 1994. They apply to all general civil cases.

## PRIORITY OVER OTHER RULES

The Chapter Seven Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

## CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

## TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

COMPLAINTS: All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

CROSS-COMPLAINTS: Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

## FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

## SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Seven Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Seven Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

This is not a complete delineation of the Chapter Seven Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is absolutely imperative.

**CERTIFICATE OF SERVICE**

       Pursuant to FRCP 5, I certify that I am an employee of the law firm of WYMAN & ISAACS LLP, and that on the date shown below, I caused service of a true and correct copy of the attached:

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §1441(b) (DIVERSITY)**

to be completed by:

_____         personally delivering

_____         delivery via Nationwide Legal Services

_____         sending via Federal Express or other overnight delivery service

  X         depositing for mailing in the U.S. mail with sufficient postage affixed thereto

_____         delivery via facsimile machine to fax no. _____

_____         by E-Mail – PDF Format - I caused the foregoing document to be served by e-mail transmission, in PDF Format, to each of the interested parties at the e-mail address shown below.

_____         electronic filing, and thereby delivery via e-mail to:

Jonathan M. Levitan, Esq.
LAW OFFICES OF JONATHAN MARK LEVITAN
12400 Wilshire Blvd., Suite 1300
Los Angeles, CA 90025
E-mail: jonathanlevitan@aol.com
VIA U.S. MAIL

       Dated this 18th day of March, 2011

                                      _____
                                      Lina Pearmain